# EXHIBIT 1

Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 N Allen Avenue
Pasadena, California 91104
Tel.:   (626) 219-6773
Fax:   (626) 389-8911

Attorneys for PLAINTIFF
PATRICK BYRNE

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| PATRICK BYRNE, an individual, | Case No.: 8:24-cv-01989 |
| PLAINTIFF, | **COMPLAINT FOR DAMAGES FOR:** |
| v. | **1. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;** |
| AMERIS BANK, a Georgia corporation, | **2. RETALIATION IN VIOLATION OF LABOR CODE §1102.5;** |
| Defendants. | **3. FAILURE TO PAY ALL WAGES DUE AT TERMINATION;** |
| | **4. VIOLATION OF BUSINESS & PROFESSIONS CODE §17200.** |
| | **DEMAND FOR JURY TRIAL** |

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 1 -

Complaint for Damages

PLAINTIFF PATRICK BYRNE ("**PLAINTIFF**") complains and alleges as follows:

## PARTIES

1.      PLAINTIFF is a male resident of Orange County, California.

2.      PLAINTIFF is informed and believes that Defendant AMERIS BANK ("**AMERIS**") is organized as a corporation under the laws of Georgia, with a principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.00.

4.      Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. § 139l(b), as the Defendant is found in, has or has had an agent or agents, has or has had contacts, and transact or have transacted business in this district.

## GENERAL ALLEGATIONS

5.      During all times relevant to this Complaint, Balboa Capital Corporation ("**BALBOA**") was and continues to be a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.

6.      On or about December 10, 2021, AMERIS entered into a Stock Purchase Agreement whereby AMERIS acquired BALBOA. Through this Stock Purchase Agreement, BALBOA continued to operate in California as a division of AMERIS. BALBOA employees continued working for BALBOA performing the same job duties as they had before the Stock Purchase Agreement, except that employees were now considered employees of AMERIS, not BALBOA.

7.      Along these lines, on or about December 10, 2021, AMERIS entered into an Employment Agreement with PLAINTIFF whereby PLAINTIFF would

Complaint for Damages

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Case 1:26-cv-00190-JLH    Document 30-1    Filed 07/23/26    Page 4 of 113 PageID #:
391
Case 8:24-cv-01989-MEMF-JDE    Document 1    Filed 09/16/24    Page 3 of 12    Page ID
#:3

continue to work at BALBOA as its Chief Executive Officer, while being an employee of AMERIS. The term of the Employment Agreement was from December 10, 2021 through December 31, 2024 ("Initial Term"). The Employment Agreement ("Agreement") would be automatically renewed for an additional one year period at the expiration of the existing term, whether the Initial Term or a Renewal Term, unless either party terminated the Agreement.

8.    On or about December 10, 2021, AMERIS issued the BALBOA Long-term Cash Incentive Plan ("**LTIP**"). The LTIP provided for cash bonus awards to eligible employees of the BALBOA division of AMERIS based on the achievement of performance goals by BALBOA during the performance periods.

9.    The potential for additional cash awards promised in the LTIP induced employees participating in the LTIP, including PLAINTIFF, to work above and beyond to increase BALBOA's profitability for AMERIS.

10.    Instead of honoring the promises made in the LTIP, AMERIS intentionally failed to properly calculate the earnings and performance of BALBOA so as to reduce BALBOA's earnings so that it would not have to pay any cash awards under the LTIP. AMERIS' miscalculations thereby reduced and/or eliminated the incentive compensation of BALBOA employees participating in the LTIP, including PLAINTIFF. As a result of AMERIS' intentional miscalculations, BALBOA employees participating in the LTIP, including PLAINTIFF, were deprived of the income they earned through their increased efforts.

11.    From June 2023 through his termination, PLAINTIFF complained repeatedly to AMERIS that they were improperly calculating BALBOA's earnings under the LTIP. PLAINTIFF complained to AMERIS that he and numerous other eligible employees were owed a larger Cash Award Bonus for their participation in the LTIP during 2022, a larger Cash Award Bonus for their participation in the LTIP during 2023, and that they were owed other monies.

- 3 -

Complaint for Damages

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

12. As a result of PLAINTIFF's complaints, AMERIS terminated PLAINTIFF'S employment effective June 30, 2024. PLAINTIFF is informed and believes and on that basis alleges that AMERIS decided to terminate his employment in retaliation for PLAINTIFF'S complaints about AMERIS' intentional miscalculation of BALBOA's earnings. Prior to PLAINTIFF'S complaints, AMERIS repeatedly told PLAINTIFF that they were happy with PLAINTIFF'S performance and that AMERIS wanted to continue the realationship with PLAINTIFF.

## DAMAGES

13. **Economic damages:** As a consequence of AMERIS' conduct, PLAINTIFF has suffered and will suffer loss of income and employment benefits in a sum to be proven at trial because AMERIS withheld monies earned by PLAINTIFF and owed to him pursuant to the Employment Agreement. Additionally, PLAINTIFF has suffered and will suffer harm, including lost past and future income and employment benefits in a sum to be proven at trial because he was terminated for complaining about unlawful violations of the California Labor Code which was depriving PLAINTIFF and other employees of AMERIS of millions of dollars in bonuses. PLAINTIFF has also lost the investment income PLAINTIFF would have earned had he been paid when the wages were due.

14. **Non-economic damages:** As a consequence of AMERIS' conduct, PLAINTIFF has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial. PLAINTIFF took great pride in his work as CEO. He personally hired many of the employees affected by AMERIS' violations of the California Labor Code. PLAINTIFF was devastated that he could not protect these employees from AMERIS' fraudulent conduct.

15. **Punitive damages:** AMERIS' conduct constitutes oppression, fraud, and/or malice under California Civil Code section 3294 and, thus, entitles

- 4 -

Complaint for Damages

PLAINTIFF to an award of exemplary and/or punitive damages.

a.   **Fraud:** In addition, and/or alternatively, AMERIS' conduct, as alleged above, was fraudulent within the meaning of California Civil Code section 3294, including that AMERIS changed the methods of calculation of BALBOA's earnings. Additionally, AMERIS asserted false (pretextual) grounds for terminating PLAINTIFF were undertaken to cause PLAINTIFF hardship and deprive him of legal rights.

b.   **Malice:** Defendants' conduct was committed with malice within the meaning of California Civil Code section 3294, including that (a) defendants acted with intent to cause injury to PLAINTIFF and/or acted with reckless disregard for PLAINTIFF'S rights, including his right to be free from retaliation for voicing valid complaints about AMERIS' violations of the California Labor Code. This conduct was despicable and committed in willful and conscious disregard of PLAINTIFF'S rights to be free of retaliation.

c.   **Oppression:** In addition, and/or alternatively, defendants' conduct was committed with oppression within the meaning of California Civil Code section 3294, including that AMERIS' actions against PLAINTIFF because of his complaints were "despicable" and subjected PLAINTIFF to cruel and unjust hardship, in knowing disregard of PLAINTIFF'S rights to a work place free of retaliation.

16.   **Attorneys' fees:** PLAINTIFF has incurred and continues to incur legal expenses and attorneys' fees.

## COUNT I

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

(Against AMERIS)

17.   PLAINTIFF realleges each and every allegation in the preceding paragraphs with the same force and effect as though fully set forth herein.

///

- 5 -

Complaint for Damages

18. Under California law, no employee, whether they are an at-will employee, or an employee under a written or other employment contract, can be terminated or subjected to adverse action for a reason that is in violation of a fundamental public policy.

19. PLAINTIFF is informed and believes, and based thereon alleges, that AMERIS terminated his employment because he complained of unlawful violations of the California Labor Code which deprived employees of earned compensation. Thus PLAINTIFF'S termination was in violation of the public policy of the State of California and the United States imposing general business duties with which every business entity must comply.

20. As a proximate result of AMERIS conduct, PLAINTIFF has sustained and will continue to sustain economic damages in the form of lost wages and benefits, future lost wages and benefits, lost business and professional opportunities.

21. In addition, PLAINTIFF has sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry and mental distress, all in an amount that is not currently known, but capable of proof at trial and within the jurisdictional limits of this court.

22. AMERIS' supervisory agents acted with malice, oppression, deceit, and with the intent to injure PLAINTIFF, or in reckless disregard of PLAINTIFF'S rights. PLAINTIFF was terminated by officers, directors or managing agents of AMERIS because *inter alia* he complained of business practices that were fraudulent and he refused to violate the California Labor Code. Alternatively, AMERIS authorized and ratified the conduct of its officers, directors and managing agents who maliciously engaged in the despicable act of terminating PLAINTIFF in conscious disregard of his right to be free of retaliation. PLAINTIFF is therefore entitled to punitive and exemplary damages. PLAINTIFF

Complaint for Damages

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

prays for punitive damages against AMERIS in an amount to be determined at the time of trial, that is sufficiently high to punish AMERIS deter them from engaging in such conduct in the future, and to make an example of them to others.

## COUNT II

## RETALIATION IN VIOLATION OF LABOR CODE §1102.5

### (Against AMERIS)

23. PLAINTIFF realleges each and every allegation in the preceding paragraphs with the same force and effect as though fully set forth herein.

24. At all times mentioned herein, the California Labor Code was in full force and effect and proscribed AMERIS' conduct.

25. AMERIS created the LTIP for the purposes of inducing employees working for BALBOA, a division of AMERIS, to perform work above and beyond what they had been doing. Beginning in 2024, after employees had already performed the work necessary to secure the results identified thoughout 2023, and despite Plaintiff complaining about the miscalculation of the Performance Formula starting in June 2023, AMERIS continued to change the Performance Formula so as deprive eligible employees of the promised cash awards. This affected approximately 145 employees. Throughout the beginning months of 2024, PLAINTIFF continued to complain repeatedly to AMERIS that their alterations to the Performance Formula retroactively removed many line items used to determine profitability, and as such, served to retroactively deprive all of the eligible employees of Cash Bonus Awards under the LTIP. These retroactive changes to the bonus structure deprived all of the eligible employees of earned wages in violation of Labor Code §§201, 202 and 219, among others.

26. PLAINTIFF is informed and believes, and thereon alleges that as a direct result of his complaints, and because PLAINTIFF refused to ignore the violations of the Labor Code, AMERIS terminated his employment.

27. As a proximate result of AMERIS' conduct, PLAINTIFF has

- 7 -

Complaint for Damages

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

sustained and will continue to sustain economic damages in the form of lost wages and benefits, future lost wages and benefits, lost business and professional opportunities.

28.   Additionally, PLAINTIFF has sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry and mental distress, all in an amount that is not currently known, but capable of proof at trial and within the jurisdictional limits of this court

29.   As a further proximate result of the aforementioned wrongful conduct, PLAINTIFF has had to employ the services of attorneys to pursue his legal rights, to PLAINTIFF'S damage in an amount unknown at this time, but according to proof at trial.

30.   The grossly reckless, and/or intentional, malicious, and bad faith manner in which AMERIS engaged in those acts as described in this cause of action entitles PLAINTIFF to punitive damages against AMERIS in an amount within the jurisdiction of this court, to be ascertained by the fact finder, that is sufficiently high to punish AMERIS deter them from engaging in such conduct again, and to make an example of them to others.

<div align="center">

**COUNT III**

**FAILURE TO PAY ALL WAGES AT TERMINATION**

**CALIFORNIA LABOR CODE §§201 AND 203**

(Against AMERIS)

</div>

31.   PLAINTIFF realleges each and every allegation in the preceding paragraphs with the same force and effect as though fully set forth herein.

32.   At all times relevant during the liability period, PLAINTIFF was an employee of AMERIS covered by California Labor Code Section 201.

33.   Pursuant to Labor Code Section 201, PLAINTIFF was entitled, upon termination, to timely payment of all wages earned and unpaid prior to termination.

<div align="center">Complaint for Damages</div>

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

34. AMERIS failed to pay PLAINTIFF all wages earned and unpaid prior to termination in accordance with California Labor Code Section 201. Indeed, to this day PLAINTIFF is still owed unpaid bonuses earned for his work in 2022 and 2023 as well as other wages.

35. AMERIS' failure to pay PLAINTIFF all wages earned at the time of termination in accordance with Labor Code Section 201 was willful. AMERIS had the ability to pay all wages earned in accordance with Labor Code Section 201 but failed to do so.

36. Pursuant to *inter alia* Labor Code Section 201, PLAINTIFF is entitled to all wages earned prior to termination that AMERIS did not pay him.

37. Pursuant to Labor Code section 203, PLAINTIFF is entitled to daily waiting time penalties equivalent to one day's wage from the day his earned and unpaid wages were due upon termination up to a maximum of thirty (30) days.

38. As a result of AMERIS' conduct, PLAINTIFF has suffered damages in an amount, subject to proof, to the extent he was not paid for all wages earned prior to termination.

39. As a result of AMERIS' conduct, PLAINTIFF has suffered damages in an amount, subject to proof, to the extent he was not paid all continuation wages/waiting time penalties owed under Labor Code section 203.

40. As a further result of AMERIS' conduct, pursuant to Labor Code sections 218.5, and 218.6, PLAINTIFF is entitled to recover interest on the unpaid final wages, reasonable attorneys' fees, and costs of suit.

## COUNT IV

## VIOLATION OF BUSINESS & PROFESSIONS CODE §17200

(Against AMERIS)

41. PLAINTIFF realleges each and every allegation in the preceding paragraphs with the same force and effect as though fully set forth herein.

///

Complaint for Damages

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

42.    Section 17200 of the California Business and Professions Code prohibits unfair competition by prohibiting any "unlawful, unfair or fraudulent business acts or practices . . ." PLAINTIFF is informed and believes that by (1) depriving employees of earned Cash Award Bonuses, and (2) terminating PLAINTIFF for complaining about AMERIS' intentional miscalculation of BALBOA'S earnings so as to avoid paying employees the Cash Award Bonuses promised in the LTIP, AMERIS violated their generally applicable duty, as recognized in the statutes cited above, to refrain from unfair and deceptive business acts and practices.

43.    AMERIS' conduct as alleged herein violates the Unfair Competition Law. The business acts and practices of AMERIS as alleged herein, constituted and continue to constitute a continuing course of conduct that is unlawful, unfair and/or fraudulent.  PLAINTIFF is informed and believes that such unlawful, unfair and/or fraudulent conduct continues to this day and AMERIS will continue such activity in the future.  The harm to the general public and AMERIS' employees far outweighs any illegitimate benefit AMERIS may derive from their legal violations.

44.    PLAINTIFF and members of the general public have been injured by AMERIS' unlawful, misleading and fraudulent general business practices. These violations persist to this day and have not been rectified.  Therefore, PLAINTIFF has been injured by AMERIS' conduct and lost money as a result of said conduct.

45.    PLAINTIFF is thus entitled to restitution, disgorgement of unlawful profits and an injunction preventing AMERIS from engaging in the unlawful practices discussed herein.

46.    PLAINTIFF also requests an award of attorneys' fees, based on his vindication of a public interest and/or the Court's inherent equitable powers, in an amount to be established by proof at time of trial.

///

///

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 10 -

Complaint for Damages

<div align="center"><strong>PRAYER</strong></div>

WHEREFORE, PLAINTIFF prays for judgment against AMERIS BANK as follows:

1.    For economic damages, including but not limited to past and future lost wages, commissions, bonuses and benefits, according to proof at trial;

2.    For non-economic, including but not limited to emotional distress damages, mental suffering, loss of reputation, anxiety, inconvenience, according to proof at trial;

3.    For punitive damages as allowed by law and according to proof at trial;

4.    For pre-judgment interest at the prevailing legal rate;

5.    For PLAINTIFF'S costs;

6.    For reasonable attorneys' fees, according to proof;

7.    For injunctive relief (as to PLAINTIFF'S cause of action for Violation of Business & Professions Code §17200); and

8.    For such other and further relief as this Court deems just and proper.

DATED:  September 16, 2024.    **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**

By: _____

Esperanza Cervantes Anderson, Esq.
Attorney for PLAINTIFF
PATRICK BYRNE

<div style="margin-left:0; writing-mode: vertical-rl;">LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA</div>

<div align="center">- 11 -</div>

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules Of Civil Procedure, PLAINTIFF hereby requests a trial by jury for all claims and issues so triable.


DATED:  September 16, 2024.     **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**

By: _____

     Esperanza Cervantes Anderson, Esq.
     Attorney for PLAINTIFF
     PATRICK BYRNE

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 12 -
Complaint for Damages

# EXHIBIT 2

FILED
CLERK, U.S. DISTRICT COURT

**06/11/2026**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TJ _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK BYRNE, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>AMERIS BANK, a Georgia corporation,<br><br>    Defendant. | Case No. 8:24-cv-01989-MWC (JDEx)<br><br>**VERDICT FORM**<br><br><span style="color:red">Redacted</span><br><br>Judge: Hon. Michelle Williams Court<br>Dept.: Courtroom 6A<br>Trial Date: June 1, 2026 |

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous.

We, the jury, return these unanimous answers as our verdict in this case:

## CLAIM 1:  Wrongful Discharge in Violation of Public Policy

1.    Was Patrick Byrne employed by Ameris Bank?

_X_ Yes          ___ No

If your answer to question 1 is yes, then answer question 2. If you answered no, answer question 18.

2.    Was Patrick Byrne discharged?

_X_ Yes          ___ No

If your answer to question 2 is yes, then answer question 3. If you answered no, answer question 18.

3.    Was Patrick Byrne's complaining about Ameris Bank's failure to pay earned wages a substantial motivating reason for Ameris Bank's decision to discharge Patrick Byrne?

_X_ Yes          ___ No

If your answer to question 3 is yes, then answer question 4. If you answered no, answer question 18.

4. Did the discharge cause Patrick Byrne harm?

_X_ Yes          ___ No

Answer question 5.

## CLAIM 2:  Whistleblower Protection

5. Was Patrick Byrne employed by Ameris Bank?

X  Yes                        ___ No


If your answer to question 5 is yes, then answer question 6. If you answered no, answer question 18.


6. Did Patrick Byrne disclose to a person with authority over Patrick Byrne or an employee with authority to investigate, discover, or correct legal violations that Ameris Bank had continuously failed to pay Patrick Byrne, and other Balboa employees, the earned compensation they were owed under the Balboa Capital LTIP?


K  Yes                        ___ No


If your answer to question 6 is yes, then answer question 7. If you answered NO to question 6, answer question 18.


7. Did Patrick Byrne have reasonable cause to believe that his complaints against Ameris Bank disclosed a violation of law?


X  Yes                        ___ No


If your answer to question 7 is yes, then answer question 8. If you answered no, answer question 18.


8. Did Ameris Bank discharge Patrick Byrne?


X  Yes                        ___ No


If your answer to question 8 is yes, then answer question 9. If you answered no, answer question 18.


9. Were Patrick Byrne's complaints a contributing factor in Ameris Bank's decision to discharge Patrick Byrne?


X  Yes                        ___ No


3

If your answer to question 9 is yes, then answer question 10. If you answered no, answer question 18.

10. Was plaintiff harmed?

    X  Yes                      No

If your answer to question 10 is yes, then answer question 11. If you answered no, answer question 18.

11. Was Ameris Bank's conduct a substantial factor in causing Patrick Byrne's harm?

    X  Yes                      No

If your answer to question 11 is yes, then answer question 12. If you answered no, answer question 18.

12. Did Ameris Bank prove by clear and convincing evidence that Ameris Bank would have discharged Patrick Byrne anyway at that time for legitimate, independent reasons?

      Yes                     X  No

Answer question 13.

## CLAIM 3: Nonpayment of Wages and Waiting Time Penalties

**Nonpayment of Wages**

13. Did Patrick Byrne perform work for Ameris Bank?

    X  Yes                      No

If your answer to question 13 is yes, then answer question 14. If you answered no, answer question 18.

14. Does Ameris Bank owe Patrick Byrne wages under the terms of the employment agreement or the LTIP for 2022 or 2023?

    X  Yes              ___ No

If your answer to question 14 is yes, then answer question 15. If you answered no, answer question 18.

**Waiting-Time Penalty for Nonpayment of Wages**

15. Did Patrick Byrne perform work for Ameris Bank?

    X  Yes              ___ No

If your answer to question 15 is yes, then answer question 16. If you answered no, answer question 18.

16. Did Ameris Bank discharge Patrick Byrne?

    X  Yes              ___ No

If your answer to question 16 is yes, then answer question 17. If you answered no, answer question 18.

17. Did Ameris Bank willfully fail to pay the full amount of wages earned by Patrick Byrne on his last day of employment?

    X  Yes              ___ No

Answer question 18.

**CLAIM 4:  Breach of Contract**

18. Did Patrick Byrne and Ameris Bank enter into a contract?

    X  Yes              ___ No

If your answer to question 18 is yes, then answer question 19. If you answered no, go to Section 5: DAMAGES.

19. Did Patrick Byrne do all, or substantially all, of the significant things that the contract required him to do?

      _x_ Yes              ___ No

If your answer to question 19 is yes, skip question 20 and answer question 21. If you answered no, answer question 20.

20. Was Patrick Byrne excused from having to do all, or substantially all, of the significant things that the contract required him to do?

      ___ Yes              ___ No

If your answer to question 20 is yes, then answer question 21. If you answered no, go to Section 5, DAMAGES.

21. Did all the conditions that were required for Ameris Bank's performance occur?

      _X_ Yes              ___ No

If your answer to question 21 is yes, skip question 22 and answer question 23. If you answered no, answer question 22.

22. Were the required conditions that did not occur excused or waived?

      ___ Yes              ___ No

If your answer to question 22 is yes, then answer question 23. If you answered no, go to Section 5, DAMAGES.

23.a. Did Ameris Bank fail to do something that the contract required it to do?

      _X_ Yes              ___ No

Case 1:26-cv-00190-JLH    Document 30-1    Filed 07/23/26    Page 21 of 113 PageID #:
408
Case 8:24-cv-01989-MWC-JDE    Document 227    Filed 06/11/26    Page 7 of 8  Page ID
#:9367

**OR**

23.b.  Did Ameris Bank do something that the contract prohibited it from doing?


___ Yes                    ___ No


If your answer to either option for question 23 is yes, then answer question 24. If you answered no to both options, go to Section 5, DAMAGES.


24. Was Patrick Byrne harmed by Ameris Bank's breach of contract?

X  Yes                    ___ No


Go to section 5:  DAMAGES

## Section 5:  DAMAGES

If you answered NO to questions 4, 11, 14, AND 24, then stop here, answer no further questions and have the presiding juror sign and date this form and return it to the court room attendant.

If you answered YES to either questions 4, 11, 14, OR 24, answer question 25.


25.     What are Patrick Byrne's damages?


a. Past economic loss                    $ ___ 9,000,000 ___

b. Future economic loss                  $ ___ 6,300,000 ___

c. Past non-economic loss                $ ___ 525,000 ___

d. Future non-economic loss              $ ___ 700,000 ___


If you answered YES to question 17, answer question 26.  If you answered NO to question 17 and YES to question 4 OR 11, answer question 28.

26. For how many calendar days following Patrick Byrne's last day of employment did Ameris Bank willfully fail to pay the full amount of Patrick Byrne's wages?

_____710_____ days

Answer question 27.

27. What was Patrick Byrne's daily wage rate at the time his employment ended?

$ ___3,885.26___ per day

If you answered YES to question 4 OR 11, answer 28. If you answered NO to question 4 or 11, stop here, answer no further questions, and have the presiding juror sign and date this form.

## Section 6:  Punitive Damages

28. Did Ameris Bank engage in the conduct with malice, oppression, or fraud?

     X  Yes            ___ No

_____      ___JUNE 11, 2026___
        Presiding Juror                   Date

After this verdict form has been signed, advise the clerk that you are ready to return to the courtroom.

# EXHIBIT 3

EFiled:  May 07 2025 12:07PM EDT
Transaction ID 76220996
Case No. N25C-05-071 PRW CCLD

**IN THE SUPERIOR COURT
OF THE STATE OF DELAWARE**

| | |
|---|---|
| AMERIS BANK, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) C.A. No. _____ CCLD |
| | ) |
| v. | ) |
| | ) |
| PATRICK E. BYRNE, THE | ) |
| PATRICK E. BYRNE | ) |
| REVOCABLE TRUST U/T/A | ) |
| DATED FEBRUARY 23, 2001, and | ) |
| THE PATRICK E. BYRNE | ) |
| IRREVOCABLE TRUST U/T/A | ) |
| DATED JULY 22, 2021, | ) |
| | ) |
| *Defendants.* | ) |

**COMPLAINT**

Plaintiff Ameris Bank ("Ameris" or "Buyer"), by and through its undersigned counsel, hereby brings the following Complaint against Defendants Patrick E. Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001 (the "Revocable Trust"), and The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021 (the "Irrevocable Trust" and together with the Revocable Trust, the "Trusts" and, collectively with Byrne, "Sellers") for breach of contract and indemnification arising under a Stock Purchase Agreement dated as of December 10, 2021 (the "SPA") providing for Ameris's purchase of all of the issued and outstanding shares of capital stock of

Balboa Capital Corporation ("Balboa"), and in support thereof, states as follows:

## THE PARTIES

1.      Plaintiff Ameris is a corporation organized under the laws of the state of Georgia.  Its principal place of business is in Atlanta, Georgia.

2.      Upon information and belief, Defendant Byrne is an individual residing in Orange County, California.

3.      Upon information and belief, the Trusts were formed in and under the laws of the state of California.

## JURISDICTION AND VENUE

4.      This case qualifies for assignment to the Superior Court Complex Commercial Litigation Division because the amount in controversy exceeds $1 million.

5.      This Court has personal jurisdiction over the parties because each contractually consented to the exclusive jurisdiction of the federal or state courts located in Delaware in SPA Section 8.4(c), which provides that the state and federal courts of Delaware shall have exclusive jurisdiction over all claims for indemnification.  SPA Section 10.8 similarly provides for jurisdiction in Delaware courts for the purposes of any action arising out of the SPA or related transactions.

6.      In SPA Section 10.8, the parties also agreed to venue in Delaware, and irrevocably and unconditionally waived any objection to the laying of venue of

any action arising out of the SPA or related transactions in the State of Delaware. Venue is therefore appropriate in this Court.

7.    In SPA Section 10.7, the parties contractually agreed to have any dispute arising out of or relating to the SPA be governed by the law of the State of Delaware.

<div align="center">STATEMENT OF FACTS</div>

## A. The Balboa Acquisition

8.    Non-party Balboa Capital Corporation ("Balboa") was founded by Defendant Byrne and a non-party colleague in or about 1988.  At all times relevant hereto, Balboa is and was an online provider of business lending solutions to small and mid-sized businesses nationwide.  Byrne served as Balboa's Chief Executive Officer ("CEO").

9.    Identifying an opportunity to accelerate its small business lending initiatives and increase its presence in the point-of-sale financing market, Ameris negotiated a potential acquisition of Balboa with Byrne.

10.    During pre-acquisition due diligence, Ameris learned that Balboa was engaged in several lawsuits, including but not limited to *Dr. Jaideep Patel v. Scott Postle*, *Balboa Corporation, et al.*, and *Samuel Feng, M.D. v. America's MHT, Inc., et al.* (collectively, with any appeals of either of the foregoing or other actions substantially related to the facts and circumstances of the foregoing, the "MHT

<div align="center">3</div>

Litigation").  Ameris negotiated for certain indemnification rights in connection with the MHT Litigation to be included in the SPA.

11.    As a result of the parties' negotiations regarding the acquisition, Balboa, Byrne, and the Trusts, which then owned all of the issued and outstanding shares of Balboa, and Ameris executed the SPA dated as of December 10, 2021, along with related agreements, including an employment agreement pursuant to which Byrne would continue to serve as CEO of Balboa.  Post acquisition, Balboa's operations have been conducted by Ameris as a separate division within Ameris.

## B.  The MHT Litigation

12.    America's Medical Home Team, Inc. ("MHT") operated a program through which physicians could remotely supervise nurse practitioners.  MHT required that, in order for a physician to participate, a limited liability company (the "Physician LLC") had to be created to secure financing from a lender to fund the purchase of one or more licenses from MHT.  In October 2016, Balboa became a lender for MHT.  By June 2017, all of the Physician LLCs had defaulted on their Balboa loans.

13.    In or about May 2017, Balboa initiated collection suits against sixteen of the Physician LLCs, followed by suits against additional collections cases that were transferred and consolidated in the United States District Court for the

4

Northern District of Texas, Dallas Division ("NDT").  Upon information and belief, as CEO of Balboa both before and after the acquisition, Byrne directed the MHT Litigation and/or was in regular communication with Balboa's attorneys regarding it.  In fact, after several years of litigation, the parties filed cross-motions for summary judgment, and the Physician LLCs filed motions to strike, including a declaration proffered by Byrne in the MHT Litigation.

14.     Post-closing of the SPA, in March 2022, the NDT held oral argument on the then-pending motions.  The NDT struck the Byrne declaration and granted the Physician LLC defendants' motion for summary judgment on Balboa's breach of contract and breach of guaranty claims.  In March 2023, the NDT issued its opinion and entered judgment that Balboa take nothing on its claims.

15.     On March 15, 2023, the Physician LLCs moved for attorneys' fees and costs in the NDT, to which Balboa objected.  The NDT issued its decision on July 29, 2024, awarding the Physician LLCs a total of $1,013,159.17 in attorneys' fees and a total of $59,501.89 in litigation expenses.

16.     Balboa appealed the summary judgment decision to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit"). On July 30, 2024, the Fifth Circuit affirmed the NDT's order striking the Byrne declaration and affirmed the summary judgment in favor of the Physician LLCs.

17.     Thus, the MHT Litigation was pending in the NDT at the time of the

5

SPA closing and was expected to, and did in fact, continue post-closing. Accordingly, Ameris negotiated express indemnification rights to be included in the SPA related to the MHT Litigation.

### C. Ameris's Right to Indemnification

18. In addition to the $1,013,159.17 in attorneys' fees and $59,501.89 in litigation expenses awarded by the NDT to the Physician LLCs in the MHT Litigation, Ameris suffered a further Loss, as defined below, of $472,352.34 in attorneys' fees and expenses for Balboa's legal representation in the MHT Litigation. Byrne and the Trusts agreed in the SPA to indemnify Ameris for all of these Losses.

19. Ameris's Losses will likely increase because the NDT is still considering an application by the Physician LLCs for attorneys' fees and expenses associated with the Fifth Circuit appeal. The Physician LLCs have asked for an additional $358,180.00 in attorneys' fees and $5,733.20 in expenses related to the Fifth Circuit appeal.

20. SPA Section 8.2 provides that the Sellers, "jointly and severally, shall indemnify and hold harmless" Ameris against any Losses it incurs "resulting from or arising out of" the MHT Litigation. SPA Article I defines "Losses" as follows:

> 'Losses' means losses, liabilities, damages, awards, settlement payments, interest obligations, fines, Taxes, interest, deficiencies, costs, expenses, assessments and penalties including reasonable costs of investigating, preparing, or defending any Action and reasonable

6

attorneys' fees and other reasonable expenses of litigation or similar proceedings, and, only to the extent recovered by a third party in connection with a Third Party Claim, punitive, consequential or exemplary damages.

21.    SPA Section 8.4 sets forth the method for asserting claims for indemnification.  It provides that the Indemnified Party (here, Ameris) must give written notice of the Third Party Claim with an estimate of the claimed Losses "to the extent then ascertainable (which estimate shall not be conclusive of the final amount of such Third Party Claim)" and copies of the pleadings within 20 days following the assertion of such claim.  In his role as CEO of Balboa after the acquisition, Byrne was provided with regular notice of Ameris's Losses associated with the MHT Litigation as they became ascertainable.

22.    Byrne had actual notice of the MHT Litigation and the amount of Losses likely to be incurred, both pre- and post-SPA closing, and certainly had copies of the pleadings.  Indeed, in his role as Balboa's CEO, he directed the MHT Litigation; proffered a declaration on behalf of Balboa in the NDT; and communicated directly with Balboa's attorneys about it.

23.    Byrne as CEO of Balboa was also notified in writing of the Losses for which Ameris sought indemnification for the MHT litigation; was provided in his role as CEO with information regarding the receivables carried on the books for them; and was repeatedly asked by Ameris to confirm that he would honor his obligation to indemnify Ameris for the attorneys' fees and litigation expenses

7

associated with the MHT litigation.

24.     After Ameris's repeated requests for indemnification for the MHT Losses, on November 15, 2023, Byrne admitted and ratified in writing his obligation under the SPA to indemnify Ameris for the MHT Litigation:  "I agree to reimburse Ameris for the MHT legal invoices per my contractual obligation in the stock purchase agreement."

25.     Ameris terminated Byrne's employment as CEO on or about June 30, 2024.  Byrne still had not honored his admitted and ratified indemnification obligation under the SPA at the time of his termination.

26.     After the NDT issued its opinion and order on July 29, 2024 awarding an aggregate of $1,072,661.06 in attorneys' fees and expenses to the Physician LLCs and the Fifth Circuit issued its opinion on July 30, 2024 affirming the NDT's decision, on August 15, 2024, Ameris notified Byrne in writing of both the sum certain of the attorneys' fees and expenses award and of the amount of legal fees Balboa and Ameris themselves incurred in connection with their own legal representation in the MHT Litigation.

27.     To date, Byrne and the Trusts owe Ameris the $1,013,159.17 in attorneys' fees and $59,501.89 in litigation expenses awarded to the Physician LLCs by the NDT plus the $472,352.34 of legal costs for Balboa's legal representation in the MHT Litigation for a grand total of $1,545,013.40.  To date,

8

the NDT has not issued its decision on an application by the Physician LLCs for their attorneys' fees of $358,180.00 and expenses of $5733.20 associated with the Fifth Circuit appeal, so the total owed to Ameris will likely be higher, in an amount to be proven at trial.

28.    To date, Byrne and the Trusts have not indemnified Ameris for the MHT Litigation.  Byrne and the Trusts as Sellers have breached the SPA. Byrne has also breached his written agreement on November 15, 2023 to honor his indemnification obligations under the SPA, and should be estopped from denying his ratification of the indemnification provision of the SPA and his promise to indemnify Ameris.

29.    Ameris has performed its obligations under the SPA.

## COUNT I: INDEMNIFICATION AND BREACH OF CONTRACT
### (Pled in the alternative)

30.    Ameris realleges and incorporates Paragraphs 1 through 29 as if set forth fully herein.

31.    Ameris has satisfied all conditions precedent to bringing this action or such conditions have been waived.

### I.A.  Indemnification for MHT Litigation

32.    Byrne and the Trusts, as the Sellers, are required under Article 8, Section 8.2(f) of the SPA to indemnify Ameris from and against Losses resulting from, or arising out of, the MHT Litigation.

9

33.     Byrne and the Trusts, as the Sellers, are required under Article 8, Section 8.2(e) of the SPA to indemnify Ameris from and against Losses resulting from, or arising out of, their failure to perform any agreement they made under the SPA.

34.     Ameris timely notified the Sellers of its claim for indemnification.

35.     Byrne had actual notice of Ameris's claim for indemnification.

36.     Byrne ratified the indemnification provision in the SPA in writing on November 15, 2023.

37.     The Sellers have breached their agreement to indemnify Ameris for its Losses resulting from, or arising out of, the MHT Litigation.

38.     As a direct and proximate cause of the Sellers' breach of their agreement to indemnify Ameris for its Losses resulting from, or arising out of, the MHT Litigation, Ameris has sustained damages and is entitled to indemnification as provided in the SPA in an amount to be proven at trial, but not less than $1,545,013.40, together with interest, reasonable attorneys' fees, disbursements, and costs of this action.

### I.B.  Breach of Contract

39.     Ameris realleges and incorporates Paragraphs 1 through 38 as if set forth fully herein.

40.     Ameris has satisfied all conditions precedent to bringing this action or

10

such conditions have been waived.

41.    Byrne and the Trusts, as the Sellers, are required under Article 8, Section 8.2(f) of the SPA to indemnify Ameris from and against Losses resulting from, or arising out of, the MHT Litigation.

42.    On November 15, 2023 Byrne ratified Section 8.2(f).

43.    On November 15, 2023, Byrne agreed to reimburse Ameris for the MHT legal invoices.

44.    To date, neither Byrne nor the Trusts has reimbursed Ameris for its MHT Losses, which to date total at least $1,545,013.40.

45.    As a direct and proximate cause of Byrne's' breach of his agreement to reimburse Ameris for its MHT Losses, Ameris has sustained damages in an amount to be proven at trial, but not less than $1,545,013.40, together with interest, reasonable attorneys' fees, disbursements, and costs of this action.

## COUNT II: PROMISSORY ESTOPPEL

46.    Ameris realleges and incorporates Paragraphs 1 through 45 as if set forth fully herein.

47.    Ameris has satisfied all conditions precedent to bringing this action or such conditions have been waived.

48.    On November 15, 2023, Byrne made a clear and unambiguous promise to reimburse Ameris for the MHT legal invoices.

11

49. Ameris reasonably relied on Byrne's promise to pay the MHT legal invoices and Ameris continued to pay for the MHT Litigation and incur Losses.

50. Ameris's reliance on Byrne's promise to pay the MHT invoices was foreseeable.

51. Byrne has breached his promise to pay the MHT legal invoices.

52. Ameris suffered Losses and continued to incur Losses in connection with the MHT Litigation as a result of its reliance on Byrne's promise to pay the MHT legal invoices.

53. Ameris has sustained damages in an amount to be proven at trial, but not less than $1,545,013.40, together with interest, reasonable attorneys' fees, disbursements, and costs of this action.

## <u>RELIEF REQUESTED</u>

54. WHEREFORE, Plaintiff Ameris Bank respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff Ameris Bank;

b. Award Plaintiff indemnification damages;

c. Award Plaintiff compensatory damages;

d. Award Plaintiff its costs and reasonable attorneys' fees;

e. Award Plaintiff such other and further relief as this Court deems just and proper.

Dated:  May 7, 2025

PINCKNEY, WEIDINGER, URBAN
 & JOYCE LLC

*/s/ Patricia R. Urban*
Patricia R. Urban (DE Bar #4011)
Megan Ix Brison (DE Bar #6721)
2 Mill Road, Suite 204
Wilmington, DE  19806
Phone: 302-504-1497
Fax: 302-442-7046
Email: purban@pwujlaw.com
        mixbrison@pwujlaw.com

# EXHIBIT 4

EFiled:  Jul 16 2025 02:56PM EDT
Transaction ID 76659662
Case No. N25C-05-071 KMM CCLD

## IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

| | |
|---|---|
| AMERIS BANK, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) C.A. No. N25-C-05-071 KMM CCLD |
| | ) |
| v. | ) |
| | ) |
| PATRICK E. BYRNE, THE | ) |
| PATRICK E. BYRNE REVOCABLE | ) |
| TRUST U/T/A DATED FEBRUARY | ) |
| 23, 2001, and THE PATRICK E. | ) |
| BYRNE IRREVOCABLE TRUST | ) |
| U/T/A DATED JULY 22, 2021, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## DIRECTION FOR ENTRY OF JUDGMENT BY DEFAULT

TO:   PROTHONOTARY, NEW CASTLE COUNTY

You are hereby directed to enter judgment by default in accordance with the provisions of Rule 55(b)(1) of the Rules of Civil Procedure of the Superior Court of the State of Delaware in favor of Plaintiff Ameris Bank and against Defendants Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021 in the amount of $1,844,524.62  plus post-judgment interest at the legal rate, or $480.08 per diem, because all Defendants have failed to appear, plead or otherwise defend as provided by said rule.

Filed contemporaneously herewith is the Affidavit of Patricia R. Urban and a

Statement of Amount Due.

Dated:  July 16, 2025

PINCKNEY, WEIDINGER, URBAN
 & JOYCE LLC

*/s/ Patricia R. Urban*
Patricia R. Urban (DE Bar #4011)
Megan Ix Brison (DE Bar #6721)
2 Mill Road, Suite 204
Wilmington, DE  19806
Phone: 302-504-1497
Fax: 302-442-7046
Email: purban@pwujlaw.com
         mixbrison@pwujlaw.com

# EXHIBIT 5

EFiled:  Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

# IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

| | |
|---|---|
| AMERIS BANK, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) C.A. No. N25-C-05-071 KMM CCLD |
| | ) |
| v. | ) |
| | ) |
| PATRICK E. BYRNE, THE | ) |
| PATRICK E. BYRNE REVOCABLE | ) |
| TRUST U/T/A DATED FEBRUARY | ) |
| 23, 2001, and THE PATRICK E. | ) |
| BYRNE IRREVOCABLE TRUST | ) |
| U/T/A DATED JULY 22, 2021, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## OPPOSITION TO DEFENDANTS' MOTION TO VACATE
## DEFAULT JUDGMENT

Dated:  November 26, 2025

PINCKNEY, WEIDINGER, URBAN
 & JOYCE LLC
Patricia R. Urban (DE Bar #4011)
Elizabeth Wilburn Joyce (DE Bar #3666)
Megan Ix Brison (DE Bar #6721)
2 Mill Road, Suite 204
Wilmington, DE  19806
Phone: 302-504-1497
Email: purban@pwujlaw.com
        ewilburnjoyce@pwujlaw.com
        mixbrison@pwujlaw.com

EFiled: Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

Plaintiff Ameris Bank hereby opposes Defendants' Motion to Vacate Default Judgment ("Mot."), and in support thereof, states the following:

## BACKGROUND

1.    Defendants admit that on May 1, 2025, Plaintiff's counsel sent Byrne's California counsel a copy of the unfiled Complaint and contemporaneously asked if she was authorized to accept service, but that they did not so authorize. Mot. ¶¶ 3, 5.

2.    Plaintiff filed the Complaint on May 7, 2025. D.I. 1. Plaintiff served Defendants with a copy of the Complaint, Summonses, and related exhibits by certified mail, return receipt requested, as required by Superior Court Civil Rule 4 and 10 *Del. C.* §3104, at 2 separate addresses: Byrne's home address, and at the P.O. Box listed in Section 10.3 of the Stock Purchase Agreement ("SPA") for notices and service to Defendants.  Urban Aff. ¶¶ 7-9, D. I. 5.

3.    The green certified mail receipts were returned by the U.S. Postal Service and marked as delivered to Byrne's personal address at 70 Monarch Bay Drive, Dana Pont, CA 92629 and signed for on behalf of all Defendants by Byrne on June 2, 2025.  Copies of the return receipts signed by Byrne were filed as exhibits to the Affidavit of Service filed on June 10, 2025. D.I. 4.

4.    The green certified mail receipts for the second service at the P.O. Box pursuant to Section 10.3 of the SPA were returned as "Return to Sender.  Not

1

EFiled:  Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

Deliverable as Addressed.  Unable to Forward." Apparently, Byrne closed the P

Box designated for notices under the SPA, notwithstanding the active disputes

between the parties related to the SPA, and designated no forwarding address. *See*

Not Deliverable return receipt, attached hereto as Exhibit 1.

5.    None of the Defendants answered the Complaint or otherwise

appeared in the Action despite the deadline for having to do so having passed on

June 23, 2025.

6.    On July 16, 2025, Plaintiff filed its Direction for Entry of Judgment

for Default, supporting Affidavit, and Statement of Amount Due ("Statement").

The Statement reflects the $1,545,013.40 plus $281,800.70 of the additional

$363,913.20 in Losses sought in the Complaint, for a total of $1,826,814.10 in

principal, plus documented attorneys' fees and cost associated with this Action,

and post-judgment interest at the legal rate of 9.5%.  D.I. 5.  That day, the Default

Judgment was entered on the Court's docket.  *Id.*

7.    Defendants filed their Motion on October 27, 2025, more than three

months after the entry of default judgment.

### ARGUMENT

8.    Although it is true that many courts have "adopted a policy in favor of

resolving cases on their merits," that policy is counterbalanced, within the Court's

discretion, by weighing three factors in determining whether a default judgment

2

EFiled:  Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

should be vacated: "first, whether culpable conduct of the defendant led to the default and, if so, was it excusable; second, whether the defendant has a meritorious defense; and third, whether the plaintiff will be prejudiced." *See Apt. Commun's Corp. v. Martinelli*, 859 A.2d 67, 70 (Del. 2004). As the Supreme Court noted, "[b]ecause the first factor is a threshold, the trial court need only consider the second and third factors 'if a satisfactory explanation has been established for failing to answer the complaint, e.g. excusable neglect or inadvertence.'" *Stevenson v. Swiggett,* 8 A.3d 1200, 1207 (Del. 2010). The burden is on Defendants to show that any neglect was excusable. *See Doherty & Assoc., Inc. v. People First Ins., Inc.,* 2018 WL 1446412, at * 3 (Del Super. Ct. Mar. 22, 2018).

9.      Defendants claim they are entitled to relief under Rule 60(b)(4) because they never actually received service of process. Mot. ¶ 11. Plaintiff properly served Defendants under Superior Court Civil Rule 4 and 10 *Del. C.* §3104. *See Univ. Captl. Mgmt., Inc. v. Micco World, Inc.*, 2011 WL 2347612, at *3 (Del. Super. Ct. June 2, 2011) (finding signed return receipt and filed affidavit of service as presumptive proof of proper service).

10.     Byrne contends that he does not recognize the signature on the return receipt and insists it is not his. Byrne Aff. ¶ 5. Byrne does not address in his Affidavit, however, whether he authorized someone at his residence to sign on Defendants' behalf. Given Byrne's refusal to allow his counsel to accept service,

EFiled: Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

and the curious termination of the post office box designated for service under the SPA, Byrne's contention is suspect. This Court has refused to vacate a judgment where the defendant actively avoided service. *See Deshields v. Bolton*, 2020 WL 242482, at *4 (Del. Super. Ct. Jan. 14, 2020).

11.     Even assuming that Defendants did not actively seek to avoid service, the "inadvertent error in the scope of the automated notice of Ameris' filings" (Mot. ¶ 15) does not constitute excusable neglect. *See, e.g., Model Fin. Co. v. Barton,* 188 A.2d 233, 235 (Del. Super. Ct. 1963) (holding that carelessness on the part of counsel "cannot automatically be deemed 'excusable neglect'" under Rule 60). Moreover, contrary to Defendants' contention that their failure to respond to the Complaint "was compounded by Ameris' decision not to provide any notice to Byrne's counsel of its intent to seek default judgment (or its position that service had validly been effectuated)" (Mot. ¶ 15), Plaintiff had no obligation to serve Defendants with such notice. *See Apt. Commun's Corp.*, 859 A.2d at 73 ("Generally, where there has not been a formal entry of appearance in an action, notice of a default judgment request is not required.").

12.     Defendants further contend that the entry of default was improper because Plaintiff sought damages in "an amount to be proven at trial". Mot. ¶ 12. Defendants ignore both Rule 55(b)(1) and paragraph 27 of the Complaint. Rule 55(b)(1) allows entry of judgment by default "for a sum certain or *for a sum which*

4

EFiled: Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

*can by computation be made certain.*" As set forth above, Paragraph 27 of the Complaint sought specific, enumerated damages, subject only to a final determination by the Fifth Circuit of whether the full $363,913.20 of indemnifiable legal fees would be awarded. On June 6, 2025, the Fifth Circuit entered a final supplemental judgment (of which this Court may take judicial notice) awarding indemnifiable legal fees and expenses totaling $281,800.70 of the additional $363,913.20 in Losses specifically sought in the Paragraph 27. A copy of the Fifth Circuit Supplemental Judgment is attached hereto as Exhibit 2. Thus, the Statement reflects a sum certain, or at the very least, a sum which can by computation be made certain.

13.     Equally unavailing is Byrne's contention that the amount in dispute is uncertain because Defendants dispute whether the entire amount awarded in the MHT litigation falls within their indemnification obligations and "whether the underlying costs and expenses incurred by Ameris were 'reasonable.'" Mot. ¶ 12. Until his termination in June 2024, Byrne, as CEO, personally directed the MHT Litigation; proffered a declaration in it; and communicated directly with the attorneys defending the litigation. Compl. ¶ 22. Any claim that the indemnifiable Losses were unreasonable – when he led the defense of the MHT Litigation –  is specious.

5

EFiled: Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

14.    Even if this Court finds excusable neglect, the inquiry is not over: the Court then considers whether Defendants have meritorious defenses and whether Plaintiff will be prejudiced if the default judgment is vacated.  As set forth above, Defendants cannot credibly claim that there is a question as to whether the Losses are indemnifiable when Byrne himself directed the MHT Litigation while CEO. Significantly, Byrne waived any defense to Defendants' obligation to indemnify Ameris for the Losses when, on November 15, 2023, he wrote to Ameris "I agree to reimburse Ameris for the MHT legal invoices per my contractual obligation in the stock purchase agreement."  A copy of the November 15, 2023 email is attached hereto as Exhibit 3.

15.    Plaintiff will be prejudiced if the default judgment is vacated. Plaintiff has depended on Byrne's admission that Defendants will reimburse it for the Losses associated with the MHT Litigation and paid them out of pocket, notwithstanding that the MHT Litigation has been going on for years – including prior to the parties' execution of the SPA.  Byrne should not be permitted to continue to evade his admitted contractual obligations.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Vacate the Default Judgment, and award Plaintiff its attorneys' fees and costs incurred with opposing the Motion.

6

EFiled:  Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

Dated:  November 26, 2025

PINCKNEY, WEIDINGER, URBAN
 & JOYCE LLC

*/s/ Patricia R. Urban*

Patricia R. Urban (DE Bar #4011)
Elizabeth Wilburn Joyce (DE Bar #3666)
Megan Ix Brison (DE Bar #6721)
2 Mill Road, Suite 204
Wilmington, DE  19806
Phone: 302-504-1497
Fax: 302-442-7046
Email: purban@pwujlaw.com
          ewilburnjoyce@pwujlaw.com
          mixbrison@pwujlaw.com

EFiled:  Nov 26 2025 03:30PM EST
Transaction ID 77877014
Case No. N25C-05-071 KMM CCLD

# EXHIBIT 1

**P W U J**

Pinckney, Weidinger, Urban
& Joyce LLC
2 Mill Road, Suite 204
Wilmington, DE 19806



CERTIFIED MAIL



UNITED STATES
POSTAL SERVICE

7022 1670 0003 1790 0117

**Retail**

92629

**RDC 99**

NIXIE   910   FE 1   00006/06/25

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 19806218454   *2547N1571 86-08203*

The Patrick E. Byrne Revocable Trust
U/T/A Dated February 23, 2001
c/o Patrick E. Byrne
P.O. Box 232
Dana Point, California 92629

**EFiled:  Nov 26 2025 03:30PM EST**
**Transaction ID 77877014**
**Case No. N25C-05-071 KMM CCLD**

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BALBOA CAPITAL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:18-cv-898-M |
| | § | |
| OKOJI HOME VISITS MHT, LLC et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## SUPPLEMENTAL JUDGMENT

In light of the Order Accepting Findings and Recommendation of the United States Magistrate Judge, it is **ORDERED, ADJUDGED AND DECREED** that Plaintiff Balboa Capital Corporation shall pay (1) to the FBFK Defendants $85,421.25, in reasonable attorneys fees, and $1,079.70, in litigation expenses; and (2) to the Hall Griffin Defendants $190,646.25, in reasonable attorneys fees, and $4,653.50 in litigation expenses.

Execution may issue for the sums awarded herein.

**DATED this 6th day of June, 2025.**

BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE

**EFiled:  Nov 26 2025 03:30PM EST**
**Transaction ID 77877014**
**Case No. N25C-05-071 KMM CCLD**

# Exhibit 3

| From: | Byrne, Patrick |
|---|---|
| To: | Stokes, Nicole |
| Cc: | Spencer, Jody; LaHaise, James; Silva, Phil |
| Subject: | RE: Purchase escrow reconciliation and final distribution |
| Date: | Wednesday, November 15, 2023 9:21:38 PM |
| Attachments: | image001.png |

Hi Nicole,

I agree to reimburse Ameris for the MHT legal invoices per my contractual obligation regarding MHT in the stock purchase agreement.

Will you please release the $456,005 in escrow to me.

Thank you,

**Patrick Byrne**
**Chief Executive Officer**
**Balboa Capital, A Division of Ameris Bank**
(D) 949-553-3415 | pateb@balboacapital.com



**From:** Stokes, Nicole <Nicole.Stokes@amerisbank.com>
**Sent:** Monday, September 25, 2023 4:28 PM
**To:** Byrne, Patrick <pateb@balboacapital.com>
**Cc:** Spencer, Jody <Jody.Spencer@amerisbank.com>; LaHaise, James <James.LaHaise@amerisbank.com>; Silva, Phil <phils@balboacapital.com>
**Subject:** Re: Purchase escrow reconciliation and final distribution

What happened to the $266,791.71 sales tax issue that was due to Ameris?

We already settled $453,994.84 out of escrow to you in good faith on December 15, 2022.

Our intent is to always do the right thing.  I hope you concur and also do the right thing.

Again, please confirm that you will reimburse us for these MHT legal invoices per your contractual obligation regarding MHT in the stock purchase agreement.

**Nicole S. Stokes**
**Ameris Bank** | EVP, Chief Financial Officer
3490 Piedmont Rd NE, Suite 1550 | Atlanta, GA 30305
(D) 404-240-1514

nicole.stokes@amerisbank.com

Visit us online at www.amerisbank.com

On Sep 25, 2023, at 11:53 AM, Byrne, Patrick <pateb@balboacapital.com> wrote:

# EXHIBIT 6

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

|  |  |
|---|---|
| AMERIS BANK,<br><br>       Plaintiff,<br><br>    v.<br><br>PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE IRREVOCABLE TRUST U/T/A DATED JULY 22, 2021,<br><br>       Defendants. | C.A. No. N25C-05-071 KMM CCLD |

## DEFENDANTS' MOTION TO VACATE DEFAULT JUDGMENT

Dated: October 27, 2025

REED SMITH LLP

Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Defendants Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

Defendants[1] hereby move to vacate the default judgment entered against th

on July 18, 2025, in the amount of $1,844,524.62 (the "Judgment"), and state the

following in support of their motion (the "Motion"):

## BACKGROUND

1.      Plaintiff purchased all the outstanding shares of Balboa Capital

Corporation ("Balboa") under a Stock Purchase Agreement dated as of December

10, 2021 (the "SPA").  Compl. ¶¶ 8, 11.  Section 8.2(f) of the SPA contemplates that

Ameris can seek indemnification for "Losses" arising out two pending lawsuits and

substantially related actions (the "MHT Litigation").[2]

2.      The Complaint seeks indemnification for $1,013,159.17 in attorneys'

fees and $59,501.89 in litigation expenses owed by Balboa after a July 29, 2024

ruling by the District Court for the Northern District of Texas on motions filed in

sixteen (16) consolidated actions.  Ex. 1 at 3; *see* Compl. ¶ 15.  Plaintiff also seeks

"$472,352.34 in attorneys' fees and expenses for Balboa's legal representation in

the MHT Litigation."  Compl. ¶ 18.

---

[1] "Defendants" refers, collectively, to Patrick E. Byrne ("Byrne"), Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001, and Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021.  "Plaintiff" or "Ameris" refers to Plaintiff Ameris Bank.

[2] Section 8.2(f) defines the MHT Litigation as follows: "(i) *Dr. Jaideep Patel v. Scott Postle, Balboa Capital Corporation, et al.,* (ii) *Samuel Feng, M.D. v. America's MHT, Inc., et al,* (iii) any appeal of either the foregoing (i)-(ii), or (iv) other Action substantially related to the facts and circumstances underlying the foregoing (i)-(ii) (clauses (i)-(iv), collectively, the 'MHT Litigation')."  *See* Compl. ¶¶ 10, 20.

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

3.      Since mid-September 2024, Byrne and Ameris have been engaged litigation in the District Court for the Central District of California (the "California Action") based on Ameris' alleged wrongful termination of Byrne.  Aff. ¶ 2.  On or around May 1, 2025, Ameris sent a copy of an unfiled complaint (substantially similar to the Complaint) to Byrne's counsel in the California Action.  Aff. ¶ 3. Byrne's counsel subsequently prepared an email alert to ensure they received notice of any action initiated by Ameris in this Court or the Court of Chancery.  Aff. ¶ 4.

4.      Ameris filed the Complaint on May 7, 2025.  The next day, Byrne's counsel received an auto-generated email notice that the Complaint had been filed. *Id.*  No email notices of subsequent filings were received by Byrne's counsel.  *Id.*

5.      Ameris' counsel contacted Byrne's counsel in the California Action and asked if she would accept service of process.  Aff. ¶ 7.  Byrne's counsel in the California Action confirmed she was not authorized to accept service of process.  *Id.*

6.      On June 10, 2025, Ameris' counsel submitted an affidavit of service indicating that service had been effectuated upon Defendants, on June 2, 2025, via "Certified Mail, Return Receipt Requested" at 70 Monarch Bay Drive, Dana Point California 92629.  Dkt. 4. The affidavit attached three return receipts, all of which indicated they were received by "Byrne."  *Id.*  Byrne does not recognize the signatures on the return receipts, Aff. ¶ 5; these signatures also appear materially different than Byrne's signatures in the SPA, *see* Ex. 2.  To date, Byrne maintains

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

that he has never received service of process of the Complaint (via any meth

Aff. ¶ 5.

7.    Byrne informed his counsel that he had not yet received service of the Complaint on multiple occasions, both before and after June 2, 2025—including in writing on June 16 (just two weeks after he was purportedly served).  Aff. ¶ 6.

8.    Two weeks after Defendants' answer would have been due (assuming proper service), Plaintiff directed the Prothonotary to enter the Judgment.  Dkt. 5. Plaintiff did not notify Byrne's counsel before seeking or obtaining the Judgment.

9.    Byrne learned about the Judgment for the first time on October 20.  The next day, the undersigned counsel contacted Plaintiff's counsel by phone (and followed up via email the following day) to inquire whether Ameris would consent to vacating the Judgment.  On October 22, Plaintiff's counsel confirmed Ameris would not consent to vacating the Judgment.

## ARGUMENT

10.    Under Rule 60(b), a party may obtain relief from a default judgment for any of "the following reasons: (1) [m]istake, inadvertence, surprise, or excusable neglect … (4) the judgment is void; … or (6) any other reason justifying relief from the operation of the judgment."  "Because courts favor Rule 60(b) motions to allow each part to be heard on the merits of the case, the rule is liberally construed." *Dalton v. Pac. Rim Cap.*, 2020 WL 6158115, at *2 (Del. Super. Oct. 20, 2020).  Indeed,

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

"liberality is highly favored where the opening of default judgments is concer[ned] because of a because of a basic underlying policy which prefers that [defendants have their] day in court.  A trial on the merits is considered superior to a default judgment." *Keystone Fuel Oil Co. v. Del-Way Petroleum Inc.*, 364 A.2d 826, 828 (Del. 1976).

## I.    This Court Should Vacate the Judgment Under Rule 60(b)(4)

11.    **First**, this Court should grant the Motion under Rule 60(b)(4) because Defendants maintain they never actually received service of process.  *See MidFirst Bank v. Mullane*, 2022 WL 4460810, at *7 (Del. Super. Sept. 26, 2022) ("A judgment is void if entered against a defendant who did not receive sufficient service of process."); *TecSyn PMP, Inc. v. Aerometals, Inc.*, 1994 WL 145990, at *3 (Del. Super. Mar. 15, 1994) (vacating default judgment where service was contested).

12.    **Second**, relief under Rule 60(b)(4) is also appropriate because Rule 55(b)(1) only permits entry of default judgment by the Prothonotary if "plaintiff's claim … is for a sum certain."  Here, Plaintiff seeks damages in "***an amount to be proven at trial***, but not less than $1,545,013.40." Compl. ¶¶ 38, 45, 53 (emphasis added).  Elsewhere, Plaintiff acknowledges its claimed Losses were uncertain as of filing. *See* Compl. ¶ 27.  Plaintiff's allegations aside, the amount in dispute is also uncertain because Defendants dispute: (i) whether the entire amount awarded by the district court falls within their indemnification obligations under the SPA; and (ii)

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

whether the underlying costs and expenses incurred *by Ameris* were "reasonab[le]" as required to constitute "Losses" under the SPA.  Compl. ¶ 20 (quoting SPA).

## II.    The Judgment Should Be Vacated Under Rule 60(b)(1)

13.    To demonstrate excusable neglect, a party must show "(1) their conduct in failing to respond was the product of excusable neglect; (2) they have a meritorious defense that would allow for a different result if the case was heard on the merits; and (3) the plaintiff will not suffer substantial prejudice if the motion is granted." *Dalton*, 2020 WL 6158115, at *3.

14.    Excusable neglect exists where "there [was] some confusion regarding the service of the summons and complaint" including "when and where it was delivered, as well as who received it." *Kohler v. Hughes*, 2000 WL 1211140, at *2 (Del. Super. Feb. 2, 2000).  Here, a finding of excusable neglect is appropriate because there is more than mere "confusion" regarding service of process. *Id.*

15.    Defendants affirmatively contest the propriety of service of process. Aff. ¶ 5.  Their failure to timely respond also stemmed from an inadvertent error in the scope of the automated notice of Ameris' filings.  This failure was compounded by Ameris' decision not to provide any notice to Byrne's counsel of its intent to seek default judgment (or its position that service had validly been effectuated). Defendants also have meritorious defenses, including that: (i) the Complaint was filed in violation of the SPA's mandatory venue provision, in favor of the Court of

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

Chancery or the District of Delaware; and (ii) Defendants contest whether al

Plaintiff's claimed damages are actually indemnifiable.  Plaintiff will not suffer

prejudice if it is forced to litigate its dispute on the merits (and in the proper venue).

## III.    Relief from the Judgment Is Warranted Under Rule 60(b)(6)

16.    Even if this Court finds that the Judgment was not void and that

Defendants have not established excusable neglect, this Court should exercise its

discretion and find that the circumstances surrounding entry of the Judgment warrant

relief pursuant to Rule 60(b)(6).  *See, e.g.*, *O'Rourke v. PNC Bank*, 2021 WL

3507666, at *4 (Del. Super. Aug. 9, 2021) (granting motion to vacate under Rule

60(b)(6) notwithstanding failure to establish excusable neglect); *Dalton*, 2020 WL

6158115, at *5-6 (same).

17.    As soon as Defendants learned that Plaintiff maintained that it had

effectuated service of process (and, further, sought and obtained the Judgement)

Defendants acted promptly to participate in this action.


[*signature on following page*]


- 6 -

EFiled:  Oct 27 2025 11:31AM EDT
Transaction ID 77446138
Case No. N25C-05-071 KMM CCLD

Dated: October 27, 2025

REED SMITH LLP

*/s/ Benjamin P. Chapple*
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Defendants Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*

# EXHIBIT 7

**EFiled:  Jan 20 2026 04:30PM EST**
**Transaction ID 78240830**
**Case No. N25C-05-071 KMM CCLD**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMERIS BANK,<br><br>       Plaintiff,<br><br>    v.<br><br>PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED JULY 22, 2021,<br><br>       Defendants. | C.A. No. N25C-05-071 KMM CCLD<br><br>**Public Version Filed:**<br>**January 20, 2026** |

### DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FOR IMPROPER VENUE

Dated: December 18, 2025

REED SMITH LLP
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
bchapple@reedsmith.com
jmiraglia@reedsmith.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL BACKGROUND..............................................................................3

NATURE AND STAGE OF THE PROCEEDINGS ...............................................5

STATEMENT OF QUESTIONS INVOLVED........................................................6

ARGUMENT ..................................................................................................6

    A.     Legal Standard....................................................................................6

    B.     Section 10.8 of the SPA Limits Venue to the Court of Chancery or the U.S. District Court for the District of Delaware ........................7

    C.     Neither Exception to Honoring the Parties' Forum Selection Clause Applies...................................................................................9

    D.     The Specific Language in Section 10.8 Qualifies the More General Language in Section 8.4(c)....................................................10

CONCLUSION ..............................................................................................12

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*DCV Hldgs., Inc. v. ConAgra, Inc.,*
    889 A.2d 954 (Del. 2005) ...................................................................................11

*GPV I FIZAN v. Surgalign Hldgs., Inc.,*
    2023 WL 1796293 (Del. Super. Ct. Feb. 7, 2023) ......................................3, 6, 9

*ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.,*
    2015 WL 3970908 (Del. Super. Ct. June 24, 2015) ..............................................3

*Kuhn Constr., Inc. v. Diamond State Port Corp.,*
    990 A.2d 393 (Del. 2010) ...................................................................................11

*Lorillard Tobacco Co. v. Am. Legacy Found.,*
    903 A.2d 728 (Del. 2006) ...................................................................................11

*Loveman v. The NuSmile, Inc.,*
    2009 WL 847655 (Del. Super. Ct. Mar. 31, 2009)...............................................9

*Pac. Ins. Co. v. Liberty Mut. Ins. Co.,*
    956 A.2d 1246 (Del. 2008) ...................................................................................8

*PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC,*
    2010 WL 2977392 (Del. Ch. July 29, 2010) ........................................................7

*PPL Corp. v. Riverstone Hldgs. LLC,*
    2019 WL 5423306 (Del. Ch. Oct. 23, 2019) ........................................................8

*Thompson v. Lynch,*
    990 A.2d 432 (Del. 2010) .....................................................................................2

*TMIP Participants LLC v. DSW Grp. Hldgs. LLC,*
    2016 WL 490257 (Del. Ch. Feb. 4, 2016).........................................................11

**Rules**

Del. Super. Ct. Civ. R. 12(b)(3)................................................................1, 3, 6, 12

Defendants[1] respectfully submit this Opening Brief in support of their Motion to Dismiss the complaint Plaintiff filed on May 7, 2025 (the "Complaint") for improper venue pursuant to Superior Court Rule of Civil Procedure 12(b)(3).

## PRELIMINARY STATEMENT

Plaintiff alleges in its Complaint that Defendants are liable for indemnification, breach of contract (in the alternative to indemnification), and promissory estoppel. Plaintiff's claims are premised on the parties' Stock Purchase Agreement dated December 10, 2021 (the "SPA").

The SPA contains two provisions relevant to Defendants' Motion to Dismiss for Improper Venue: Sections 8.4(c) and 10.8. These provisions are unambiguous and consistent. Section 8.4(c) establishes that Delaware's state and federal courts have exclusive jurisdiction to hear and determine any dispute arising out of or in connection with the SPA; Section 10.8 establishes which Delaware courts qualify as proper venues—specifically, only the Delaware Court of Chancery or the United States District Court for the District of Delaware (the "District Court"). Plaintiff impermissibly filed its Complaint in this Court in contravention of Section 10.8 of the SPA. The District Court is an appropriate venue based on diversity jurisdiction.

---

[1] "Defendants" refers, collectively, to Patrick E. Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001, and The Patrick E. Byrne Revocable Trust U/T/A dated July 22, 2021. "Plaintiff" or "Ameris" refers to Plaintiff Ameris Bank.

Delaware courts decline to enforce contractual choice-of-forum provisions under only two circumstances: if (i) enforcement would be unreasonable and unjust under the circumstances; or (ii) the forum selection clause was procured by fraud.[2] Neither exception applies.    Enforcement of Section 10.8 would be neither unreasonable nor unjust; nothing procedurally prevents or otherwise impairs Plaintiff from filing its Complaint in the District Court.  Indeed, Plaintiff embraces Section 10.8 in its Complaint, alleging that "Section 10.8 similarly provides for jurisdiction in Delaware courts" and "[i]n SPA Section 10.8, the parties also agreed to venue in Delaware …. Venue is therefore appropriate in this Court."  And Plaintiff contractually waived and agreed not to plead or claim in either the Court of Chancery or the District Court that any applicable action brought there has been brought in an inconvenient forum (let alone "unreasonable and unjust").  Plaintiff likewise cannot establish that Section 10.8 was procured by fraud: the SPA was drafted by sophisticated parties negotiating at arms-length, and (again) Plaintiff embraces Section 10.8's enforceability and applicability in the Complaint.

---

[2] Defendants recognize that a Delaware court will not enforce a contractual forum selection clause if the forums identified by the parties do not independently have subject matter jurisdiction over the parties' dispute. *See, e.g.*, *Thompson v. Lynch*, 990 A.2d 432, 434 (Del. 2010) ("It is settled law that parties may not confer subject matter jurisdiction by agreement[.]").  But for the reasons stated herein, the District Court—one of two courts identified in Section 10.8—has subject matter jurisdiction over the parties' dispute (and, therefore, is a proper venue for Plaintiff's Complaint).

- 2 -

Moreover, to the extent Plaintiff argues that Sections 8.4(c) and 10.8 conflict (they do not) or are otherwise ambiguous (they are not), well-established principles of contract interpretation and construction demonstrate that Section 10.8 qualifies (not conflicts with) the meaning of Section 8.4(c) and limits venue to either the Court of Chancery or the District Court.  A contrary reading would render language in Section 10.8 "mere surplusage."

For these and the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint under Rule 12(b)(3).

## **<u>FACTUAL BACKGROUND</u>**

On December 10, 2021, Plaintiff and Defendants entered into the SPA, under which Defendants sold to Plaintiff the issued and outstanding shares of capital stock of Balboa Capital Corporation and certain of its affiliates (collectively, "Balboa"). Compl. ¶ 11.  A true and correct copy of the SPA is attached hereto as **Exhibit A.**[3]

In Section 8.4(c) of the SPA, the parties (i) consented to personal jurisdiction in Delaware; and (ii) agreed that Delaware state and federal courts shall hear any dispute arising out of the SPA:

---

[3] While the SPA was not attached as an exhibit to the Complaint, it is integral to, and incorporated by reference in, the Complaint.  *See, e.g.*, *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.,* 2015 WL 3970908, at *4 (Del. Super. Ct. June 24, 2015).  Regardless, this Court may consider extrinsic evidence from the outset when evaluating a motion to dismiss under Rule 12(b)(3).  *See GPV I FIZAN v. Surgalign Hldgs., Inc.*, 2023 WL 1796293, at *4 (Del. Super. Ct. Feb. 7, 2023).

<u>Resolution of Disputes.</u>  Any dispute submitted to litigation pursuant to this <u>Section 8.4(c)</u> shall be finally and conclusively determined by litigation in a court of competent jurisdiction.  Each party to this Agreement agrees that the state and federal courts located in the State of Delaware (the "<u>Delaware Courts</u>") shall have exclusive jurisdiction to hear and determine any Action, and to settle any disputes, which may arise out of or in connection with this Agreement and, for such purposes, consents to submit itself to the personal jurisdiction of such courts.  Each of the parties hereto (i) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (ii) agrees that it shall not bring any action relating to this Agreement or any of the Transactions in any court other than a Delaware Court.

Section 10.8 of the SPA, in turn, lists *which specific* state and federal courts in Delaware constitute the proper venue(s) for "purposes of any Action arising out of [the SPA] or the transactions contemplated [t]hereby."  SPA § 10.8.  Under Section 10.8, the parties submitted to the "exclusive jurisdiction" of the District Court and the Delaware Court of Chancery for purposes of "any Action arising out of" the SPA:

Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and the Court of Chancery of Delaware in the State of Delaware, for the purposes of any Action arising out of this Agreement or the transactions contemplated hereby.  Each party hereto agrees to commence any such Action either in the United States District Court for the District of Delaware or the Court of Chancery of Delaware in the State of Delaware ….  Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any Action arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the District of Delaware and the Court of Chancery of Delaware in the State of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim

- 4 -

in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

On May 7, 2025, Plaintiff filed the Complaint in this Court. Plaintiff alleges jurisdiction in this Court is appropriate under Section 10.8 of the SPA, despite that section exclusively identifying the District Court and the Court of Chancery as appropriate venues.

Plaintiff alleges in Count I of the Complaint, styled as "Indemnification and Breach of Contract (Pled in the Alternative)", that it is entitled to indemnification under the SPA for purported losses resulting from litigation involving Balboa. Compl. ¶¶ 10, 32–38. Plaintiff further alleges that it is alternatively entitled to damages in connection with Defendants' purported breach of Section 8.2(f) of the SPA. *Id.* ¶¶ 39–45. Plaintiff asserts a promissory estoppel claim in Count II and alleges that Byrne breached his purported promise to pay certain invoices in connection with litigation involving Balboa. *Id.* ¶¶ 46–53. Plaintiff seeks indemnification and compensatory damages. *Id.*, "Relief Requested."

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed its Complaint on May 7, 2025 (Dkt. 1). On July 16, 2025, Plaintiff filed a Direction for Entry of Judgment by Default (Dkt. 5). On October 27, 2025, Defendants filed a Motion to Vacate Default Judgment (the "Motion to Vacate") (Dkt. 8). Plaintiff filed its Opposition to the Motion to Vacate on

November 26, 2025 (Dkt. 11). This Court held a hearing on the Motion to Vacate on December 5, 2025, at which the Court granted the Motion to Vacate and instructed Defendants to respond to the Complaint on or before Friday, December 19, 2025 (Dkt. 12). This is Defendants' response.

## STATEMENT OF QUESTIONS INVOLVED

1.      Whether, pursuant to Rule 12(b)(3), the Complaint should be dismissed for improper venue because in Section 10.8 of the SPA, the parties submitted to the "exclusive jurisdiction" of the District Court and the Delaware Court of Chancery for purposes of "any Action arising out of" the SPA.

## ARGUMENT

The Complaint should be dismissed for improper venue under Rule 12(b)(3) based on the parties' agreement in Section 10.8 of the SPA.

### A.      Legal Standard

Rule 12(b)(3) governs a motion to dismiss for improper venue. Under this standard, "the Court should give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation." *Surgalign Hldgs.,* 2023 WL 1796293, at *5 (internal quotations omitted). As then-Vice Chancellor Strine once explained:

> Delaware honors contractual choice of forum provisions. Thus, under Rule 12(b)(3), a court will grant a motion to dismiss for improper venue based upon a forum selection clause where the parties use express language clearly indicating that the forum selection excludes all other

- 6 -

courts before which those parties could otherwise properly bring an action. Delaware courts defer to forum selection clauses and routinely give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation.

*PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC*, 2010 WL 2977392, at *5 (Del. Ch. July 29, 2010) (internal quotations omitted).

### B. Section 10.8 of the SPA Limits Venue to the Court of Chancery or the U.S. District Court for the District of Delaware

Section 10.8 covers the claims set forth in the Complaint. It provides that each party to the SPA "irrevocably submits to the *exclusive* jurisdiction" of the District Court and the Court of Chancery. SPA § 10.8 (emphasis added). Additionally, unlike Section 8.4(c), Section 10.8 specifically provides that the parties agree "to *commence*" any action "arising out of [the SPA] or the transactions contemplated [t]hereby" in the District Court or the Court of Chancery. *Id.* § 10.8 (emphasis added); *see also id.* § 8.4(c). Section 10.8, unlike Section 8.4(c), uses the term "venue".

Count I of the Complaint is premised upon: (i) Plaintiff's purported right to indemnification under Section 8.2 of the SPA, *see* Compl. ¶¶ 32–33; and (ii) Byrne's purported breach of Section 8.2 (in the alternative), *see id.* ¶¶ 41–45. Count II of the Complaint (Promissory Estoppel) is premised upon Byrne's purported promise to reimburse Plaintiff for legal invoices, consistent with his obligations under the SPA.

*Id.* ¶¶ 24, 48–53.  All three claims, therefore, "arise out of" the SPA.  *See* SPA § 10.8; *PPL Corp. v. Riverstone Hldgs. LLC*, 2019 WL 5423306, at *7 (Del. Ch. Oct. 23, 2019) (explaining "[b]road forum selection clauses apply not only to claims dealing directly with the terms of the contract itself, but also to any issues that touch on contract rights or contract performance." (internal quotations omitted)); *see also Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008) ("[U]nder Delaware law, the term 'arising out of' is broadly construed ….").

Consequently, Plaintiff is contractually limited to filing the Complaint in either the Court of Chancery or the District of Delaware.  Section 8.4(c)'s broad reference to "the state and federal courts located in the State of Delaware" does not alter this conclusion.  The two provisions are unambiguous and entirely consistent: Section 8.4(c) establishes that Delaware's state and federal courts have exclusive jurisdiction to hear and determine any action arising out of or in connection with the SPA, and Section 10.8 clarifies **which** such courts qualify as proper venues.  Indeed, Section 10.8, unlike Section 8.4(c), explicitly reflects the parties' agreement to commence any applicable action **only** in the Court of Chancery or the District of Delaware.  *See* SPA §§ 8.4(c), 10.8.

C. **Neither Exception to Honoring the Parties' Forum Selection Clause Applies**

Plaintiff cannot establish that either of the two exceptions that permit Delaware courts to decline to enforce an otherwise valid forum selection clause apply: if (i) enforcement would be unreasonable and unjust under the circumstances; or (ii) the forum selection clause was procured by fraudulent inducement. *Surgalign Hldgs.*, 2023 WL 1796293, at *5.

As to the first exception, "[a]n agreement is only unreasonable when its enforcement would seriously impair [the plaintiff's] ability to pursue its cause of action. Mere inconvenience or additional expense is not the test of unreasonableness." *Surgalign Hldgs.*, 2023 WL 1796293, at *6 (quoting *Loveman v. The NuSmile, Inc.*, 2009 WL 847655, at *3 (Del. Super. Ct. Mar. 31, 2009)).

Here, nothing prevents or otherwise impairs Plaintiff from filing its Complaint in the District of Delaware: the amount in controversy is over $75,000 and complete diversity exists among the parties. Compl. ¶¶ 1–4.[4] Moreover, Plaintiff "irrevocably and unconditionally waive[d] and agree[d] not to plead or claim in any such court

---

[4] Complete diversity exists because, for purposes of diversity jurisdiction, Plaintiff is deemed a citizen of Georgia and Defendants are all deemed citizens of California. Compl. ¶ 1 ("Ameris is corporation organized under the laws of the state of Georgia" and "[i]ts principal place of business is in Atlanta, Georgia"); *id.* ¶ 2 ("Byrne is an individual residing in Orange County, California."); *id.* ¶ 3 ("[T]he Trusts were formed in and under the laws of the state of California.").

- 9 -

[that is, the Court of Chancery or the District Court] that any such Action brought in any such court has been brought in an inconvenient forum." SPA § 10.8. And Plaintiff embraces Section 10.8's enforceability (and applicability) by specifically alleging that Section 10.8 "provides for jurisdiction in Delaware courts for the purposes of any action arising out of the SPA or related transactions" and that, in "Section 10.8, the parties also agreed to venue in Delaware[.]" Compl. ¶¶ 5–6. "Venue is therefore", Plaintiff continues, "appropriate in this Court." *Id.* ¶ 6.

Nor can Plaintiff establish that Section 10.8 "was procured by fraudulent inducement." The SPA was drafted by sophisticated parties negotiating at arms-length. Plaintiff cannot credibly challenge either the propriety of the SPA or Section 10.8 specifically. On the contrary, again, Plaintiff embraces Section 10.8's enforceability and applicability. *See* Compl. ¶¶ 5–6.

D.    **The Specific Language in Section 10.8 Qualifies the More General Language in Section 8.4(c)**

The Court should reject any argument from Plaintiff that Section 8.4(c) conflicts with Section 10.8 or otherwise renders the provisions ambiguous. Application of well-established principles of contract interpretation and construction demonstrate that Section 10.8 qualifies (not conflicts with) the meaning of Section 8.4(c) and limits venue to either the Court of Chancery or the District Court.

"When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). In so doing, courts are "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." *Id.* A court is to "read a contract as a whole and … give each provision and term effect, so as not to render any part of the contract mere surplusage" and apply the plain meaning of unambiguous terms "in the context of the contract language and circumstances[.]" *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010); *Lorillard Tobacco*, 903 A.2d at 740. Delaware courts regard as a "basic principle" of contract construction that "specific language controls over general language in a contract", and "where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *TMIP Participants LLC v. DSW Grp. Hldgs. LLC*, 2016 WL 490257, at \*12 (Del. Ch. Feb. 4, 2016); *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

By "submit[ting] to the exclusive jurisdiction of the United States District Court for the District of Delaware and the Court of Chancery of Delaware in the State of Delaware, for the purposes of any Action arising out of this Agreement or the transactions contemplated hereby" and agreeing "to commence any such Action either in" District Court or the Court of Chancery, the parties demonstrably intended to limit venue to those two courts. *See* SPA § 10.8. Section 10.8 is more specific

- 11 -

than Section 8.4(c) and thus controls.  Accordingly, to the extent there is any conflict between these provisions, Section 10.8 qualifies the meaning of the phrase "the state and federal courts located in the State of Delaware" in Section 8.4(c).

To permit the parties' dispute to proceed in this Court would effectively preclude the parties' venue designation in Section 10.8 from having any practical force or effect and impermissibly render language in that section "mere surplusage."

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Dismiss and dismiss the Complaint for improper venue under Rule 12(b)(3).

Dated: December 18, 2025

Respectfully submitted,

REED SMITH LLP

*/s/ Benjamin P. Chapple*
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
bchapple@reedsmith.com
jmiraglia@reedsmith.com

*Counsel for Defendants*

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE IRREVOCABLE TRUST U/T/A DATED JULY 22, 2021, <br><br> Plaintiffs, <br><br> v. <br><br> AMERIS BANK, <br><br> Defendant. | Case No. 1:25-cv-01557-JLH |

**FIRST AMENDED COMPLAINT**

Plaintiffs Patrick E. Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001 ("Byrne Revocable Trust"), and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021 ("Byrne Irrevocable Trust") (collectively, "Sellers") submit this First Amended Complaint, and in support thereof, allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.    Byrne is the founder, former majority shareholder, and former Chief Executive Officer of Balboa Capital Corporation ("Balboa"), a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.

2.    On December 10, 2021, Sellers and Balboa entered into a Stock Purchase Agreement ("SPA") with Defendant Ameris Bank ("Ameris") under which Ameris acquired Balboa.  Following the closing of the SPA, Balboa continued to operate in California as a

separately run and operated division of Ameris (the "Balboa Division"), with the now-former Balboa employees continuing to perform essentially the same job duties they had previously.

3.     Ameris, however, procured the SPA by fraud.  Critical to the Sellers' inducement to sell Balboa to Ameris was the execution of the Balboa Capital Long-Term Cash Incentive Plan ("LTIP"), which would provide cash bonus awards to employees of the continuing Balboa Division based on the achievement of certain performance thresholds that were to be calculated based on an agreed-upon formula that was laid out in the LTIP.  But as Sellers would learn following the close of the first LTIP cycle on December 31, 2022, Ameris never intended to honor the LTIP and at its first opportunity breached its promise to Sellers and Balboa's former employees by intentionally miscalculating the cash bonus awards due thereunder in violation of the agreed upon calculation formula in the LTIP.  Had Sellers known that Ameris never intended to honor the LTIP, Sellers would not have agreed to enter into the Stock Purchase Agreement with Ameris.

4.     Ameris profited handsomely from its fraudulent acts.  Not only did Ameris's fraud enable it to acquire Balboa by inducing Sellers to enter into the SPA, following the closing of the SPA, the former Balboa employees who were parties to the LTIP were induced by the promise of the cash bonus awards under the LTIP to work above and beyond their normal job responsibilities to ensure that the performance thresholds necessary to trigger the cash bonus awards were met. As a result of Ameris's fraudulent inducement, the hard work of the former Balboa employees increased the Balboa Division's profitability substantially, resulting in additional profits for Ameris and increased stock value for Ameris stockholders.

5.     Ameris's fraudulent promise that it would comply with the terms of the LTIP was also critical to Sellers' agreement to certain indemnification rights in the SPA.  More specifically, in reliance on Ameris's fraudulent representation, Sellers agreed to indemnify and hold harmless

Ameris against losses incurred in certain litigation that was pending against Balboa at the time of its acquisition.

6.    Sellers now bring this action for rescission or partial rescission of the SPA.  Ameris should be required to restore to Sellers the benefits procured from Sellers under the SPA and pay any monetary damages arising from its fraudulent inducement.

7.    In the alternative, Sellers seek equitable reformation of the SPA, on the basis of fraudulent inducement, to void the indemnification provisions therein.

## PARTIES

8.    Plaintiff Byrne is an individual residing in Orange County, California.

9.    Plaintiff Byrne Revocable Trust is a revocable trust that was formed in and under the laws of the State of California.

10.    Plaintiff Byrne Irrevocable Trust is an irrevocable trust that was formed in and under the laws of the State of California.

11.    Defendant Ameris is a corporation organized under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action involves an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

13.    This Court has personal jurisdiction over Ameris because, pursuant to Section 10.8 of the SPA, it consented to this Court's jurisdiction for the purposes of any action arising out of the SPA.

14.    Venue is proper in this Court because, pursuant to Section 10.8 of the SPA, Ameris

irrevocably and unconditionally waived any objection to the laying of venue of any action arising out of the SPA in this Court.

## **FACTUAL BACKGROUND**

15.     Founded in 1988 by Byrne, Balboa is a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.  Through Byrne's leadership, Balboa grew into one of the nation's largest privately held finance companies.  Byrne, in conjunction with the Byrne Revocable Trust and Byrne Irrevocable Trust, owned all shares of Balboa prior to its acquisition by Ameris.

16.     Ameris became interested in acquiring Balboa and began negotiations with Byrne. A critical consideration for Byrne throughout the negotiation process was to ensure that Balboa's employees would not lose their jobs following Ameris's acquisition of the company, and that the soon-to-be former employees of Balboa would be fairly compensated for the time, effort, and energy they put into Balboa's continued success as they transitioned into being employees of Ameris.

17.     To that end, Byrne secured Ameris's agreement to enter into the LTIP with eligible former employees of Balboa that would continue on as employees of Ameris following the closing of the acquisition.  Under the LTIP, eligible employees of the Balboa Division would be entitled to "Cash Bonus Awards" based on the achievement of certain "Performance Goals" defined therein.  The Performance Goals under the LTIP would be satisfied if Balboa reached a minimum threshold of earnings before taxes (or "EBT") of $37 million, $48.5 million, and $57.2 million for the years 2022, 2023, and 2024, respectively.  If Balboa exceeded the Performance Goals for these given years, 35% of the amount by which Balboa exceeded the Performance Goal threshold would be placed in an "Incentive Pool" from which the Cash Bonus Awards would be distributed to

employees working in the Balboa Division.

18.     Critically, to avoid any inconsistencies in the payment of Cash Bonus Awards to former Balboa employees, Byrne ensured that the LTIP contained a specific formula for calculating when the Performance Goals were reached and exceeded that was consistent with Balboa's financial accounting methodologies—the Pioneer 1Q21 Operating Model.  To that end, the LTIP expressly provides that EBT—the critical component of determining whether a Performance Goal was met—"is defined as actual annual earnings before tax as identified as 'Actual Earnings Before Tax' in the Pioneer 1Q21 Operating Model," which was attached to the LTIP as Exhibit A.  The LTIP further provides that "[f]or purposes of the calculation of EBT under this Agreement and the Plan (defined below), the Key Assumptions (defined below) must be used in interpretation and application of the Pioneer 1Q21 Operating Model for purposes of the calculation of EBT, and no costs of a type not contemplated by the Pioneer 1Q21 Operating Model will be allocated to Balboa."

19.     During the parties' negotiations, Byrne (and, in some instances, other Balboa personnel, including Phil Silva, Balboa's Chief Financial Officer, and Rob Rasmussen, Balboa's Chief Operating Officer) held numerous focused discussions with Ameris personnel concerning the application of the Pioneer 1Q21 Operating Model to the LTIP and the importance of adhering to accounting methodologies consistent with Balboa's past practices.  Those discussions included:

   a.     Phone calls with Jim LaHaise (then Ameris's Chief Strategy Officer) and Michael Jones and Daniel Larrea of Keefe, Bruyette & Woods, Ameris's financial advisor, between approximately July 2021 and December 9, 2021;

   b.     A phone call with Mr. LaHaise on or about August 1–2, 2021;

   c.     A phone call with Palmer Proctor, Ameris's Chief Executive Officer, on or about August 1–2, 2021;

   d.     Due diligence phone calls with Messrs. LaHaise and Proctor, Nicole Stokes

(Ameris's Chief Financial Officer), Jon Edwards (Ameris's Chief Credit Officer), Jody Spencer (Ameris's Chief Legal Officer), Ross Creasy (Ameris's Chief Information Officer), Bill McKendry (Ameris's Chief Risk Office), and Doug Strange (Ameris's then-Executive Vice President and current Chief Credit Officer), between November 15, 2021, and December 9, 2021;

e.     Due diligence phone calls with Messrs. LaHaise, Edwards, McKendry, Strange, and Spencer, and Ms. Stokes, between July and August 2, 2021;

f.     An in-person meeting at Ameris's office in Atlanta, Georgia with Messrs. LaHaise, Proctor, and Edwards and Ms. Stokes in August 2021;

g.     A dinner with Messrs. LaHaise, Edwards, and McKendry, and Ms. Stokes in Atlanta, Georgia on same evening as the parties' in-person meeting at Ameris's office; and

h.     In-person meetings in Irvine, California: (i) between August 2 and December 10, 2021 with (a) Messrs. McKendry and Creasy; (b) Messrs. LaHaise and Creasy; and (c) Mr. McKendry and Ms. Stokes; and (ii) with Messrs. LaHaise and Proctor.

20.     Ameris, by and through Messrs. LaHaise and Edwards and Ms. Stokes, affirmatively represented to Byrne during the aforementioned calls between August and November 2021, as well as during the aforementioned meeting and dinner in Atlanta, Georgia in August 2021, that Balboa's existing financial accounting methodologies and the Pioneer 1Q21 Operating Model would continue to be used post-closing by Ameris for purposes of the LTIP and Cash Bonus Awards calculations thereunder irrespective of Ameris's financial reporting results or obligations; in other words, that Ameris would honor and comply with the LTIP's terms post-closing.

21.     Obtaining Ameris's agreement to the terms of the LTIP and commitment to enter into the LTIP with eligible employees of the Balboa Division was a critical consideration in Byrne's ultimate decision to sell Balboa to Ameris.  Without the LTIP and assurances that the soon-to-be former Balboa employees were protected and would be fairly compensated going forward, Byrne would not have sold Balboa to Ameris.  The LTIP was also a critical consideration

- 6 -

in Byrne's decision to agree to certain indemnification provisions in the SPA. During the negotiation process, Ameris insisted that Sellers indemnify Ameris for any losses associated with certain litigation that was pending against Balboa at the time. Byrne was willing to take on the risk that Sellers would have to indemnify Ameris only because he understood that the soon-to-be-former Balboa employees would be sufficiently protected and compensated post-acquisition. Accordingly, Sellers agreed to the indemnification provisions found in Section 8 of the SPA.

22.    On December 10, 2021, Ameris entered into the SPA with Sellers and agreed to the LTIP.

23.    Ameris, contrary to its pre-closing representations to Byrne (who remained as CEO of Balboa post-acquisition), breached the LTIP at its first opportunity. Specifically, beginning with the first LTIP cycle for the year 2022, which closed on December 31, 2022, Ameris intentionally miscalculated Balboa's EBT in violation of the agreed upon calculation methodology under the LTIP. More specifically, Ameris willfully used methods that were inconsistent with the Pioneer 1Q21 Operating Model and disregarded the "Key Assumptions" that the LTIP required to be applied. Instead, Ameris calculated the EBT of Balboa using methods that intentionally lowered Balboa's EBT, and by extension, lowered or eliminated the Cash Bonus Awards earned but not received by approximately 145 Balboa employees participating in the LTIP from 2022 to 2024. Ameris's intentional miscalculations resulted in a reduction of the Incentive Pool for 2022 and eliminated the Incentive Pool for 2023, thereby depriving approximately 145 employees of the Cash Bonus Awards they rightfully earned under the LTIP for their work in 2022 and 2023.

24.    Sellers did not discover—and could not have reasonably discovered—Ameris's fraudulent intent and acts until after the first Cash Bonus Award became due following the close of the first LTIP cycle on December 31, 2022. Between closing and when the first Cash Bonus

Award became due, Sellers did not have access to the financial information that would have been necessary to detect Ameris's departures in accounting methodologies. And Ameris had previously represented to Byrne at all relevant times that it would comply with the terms of the LTIP.

25.    Beginning in or about June 2023, after the close of the first LTIP cycle, Byrne complained repeatedly to Ameris about its miscalculations but understood, following conversations with Ameris personnel, those disputes to be ordinary post-closing accounting disagreements that Ameris would resolve in good faith.

26.    Ameris, however, never intended to perform under the LTIP. Following Byrne's complaints, Sellers learned that Ameris, prior to (and after) its acquisition of Balboa, utilized financial accounting methodologies that differed materially from Balboa's financial accounting methodologies and the Pioneer 1Q21 Operating Model. And Ameris never took steps to implement the bookkeeping procedures and financial accounting methodologies that would be necessary to perform under the LTIP, either prior to or immediately after closing.

27.    It thus became clear to Sellers that Ameris never intended to apply Balboa's financial accounting methodologies to the newly formed Balboa division—despite agreeing to do so in the LTIP—or otherwise honor the LTIP's terms. Instead, Ameris's plan was always to apply its own, materially different, financial accounting methodology to the newly formed Balboa division.

28.    Ameris's fraudulent conduct did not end there. While Ameris personnel, starting in or about June 2023, communicated with Byrne about his concerns regarding Ameris's miscalculations and its clear breach of the LTIP, Ameris never ultimately meaningfully addressed them or conformed its methodologies to comply with the LTIP. Instead, Ameris terminated Byrne in June 2024 to further conceal the fact that it never intended to honor the LTIP in the first place.

- 8 -

29.    Unsurprisingly, then, the United States District Court for the Central District of California, in ruling on Ameris's motion for summary judgment in pending litigation between Byrne and Ameris in that District, found that "[a] rational jury could review the numerous emails [Byrne] sent to [Ameris] regarding purported miscalculations, as well as internal communications among Ameris employees discussing his contentions, and determine that [Ameris] willfully performed the LTIP calculations improperly." *Patrick Byrne v. Ameris Bank*, Case No. 8:24-cv-01989-MWC-JDE (C.D. Cal. Feb. 13, 2026), Dkt. 121 at 16.

30.    Given Ameris's breach of the LTIP at its first opportunity, as well as its failure, prior to and immediately after closing, to implement the bookkeeping procedures and financial accounting methodologies necessary to comply with the LTIP, it is clear that Ameris never intended to honor its terms. Instead, Ameris fraudulently represented (both by executing the LTIP and during the negotiation process with Byrne) that it would comply with the terms of the LTIP.

31.    As a result of these fraudulent acts, Ameris received a windfall. Not only did Ameris fraudulently induce Sellers to enter into the SPA, it turned tens of millions of dollars of additional profit for Ameris as a result of the efforts of the former Balboa employees who were motivated by the promise of Cash Bonus Awards under the LTIP to go above and beyond their duties to increase Balboa's profitability, all while being completely unaware that Ameris never intended to honor the terms of the LTIP.

32.    The harms suffered by Sellers cannot be remedied by monetary damages alone. Sellers would not have entered into the SPA, and would not have agreed to indemnify Ameris, had it known that Ameris never intended to comply with the LTIP. Accordingly, rescission (or partial rescission) of the SPA is warranted.

33.    Alternatively, Sellers seek equitable reformation of the SPA to void the

indemnification provisions in Section 8 of the SPA.

34.    Balboa, as a company, is a unique asset whose present and future value is not readily ascertainable.  Thus, only equitable relief in the form of rescission or reformation can afford Sellers an adequate remedy.

35.    In addition, Ameris sued Sellers in Delaware Superior Court under the same SPA that Ameris fraudulently obtained by misleading Sellers into believing it would honor the terms of the LTIP.  The action initiated by Ameris was captioned *Ameris Bank v. Patrick E. Byrne et al.*, C.A. No. N25C-05-071 KMM CCLD (Del. Super. Ct.) (the "Superior Court Action").

36.    Ameris eventually voluntarily dismissed the Superior Court Action on February 18, 2026, and re-filed its Complaint in this Court, but not until after Sellers were forced to defend the action and respond to the Complaint on December 18, 2025 by filing a Motion to Dismiss for Improper Venue.

37.    By initiating the Superior Court Action, Ameris breached Section 10.8 of the SPA, which designates the "United States District Court for the District of Delaware and the Court of Chancery" as the "exclusive" venue "for the purposes of any Action arising out of [the SPA]."

## COUNT I

### (Fraudulent Inducement)

38.    Sellers incorporate the foregoing allegations as if fully set forth herein.

39.    During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

40.    During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with

- 10 -

the LTIP's terms.

41.    These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

42.    Sellers would not have entered into the SPA had it known these representations were false.

43.    Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

44.    Ameris made these representations with the intention of inducing Sellers' reliance.

45.    Sellers reasonably and justifiably relied on Ameris's misrepresentations.

46.    Sellers have suffered harm due to Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

47.    Accordingly, Sellers seek a remedy for Ameris's fraudulent inducement in the form of rescission or partial rescission of the SPA.

48.    In addition, Sellers seek a remedy for Ameris's fraudulent inducement in the form of rescissory damages in an amount to be determined at trial.

49.    In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT II

### (Equitable Fraud (In the Alternative))

50.    Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

51.    During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to

- 11 -

comply with the LTIP.

52.     During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

53.     These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

54.     Sellers would not have entered into the SPA had they known these representations were false.

55.     Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

56.     Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

57.     Sellers reasonably and justifiably relied on Ameris's misrepresentations.

58.     Sellers have suffered harm due to Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

59.     Sellers lack an adequate remedy at law.

60.     Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of rescission or partial rescission of the SPA.

61.     In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

62.     In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT III

### (Equitable Fraud (In the Alternative))

63.    Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

64.    During the parties' negotiation of the SPA, Ameris negligently misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

65.    During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

66.    These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

67.    Sellers would not have entered into the SPA had they known these representations were false.

68.    Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

69.    Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

70.    Sellers reasonably and justifiably relied on Ameris's misrepresentations.

71.    Sellers have suffered harm due to Ameris's negligent inducement of Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

72.    Sellers lack an adequate remedy at law.

73.    Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of

rescission or partial rescission of the SPA.

74.    In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

75.    In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT IV

### (Breach of Contract)

76.    Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

77.    The SPA is a valid and enforceable contract, subject to its voidability at Sellers' option by reason of Ameris's fraud.

78.    Ameris breached Section 10.8 the SPA by initiating the Superior Court Action.

79.    Ameris's breach of Section 10.8 of the SPA caused Sellers to suffer damages, as they were forced to defend against the Superior Court Action.

80.    Accordingly, Sellers seek monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant awarding Plaintiffs all appropriate relief, including the following:

a. Rescission or partial rescission of the SPA on the basis that Sellers' agreement to the same was fraudulently induced;

b. Awarding rescissory damages;

c. Alternatively, reformation of the SPA to void Section 8 therein;

d. Monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action;

e. Sellers' costs, attorneys' fees and expenses incurred in connection with this action; and

f. Such other and further relief as the Court may deem just and proper.

Dated: May 18, 2026                    REED SMITH LLP

*/s/ Benjamin P. Chapple*
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Plaintiffs Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*

# EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF DELAWARE

|  |  |
|---|---|
| PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE IRREVOCABLE TRUST U/T/A DATED JULY 22, 2021, <br><br> Plaintiffs, <br><br> v. <br><br> AMERIS BANK, <br><br> Defendant. | Case No. ————1:25-cv-01557-JLH |

### FIRST AMENDED COMPLAINT

PlaintiffPlaintiffs Patrick E. Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001 ("Byrne Revocable Trust"), and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021 ("Byrne Irrevocable Trust") (collectively, "Sellers") submit this VerifiedFirst Amended Complaint, and in support thereof, allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Byrne is the founder, former majority shareholder, and former Chief Executive Officer of Balboa Capital Corporation ("Balboa"), a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.

2.      On December 10, 2021, Sellers and Balboa entered into a Stock Purchase Agreement ("SPA") with Defendant Ameris Bank ("Ameris") under which Ameris acquired

Balboa.  Following the closing of ~~this~~the SPA, Balboa continued to operate in California as a separately run and operated division of Ameris (the "Balboa Division"), with the now-former Balboa employees continuing to perform essentially the same job duties they had previously.

3.      Ameris, however, procured the SPA by fraud.  Critical to the Sellers' inducement to sell Balboa to Ameris was the execution of the Balboa Capital Long-Term Cash Incentive Plan ("LTIP"), which would provide cash bonus awards to employees of the continuing Balboa ~~division of Ameris~~Division based on the achievement of certain performance thresholds that were to be calculated based on an agreed-upon formula that was laid out in the LTIP.  But as Sellers would learn following the close of the first LTIP cycle on December 31, 2022, Ameris never intended ~~the~~to honor the LTIP~~,~~ and ~~immediately~~at its first opportunity breached its promise to Sellers and Balboa's former employees by intentionally miscalculating the cash bonus awards due thereunder in violation of the agreed upon calculation formula in the LTIP.  Had Sellers known that Ameris never intended to honor the LTIP, Sellers would not have agreed to enter into the Stock Purchase Agreement with Ameris.

4.      Ameris  profited  handsomely  from  its  fraudulent  acts.    Not  only  did ~~Ameris'~~Ameris's fraud enable it to acquire Balboa by inducing Sellers to enter into the SPA, following the closing of the SPA, the former Balboa employees who were parties to the LTIP were induced by the promise of the cash bonus awards under the LTIP to work above and beyond their normal job responsibilities to ensure that the performance thresholds necessary to trigger the cash bonus awards were met.   As a result of ~~Ameris'~~Ameris's fraudulent inducement, the hard work of the former Balboa employees increased the Balboa ~~division's~~Division's profitability substantially, resulting in additional profits for Ameris and increased stock value for Ameris stockholders.

5.      ~~Ameris'~~Ameris's fraudulent promise that it would comply with the terms of the LTIP was also critical to Sellers' agreement to certain indemnification rights in the SPA.  More specifically, in reliance on ~~Ameris'~~Ameris's fraudulent representation, Sellers agreed to indemnify and hold harmless Ameris against losses incurred in certain litigation that was pending against Balboa at the time of its acquisition.

6.      Sellers now bring this action for rescission or partial rescission of the SPA. Ameris should be required to restore to Sellers the benefits procured from Sellers under the SPA~~,~~ ~~or in the alternative,~~ and pay any monetary damages arising from its fraudulent inducement.

7.      In the alternative, Sellers seek equitable reformation of the SPA, on the basis of fraudulent inducement, to void the indemnification provisions therein.

## PARTIES

8.      Plaintiff Byrne is an individual residing in Orange County, California.

9.      Plaintiff Byrne Revocable Trust is a revocable trust that was formed in and under the laws of the State of California.

10.      Plaintiff Byrne Irrevocable Trust is an irrevocable trust that was formed in and under the laws of the State of California.

11.      Defendant Ameris is a corporation organized under the laws of the ~~state~~State of Georgia with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action involves an amount in controversy that exceeds the sum or value of $75,000, exclusive of ~~interests~~interest and costs, and is between citizens of different states.

13.      This Court has personal jurisdiction over Ameris because, pursuant to Section

10.8 of the SPA, it consented to this Court's jurisdiction for the purposes of any action arising out of the SPA.

14.    Venue is proper in this Court because, pursuant to Section 10.8 of the SPA, Ameris irrevocably and unconditionally waived any objection to the laying of venue of any action arising out of the SPA in this Court.

**FACTUAL BACKGROUND**

15.    Founded in 1988 by Byrne, Balboa is a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.  Through Byrne's leadership, Balboa grew into one of the nation's largest privately held finance companies.  Byrne, in conjunction with the Byrne Revocable Trust and Byrne Irrevocable Trust, owned all shares of Balboa prior to its acquisition by Ameris.

16.    Ameris became interested in acquiring Balboa and began negotiations with Byrne. A critical consideration for Byrne throughout the negotiation process was to ensure that Balboa's employees would not lose their jobs following ~~Ameris'~~Ameris's acquisition of the company, and that the soon-to-be former employees of Balboa would be fairly compensated for the time, effort, and energy they put into Balboa's continued success as they transitioned into being employees of Ameris.

17.    To that end, Byrne secured ~~Ameris'~~Ameris's agreement to enter into the LTIP with eligible former employees of Balboa that would continue on as employees of Ameris following the closing of the acquisition.  Under the LTIP, eligible employees of the Balboa ~~division of Ameris~~Division would be entitled to "Cash Bonus Awards" based on the achievement of certain "Performance Goals" defined therein.  The Performance Goals under the

LTIP would be satisfied if Balboa reached a minimum threshold of earnings before taxes (or "EBT") of $37 million, $48.5 million, and $57.2 million for the years 2022, 2023, and 2024, respectively.   If Balboa exceeded the Performance Goals for these given years, 35% of the amount by which Balboa exceeded the Performance Goal threshold would be placed in an "Incentive Pool" from which the Cash Bonus Awards would be distributed to employees working in the Balboa ~~division of Ameris~~Division.

18.     Critically, to avoid any inconsistencies in the payment of Cash Bonus Awards to former Balboa employees, Byrne ensured that the LTIP contained a specific formula for calculating when the Performance Goals were reached and exceeded that was consistent with Balboa's financial accounting methodologies—the Pioneer 1Q21 Operating Model.  To that end, the LTIP expressly provides that EBT—the critical component of determining whether a Performance Goal was met—"is defined as actual annual earnings before tax as identified as 'Actual Earnings Before Tax' in the Pioneer 1Q21 Operating Model," which was attached to the LTIP as Exhibit A.  The LTIP further provides that "[f]or purposes of the calculation of EBT under this Agreement and the Plan (defined below), the Key Assumptions (defined below) must be used in interpretation and application of the Pioneer 1Q21 Operating Model for purposes of the calculation of EBT, and no costs of a type not contemplated by the Pioneer 1Q21 Operating Model will be allocated to Balboa."

19.     During the parties' negotiations, Byrne (and, in some instances, other Balboa personnel, including Phil Silva, Balboa's Chief Financial Officer, and Rob Rasmussen, Balboa's Chief Operating Officer) held numerous focused discussions with Ameris personnel concerning the application of the Pioneer 1Q21 Operating Model to the LTIP and the importance of adhering to accounting methodologies consistent with Balboa's past practices.   Those discussions

included:

    a.    Phone calls with Jim LaHaise (then Ameris's Chief Strategy Officer) and Michael Jones and Daniel Larrea of Keefe, Bruyette & Woods, Ameris's financial advisor, between approximately July 2021 and December 9, 2021;

    b.    A phone call with Mr. LaHaise on or about August 1–2, 2021;

    c.    A phone call with Palmer Proctor, Ameris's Chief Executive Officer, on or about August 1–2, 2021;

    d.    Due diligence phone calls with Messrs. LaHaise and Proctor, Nicole Stokes (Ameris's Chief Financial Officer), Jon Edwards (Ameris's Chief Credit Officer), Jody Spencer (Ameris's Chief Legal Officer), Ross Creasy (Ameris's Chief Information Officer), Bill McKendry (Ameris's Chief Risk Office), and Doug Strange (Ameris's then-Executive Vice President and current Chief Credit Officer), between November 15, 2021, and December 9, 2021;

    e.    Due diligence phone calls with Messrs. LaHaise, Edwards, McKendry, Strange, and Spencer, and Ms. Stokes, between July and August 2, 2021;

    f.    An in-person meeting at Ameris's office in Atlanta, Georgia with Messrs. LaHaise, Proctor, and Edwards and Ms. Stokes in August 2021;

    g.    A dinner with Messrs. LaHaise, Edwards, and McKendry, and Ms. Stokes in Atlanta, Georgia on same evening as the parties' in-person meeting at Ameris's office; and

    h.    In-person meetings in Irvine, California: (i) between August 2 and December 10, 2021 with (a) Messrs. McKendry and Creasy; (b) Messrs. LaHaise and Creasy; and (c) Mr. McKendry and Ms. Stokes; and (ii) with Messrs. LaHaise and Proctor.

20.    Ameris, by and through Messrs. LaHaise and Edwards and Ms. Stokes, affirmatively represented to Byrne during the aforementioned calls between August and November 2021, as well as during the aforementioned meeting and dinner in Atlanta, Georgia in August 2021, that Balboa's existing financial accounting methodologies and the Pioneer 1Q21 Operating Model would continue to be used post-closing by Ameris for purposes of the LTIP and

Cash Bonus Awards calculations thereunder irrespective of Ameris's financial reporting results or obligations; in other words, that Ameris would honor and comply with the LTIP's terms post-closing.

21.    ~~19.~~ Obtaining ~~Ameris'~~Ameris's agreement to the terms of the LTIP and commitment to enter into the LTIP with eligible employees of the Balboa ~~division of Ameris~~Division was a critical consideration in Byrne's ultimate decision to sell Balboa to Ameris.  Without the LTIP and assurances that the soon-to-be former Balboa employees were protected and would be fairly compensated going forward, Byrne would not have sold Balboa to Ameris.

~~20.~~ The LTIP was also a critical consideration in Byrne's decision to agree to certain indemnification provisions in the SPA.  During the negotiation process, Ameris insisted that Sellers indemnify Ameris for any losses associated with ~~two litigations that were~~certain litigation that was pending against Balboa at the time.  Byrne was willing to take on the risk that Sellers would have to indemnify Ameris only because he understood that the soon-to-be-former Balboa employees would be sufficiently protected and compensated post-acquisition.  Accordingly, Sellers agreed to the indemnification provisions found in Section 8 of the SPA.

22.    ~~21.~~ On December 10, 2021, Ameris entered into the SPA with Sellers and agreed to the LTIP.

~~22. Ameris, however, never intended to perform under the LTIP.  Prior to (and after) its acquisition of Balboa, Ameris utilized financial accounting methodologies that differed materially from Balboa's financial accounting methodologies and the Pioneer 1Q21 Operating Model.  Ameris never intended to apply Balboa's financial accounting methodologies to the newly formed Balboa division despite agreeing to do so in the LTIP.  Instead, Ameris' plan was~~

- 7 -

~~always to apply its own, materially different, financial accounting methodology to the newly formed Balboa division.~~

23.    ~~Given that Ameris never intended to perform under the LTIP, unsurprisingly, Ameris immediately breached it.  Beginning~~Ameris, contrary to its pre-closing representations to Byrne (who remained as CEO of Balboa post-acquisition), breached the LTIP at its first opportunity.  Specifically, beginning with the first LTIP cycle for the year 2022, which closed on December 31, 2022, Ameris intentionally miscalculated Balboa's EBT in violation of the agreed upon calculation methodology under the LTIP.  More specifically, Ameris willfully used methods that were inconsistent with the Pioneer 1Q21 Operating Model and disregarded the "Key Assumptions" that the LTIP required to be applied.  Instead, Ameris calculated the EBT of Balboa using methods that intentionally lowered Balboa's EBT, and by extension, lowered or eliminated the Cash Bonus Awards earned but not received by approximately 145 Balboa employees participating in the LTIP from 2022 to 2024.  ~~Ameris'~~Ameris's intentional miscalculations resulted in a reduction of the Incentive Pool for 2022 and eliminated the Incentive Pool for 2023, thereby depriving approximately 145 employees of the Cash Bonus Awards they ~~rightful~~rightfully earned under the LTIP for their work in 2022 and 2023.

24.    Sellers did not discover—and could not have reasonably discovered—Ameris's fraudulent intent and acts until after the first Cash Bonus Award became due following the close of the first LTIP cycle on December 31, 2022.  Between closing and when the first Cash Bonus Award became due, Sellers did not have access to the financial information that would have been necessary to detect Ameris's departures in accounting methodologies.  And Ameris had previously represented to Byrne at all relevant times that it would comply with the terms of the LTIP.

- 8 -

25.     Beginning in or about June 2023, after the close of the first LTIP cycle, Byrne complained repeatedly to Ameris about its miscalculations but understood, following conversations with Ameris personnel, those disputes to be ordinary post-closing accounting disagreements that Ameris would resolve in good faith.

26.     Ameris, however, never intended to perform under the LTIP.  Following Byrne's complaints, Sellers learned that Ameris, prior to (and after) its acquisition of Balboa, utilized financial accounting methodologies that differed materially from Balboa's financial accounting methodologies and the Pioneer 1Q21 Operating Model.  And Ameris never took steps to implement the bookkeeping procedures and financial accounting methodologies that would be necessary to perform under the LTIP, either prior to or immediately after closing.

27.     It thus became clear to Sellers that Ameris never intended to apply Balboa's financial accounting methodologies to the newly formed Balboa division—despite agreeing to do so in the LTIP—or otherwise honor the LTIP's terms.   Instead, Ameris's plan was always to apply its own, materially different, financial accounting methodology to the newly formed Balboa division.

28.     Ameris's fraudulent conduct did not end there.  While Ameris personnel, starting in or about June 2023, communicated with Byrne about his concerns regarding Ameris's miscalculations and its clear breach of the LTIP, Ameris never ultimately meaningfully addressed them or conformed its methodologies to comply with the LTIP.  Instead, Ameris terminated Byrne in June 2024 to further conceal the fact that it never intended to honor the LTIP in the first place.

29.     Unsurprisingly, then, the United States District Court for the Central District of California, in  ruling on Ameris's motion for summary judgment in pending litigation between

Byrne and Ameris in that District, found that "[a] rational jury could review the numerous emails [Byrne] sent to [Ameris] regarding purported miscalculations, as well as internal communications among Ameris employees discussing his contentions, and determine that [Ameris] willfully performed the LTIP calculations improperly." *Patrick Byrne v. Ameris Bank,* Case No. 8:24-cv-01989-MWC-JDE (C.D. Cal. Feb. 13, 2026), Dkt. 121 at 16.

30.    ~~24.~~ Given ~~Ameris' immediate~~Ameris's breach of the LTIP at its first opportunity, as well as its failure, prior to and immediately after closing, to implement the bookkeeping procedures and financial accounting methodologies necessary to comply with the LTIP, it is clear that Ameris never intended to honor its terms.  Instead, Ameris fraudulently represented (both by executing the LTIP and during the negotiation process with Byrne) that it would comply with the terms of the LTIP.

~~25. Ameris' fraudulent conduct did not end there.  Beginning in about June 2023, Byrne (who remained as CEO of Balboa post-acquisition) complained repeatedly to Ameris that it was miscalculating and changing various inputs to the EBT calculation in violation of the LTIP.  But Ameris did not address Byrne's concerns regarding its clear breach of the LTIP.  Instead, Ameris terminated Byrne in June 2024 to further conceal the fact that it never intended to honor the LTIP in the first place.~~

31.    ~~26.~~ As a result of these fraudulent acts, Ameris received a windfall.  Not only did Ameris fraudulently induce Sellers to enter into the SPA, it turned tens of millions of dollars of additional profit for Ameris as a result of the efforts of the former Balboa employees who were motivated by the promise of Cash Bonus Awards under the LTIP to go above and beyond their duties to increase Balboa's profitability, all while being completely unaware that ~~Balboa~~Ameris never intended to honor the terms of the LTIP.

32. ~~27.~~ The harms suffered by Sellers cannot be remedied by monetary damages alone.  Sellers would not have entered into the SPA, and would not have agreed to indemnify Ameris, had it known that Ameris never intended to comply with the LTIP.  Accordingly, rescission (or partial rescission) of the SPA is warranted.

33. ~~28.~~ Alternatively, Sellers seek equitable reformation of the ~~SAFE~~SPA to void the indemnification provisions in Section 8 of the SPA.

34. Balboa, as a company, is a unique asset whose present and future value is not readily ascertainable.  Thus, only equitable relief in the form of rescission or reformation can afford Sellers an adequate remedy.

35. ~~29.~~ In addition, Ameris ~~has~~ sued Sellers in Delaware Superior Court under the ~~indemnification provisions in the~~same SPA that Ameris fraudulently obtained by misleading Sellers into believing it would honor the terms of the LTIP.  The action initiated by ~~Sellers is~~Ameris was captioned *Ameris Bank v. Patrick E. Byrne et al.*, C.A. No. N25C-05-071 KMM CCLD (Del. Super. Ct.) (the "Superior Court Action").

36. Ameris eventually voluntarily dismissed the Superior Court Action on February 18, 2026, and re-filed its Complaint in this Court, but not until after Sellers were forced to defend the action and respond to the Complaint on December 18, 2025 by filing a Motion to Dismiss for Improper Venue.

37. ~~30.~~ By initiating the Superior Court Action, Ameris breached Section 10.8 of the SPA, which designates the "United States District Court for the District of Delaware and the Court of Chancery" as the "exclusive" venue "for the purposes of any Action arising out of [the SPA]."

## COUNT I

### (Fraudulent Inducement)

38. ~~31.~~ Sellers incorporate the foregoing allegations as if fully set forth herein.

39. ~~32.~~ During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

40. ~~33.~~ During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

41. ~~34.~~ These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

42. ~~35.~~ Sellers would not have entered into the SPA had it known these representations were false.

43. ~~36.~~ Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

44. ~~37.~~ Ameris made these representations with the intention of inducing Sellers' reliance.

45. ~~38.~~ Sellers reasonably and justifiably relied on ~~Ameris'~~ Ameris's misrepresentations.

46. ~~39.~~ Sellers have suffered harm due to ~~Ameris'~~ Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on ~~Ameris'~~ Ameris's material misrepresentations and/or ~~omission~~ omissions.

47.   40.  Accordingly, Sellers seek a remedy for Ameris' Ameris's fraudulent inducement in the form of rescission or partial rescission of the SPA.

48.   41. In addition or in the alternative, Sellers seek a remedy for Ameris' Ameris's fraudulent inducement in the form of rescissory damages in an amount to be determined at trial.

49.   In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT II

### (Reformation  Equitable Fraud (In the Alternative))

50.   42. Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

51.   43. During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

52.   44. During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

53.   45. These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

54.   46.  Sellers would not have entered into the SPA had they known these representations were false.

55.   47. Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

56.    48. Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

57.    49.  Sellers reasonably and justifiably relied on Ameris'Ameris's misrepresentations.

58.    50. Sellers have suffered harm due to Ameris'Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris'Ameris's material misrepresentations and/or omissionomissions.

59.    51. Sellers lack an adequate remedy at law.

60.    Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of rescission or partial rescission of the SPA.

61.    In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

62.    52. AccordinglyIn the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT III

### (Reformation  Equitable Fraud (In the Alternative))

63.    53. Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

64.    54. During the parties' negotiation of the SPA, Ameris negligently misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

65.    55. During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

66.    ~~56.~~ These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

67.    ~~57.~~ Sellers would not have entered into the SPA had they known these representations were false.

68.    ~~58.~~ Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

69.    ~~59.~~ Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

70.    ~~60.~~ Sellers reasonably and justifiably relied on ~~Ameris'~~ Ameris's misrepresentations.

71.    ~~61.~~ Sellers have suffered harm due to ~~Ameris'~~ Ameris's negligent inducement of Sellers' entry into the SPA in reliance on ~~Ameris'~~ Ameris's material misrepresentations and/or ~~omission~~ omissions.

72.    ~~62.~~ Sellers lack an adequate remedy at law.

73.    Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of rescission or partial rescission of the SPA.

74.    In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

75.    ~~63. Accordingly~~ In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT IV

### (Breach of Contract)

76. ~~64.~~ Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

77. ~~65.~~ The SPA is a valid and enforceable contract, subject to its voidability at Sellers' option by reason of ~~Ameris'~~Ameris's fraud.

78. ~~66.~~ Ameris breached Section 10.8 the SPA by initiating the Superior Court Action.

79. ~~67. Ameris'~~Ameris's breach of Section 10.8 of the SPA caused Sellers to suffer damages, as they ~~have been~~were forced to defend against the Superior Court Action.

~~68. Sellers will continue to incur damages in connection with defending against the Superior Court Action until they are able to secure a dismissal or transfer of the Superior Court Action.~~

80. ~~69.~~ Accordingly, Sellers seek monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant awarding Plaintiffs all appropriate relief, including the following:

a.  Rescission or partial rescission of the SPA on the basis that Sellers' agreement to the same was fraudulently induced;

b.  Awarding rescissory damages;

c.  Alternatively, reformation of the SPA to void Section 8 therein;

d.  Monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action;

e.  ~~d.~~ Sellers' costs, attorneys' fees and expenses incurred in connection with this action; and

f.  ~~e.~~ Such other and further relief as the Court may deem just and proper.

Dated: ~~December 23, 2025~~ May 18, 2026

REED SMITH LLP

/s/ Benjamin P. Chapple
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Plaintiffs Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*