# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERIS BANK,<br><br>Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE IRREVOCABLE TRUST U/T/A DATED JULY 22, 2021,<br><br>Plaintiffs,<br><br>v.<br><br>AMERIS BANK,<br>Defendant.Defendants/Counterclaim Plaintiffs. | Case No. 1:2526-cv-01557-00190-JLH |

**FIRSTSECOND AMENDED COMPLAINT/COUNTERCLAIMS[1]**

Plaintiffs Patrick E. Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001 ("Byrne Revocable Trust"), and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021 ("Byrne Irrevocable Trust", with the Byrne Revocable Trust, the "Byrne Trusts") (collectively, "Sellers") submit this FirstSecond Amended Complaint/Counterclaims, and in support thereof, allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

[1] Sellers previously filed their complaint and first amended complaint in Case No. 1:25-cv-01557-JLH prior to the court consolidating that action with this action on August 24, 2026 and, in connection with consolidation, designating Sellers as defendants/counterclaim plaintiffs.

## NATURE OF THE ACTION

1. Byrne is the founder, former majority shareholder, and former Chief Executive Officer of Balboa Capital Corporation ("Balboa"), a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.

2. On December 10, 2021, Sellers and Balboa entered into a Stock Purchase Agreement ("SPA") with ~~Defendant~~ Ameris Bank ("Ameris") under which Ameris acquired Balboa. Following the closing of the SPA, Balboa continued to operate in California as a separately run and operated division of Ameris (the "Balboa Division"), with the now-former Balboa employees continuing to perform essentially the same job duties they had previously.

3. Ameris, however, procured the SPA by fraud. Critical to the Sellers' inducement to sell Balboa to Ameris was the execution of the Balboa Capital Long-Term Cash Incentive Plan ("LTIP"), which would provide cash bonus awards to employees of the continuing Balboa Division based on the achievement of certain performance thresholds that were to be calculated based on an agreed-upon formula that was laid out in the LTIP.[2] But, as Sellers would learn following the close of the first LTIP cycle on December 31, 2022, Ameris never intended to honor the LTIP and at its first opportunity breached its promise to Sellers and Balboa's former employees by intentionally miscalculating the cash bonus awards due thereunder in violation of the ~~agreed upon~~agreed-upon calculation formula in the LTIP. Had Sellers known that Ameris never intended to honor the LTIP, Sellers would not have agreed to enter into the Stock Purchase Agreement with Ameris.

---

[2] Unless otherwise alleged herein, all of Ameris's fraudulent representations and omissions were made to Byrne on behalf of all Sellers.

4. Ameris profited handsomely from its fraudulent acts. Not only did Ameris's fraud enable it to acquire Balboa by inducing Sellers to enter into the SPA, following the closing of the SPA, the former Balboa employees who were parties to the LTIP were induced by the promise of the cash bonus awards under the LTIP to work above and beyond their normal job responsibilities to ensure that the performance thresholds necessary to trigger the cash bonus awards were met. As a result of Ameris's fraudulent inducement, the hard work of the former Balboa employees increased the Balboa Division's profitability substantially, resulting in additional profits for Ameris and increased stock value for Ameris stockholders (value Sellers could have retained had Ameris not fraudulently induced entry into the SPA).

5. Ameris's fraudulent promise that it would comply with the terms of the LTIP was also critical to Sellers' agreement to certain indemnification rights in the SPA. More specifically, in reliance on Ameris's fraudulent ~~representation~~promise, Sellers agreed to indemnify and hold harmless Ameris against losses incurred in certain litigation that was pending against Balboa at the time of its acquisition. The transactions underlying that litigation had been written down to zero on Balboa's books before the acquisition date, in conjunction with the negotiation of the LTIP, so Sellers had already absorbed the associated loss through the purchase price, which was calculated as a multiple of Balboa's closing equity.

6. Sellers accepted the residual indemnification exposure only because of Ameris's LTIP commitment.

7. ~~6.~~ Sellers now bring this action for rescission or partial rescission of the SPA, rescissory damages, and other relief. Ameris should be required to restore to Sellers the benefits procured from Sellers under the SPA and pay any additional monetary damages arising from its fraudulent inducement.

~~7. In the alternative, Sellers seek equitable reformation of the SPA, on the basis of fraudulent inducement, to void the indemnification provisions therein.~~

8. Ameris is no stranger to willful misconduct relating to its failure to comply with the LTIP, evidenced by the outcome of the related proceeding in *Patrick Byrne v. Ameris Bank*, Case No. 8:24-cv-01989-MWC-JDE (C.D. Cal.) (the "California Action"). Specifically, the jury in the California Action found that "Ameris acted with malice, oppression, or fraud" (D.I. 227 at 8; D.I. 246 ¶ 27) in connection with Ameris's retaliatory termination of Byrne as an employee in June 2024 following Byrne raising concerns about Ameris's incorrect LTIP calculations.[3] The California Action jury further found that Ameris owed Byrne wages under the LTIP for 2022 and 2023, that Ameris willfully failed to pay the full amount of earned wages, that Ameris breached

[3] The California Action and this action involve distinct plaintiffs proceeding in different capacities and seeking different relief. In the California Action, Byrne brought suit solely in his individual capacity as a former employee of Ameris, asserting employment-related claims: (i) wrongful termination in violation of public policy, (ii) whistleblower retaliation under California Labor Code § 1102.5, (iii) failure to pay all wages at termination in breach of California Labor Code §§201 and 203, (iv) violation of California's Unfair Competition Law, and (v) breach of Byrne's employment agreement and the LTIP. The damages sought and awarded in the California Action compensated Byrne for harms suffered as an employee: lost wages, non-economic damages arising from his wrongful termination, and waiting-time penalties. *See* California Action Am. Compl. (D.I. 207).

By contrast, this action is brought by the Sellers—Byrne and the Byrne Trusts—in their capacities as the former shareholders of Balboa who were parties to the SPA. The claims asserted here—fraudulent inducement, equitable fraud, and breach of the SPA—arise from Ameris's fraudulent procurement of the SPA itself, and the relief sought is rescission and/or rescissory damages flowing from the fraudulently induced sale of Balboa. Neither the Byrne Revocable Trust nor the Byrne Irrevocable Trust was a party to the California Action, and no claim for rescission of the SPA was or could have been asserted in that proceeding because, among other things, the SPA's forum-selection clause requires SPA-related disputes to be litigated in Delaware (and Byrne's claims in the California Action were required to be litigated in California under the LTIP's separate forum-selection clause). The California Action's findings are relevant here as evidence of Ameris's fraudulent intent and course of conduct in connection with the LTIP—the very instrument Ameris used to induce Sellers to enter the SPA—but the causes of action and damages in this case are distinct.

its contract with Byrne, and that Ameris willfully miscalculated the LTIP bonus pool. (D.I. 246 ¶¶ 11-12, 26-27, 30, 42). The jury awarded Byrne $62,906,613 in punitive damages, and the California court entered judgment in Byrne's favor in the amount of $79,548,170.80. (D.I. 253). The California court's Findings of Fact dated June 29, 2026, further found that Ameris owed Byrne $3,234,276 in earned LTIP wages for 2022 and 2023, that Ameris willfully miscalculated the LTIP bonus pool for performance periods 2022 and 2023, and that Ameris breached the LTIP and Byrne's Employment Agreement by failing to calculate the LTIP bonus pool in a manner consistent with the LTIP's terms for all applicable performance periods (2022, 2023, and 2024). (D.I. 246 ¶¶ 13-14, 25, 29, 42, 45-46).[4]

**PARTIES**

9. ~~8. Plaintiff~~ Byrne is an individual residing in Orange County, California.

10. ~~9. Plaintiff~~ Byrne Revocable Trust is a revocable trust that was formed in and under the laws of the State of California.

11. ~~10. Plaintiff~~ Byrne Irrevocable Trust is an irrevocable trust that was formed in and under the laws of the State of California.

12. ~~11. Defendant~~ Ameris is a corporation organized under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia.

---

[4] Many of the amended allegations herein rest on factual information disclosed in the California Action that was not public before the jury trial. Sellers requested that Ameris consent to Sellers' use of non-public information exchanged in the California Action that Sellers could rely on to support this Second Amended Complaint, subject to the protective order entered in this action. Ameris agreed only to permit Sellers to rely on that information once it is produced in discovery in this action. Sellers asked Ameris to reconsider its position because Sellers were in the process of amending their complaint, but Ameris never agreed. As a result, Sellers cannot rely on the full breadth of information discovered through the California Action to support their claims.

## JURISDICTION AND VENUE

13. ~~12.~~ This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action involves an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

14. ~~13.~~ This Court has personal jurisdiction over Ameris because~~, pursuant to Section 10.8 of the SPA, it~~ Ameris consented to this Court's jurisdiction for the purposes of any ~~action~~Action arising out of the SPA or the transactions contemplated thereby, as provided in Section 10.8 of the SPA.

15. ~~14.~~ Venue is proper in this Court because~~, pursuant to Section 10.8 of the SPA,~~ Ameris irrevocably and unconditionally waived any objection to the laying of venue of ~~any~~this action ~~arising out of the SPA~~ in this Court, as provided in Section 10.8 of the SPA.

## FACTUAL BACKGROUND

16. ~~15.~~ Founded in 1988 by Byrne, Balboa is a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment. Through Byrne's leadership, Balboa grew into one of the nation's largest privately held finance companies. Byrne, in conjunction with the Byrne ~~Revocable Trust and Byrne Irrevocable Trust~~Trusts, owned all shares of Balboa prior to its acquisition by Ameris.

~~16. Ameris became interested in acquiring Balboa and began negotiations with Byrne.~~

17. Because of the reputation Byrne had built for Balboa, many companies were heavily interested in acquiring Balboa—one of which was Ameris.

18. Accordingly, in 2021, Ameris began negotiations with Byrne to acquire Balboa. As Jim LaHaise, Chief Strategy Officer of Ameris, testified at the California trial, Ameris was aware that it would have to consider Byrne's preferences for the future of Balboa "to win" the

Balboa transaction over other potential acquirors. A critical consideration for Byrne throughout the negotiation process, when considering to whom he would sell Balboa, was to ensure that Balboa's employees would not lose their jobs following Ameris's acquisition of the company~~,~~ and ~~that the soon-to-be former employees of Balboa~~ would be fairly compensated for the time, effort, and energy they ~~put into~~invested in Balboa's continued success as they transitioned ~~into~~to being employees of Ameris.

19. ~~17.~~ To that end, Byrne secured Ameris's agreement to enter into the LTIP with eligible former employees of Balboa ~~that would continue on as employees of Ameris~~who, following the closing of the acquisition~~.~~, would become employees of Ameris as part of Ameris's new "Balboa Division." Under the LTIP, eligible employees of the Balboa Division would be entitled to "Cash Bonus Awards" based on the achievement of certain "Performance Goals" defined therein. The Performance Goals under the LTIP would be satisfied if Balboa reached a minimum threshold of earnings before taxes (or "EBT") of \$37 million, \$48.5 million, and \$57.2 million for the years 2022, 2023, and 2024, respectively. If Balboa exceeded the Performance Goals for these given years, 35% of the amount by which Balboa exceeded the Performance Goal threshold would be placed in an "Incentive Pool" from which the Cash Bonus Awards would be distributed to employees working in the Balboa Division.

20. ~~18.~~ Critically, to avoid any inconsistencies in the payment of Cash Bonus Awards to former Balboa employees, Byrne ensured that the LTIP contained a specific formula for calculating when the Performance Goals were reached and exceeded that was consistent with Balboa's financial accounting methodologies—specifically, the Pioneer 1Q21 Operating Model. To that end, the LTIP expressly provides that EBT—the critical component of determining whether a Performance Goal was met—"is defined as actual annual earnings before tax as

identified as 'Actual Earnings Before Tax' in the Pioneer 1Q21 Operating Model,." which The Pioneer 1Q21 Operating Model was attached to the LTIP as Exhibit A. The LTIP further provides that "[f]or purposes of the calculation of EBT under this Agreement and the Plan (defined below), the Key Assumptions (defined below) must be used in interpretation and application of the Pioneer 1Q21 Operating Model for purposes of the calculation of EBT, and no costs of a type not contemplated by the Pioneer 1Q21 Operating Model will be allocated to Balboa."[5]

21. 19. During the parties' negotiations, Byrne (and, in some instances, other Balboa personnel, including Phil Silva, Balboa's Chief Financial Officer, and Rob Rasmussen, Balboa's Chief Operating Officer) held numerous focused discussions with Ameris personnel concerning the application of the Pioneer 1Q21 Operating Model to the LTIP and the importance of adhering to accounting methodologies consistent with Balboa's past practices. During the conversations, Ameris representatives repeatedly assured Byrne that Ameris would faithfully apply the Pioneer 1Q21 Operating Model in implementing the LTIP and adhere to accounting methodologies consistent with Balboa's pre-acquisition practices. Those discussions with Byrne included, among others:

a. Phone calls with Jim LaHaise (then Ameris's Chief Strategy Officer) and Michael Jones and Daniel Larrea of Keefe, Bruyette & Woods, Ameris's ("KBW"), Balboa's financial advisor, between approximately July 2021 and December 9, 2021;

[5] "Plan" is defined as the "Balboa Capital Long-Term Cash Incentive Plan" and "Key Assumptions" are defined to include the following: (a) initial direct costs will be calculated using GAAP methodology; (b) the indirect costs used will be 1%; (c) there will be no allocation of indirect Ameris indirect expenses to Balboa by Ameris, and there will be no transfer pricing between Ameris and Balboa; (d) Balboa will not be charged for any other cost of capital other than the 1% cost of funds on the average outstanding balance on all earning assets; (e) Balboa will bear all direct costs associated incurred in its operations, and Ameris will pass through at actual cost without markup any discounts relating to Balboa's operations that Ameris enjoys with suppliers and vendors; and (f) the allowance for loan losses calculations and expenses for Balboa will be the greater of (i) actual net charge-offs or (ii) 1.25% of net investment in direct financing leases.

b. A phone call with Mr. LaHaise on or about August 1–2, 2021;

c. A phone call with Palmer Proctor, Ameris's Chief Executive Officer, on or about August 1–2, 2021;

d. Due diligence phone calls with Messrs. LaHaise and Proctor, Nicole Stokes (Ameris's Chief Financial Officer), Jon Edwards (Ameris's Chief Credit Officer), Jody Spencer (Ameris's Chief Legal Officer), Ross Creasy (Ameris's Chief Information Officer), Bill McKendry (Ameris's Chief Risk Office), and Doug Strange (Ameris's then-Executive Vice President and current Chief Credit Officer), between November 15, 2021, and December 9, 2021;

d. e. Due diligence phone calls with Messrs. LaHaise, Edwards, McKendry, Strange, and Spencer, and Ms. Stokes, between July and August 2, 2021;

e. f. An in-person meeting at Ameris's office in Atlanta, Georgia with Messrs. LaHaise, Proctor, and Edwards and Ms. Stokes in August 2021;

f. g. A dinner with Messrs. LaHaise, Edwards, and McKendry, and Ms. Stokes in Atlanta, Georgia on the same evening as the parties' in-person meeting at Ameris's office in August 2021; and

g. Due diligence phone calls with Messrs. LaHaise and Proctor, Nicole Stokes (Ameris's Chief Financial Officer), Jon Edwards (Ameris's Chief Credit Officer), Jody Spencer (Ameris's Chief Legal Officer), Ross Creasy (Ameris's Chief Information Officer), Bill McKendry (Ameris's Chief Risk Officer), and Doug Strange (Ameris's then-Executive Vice President and current Chief Credit Officer), between November 15, 2021, and December 9, 2021; and

h. In-person meetings in Irvine, California: (i) between August 2 and December 10, 2021 with: (a) Messrs. McKendry and Creasy; (b) Messrs. LaHaise and Creasy; and (c) Mr. McKendry and Ms. Stokes; and (iid) with Messrs. LaHaise and Proctor.

22. 20. Ameris, by and through Messrs. LaHaise and Edwards and Ms. Stokes, affirmatively represented to Byrne during the aforementioned calls between August and November 2021, as well as during the aforementioned meeting and dinner in Atlanta, Georgia in August 2021, that Balboa's existing financial accounting methodologies and the Pioneer 1Q21 Operating Model would continue to be used post-closing by Ameris for purposes of the LTIP and Cash Bonus Awards calculations thereunder irrespective of Ameris's financial reporting results or obligations;

in other words, that Ameris would honor and comply with the LTIP's terms post-closing.

23. ~~21.~~ Obtaining Ameris's agreement to the terms of the LTIP and commitment to enter into the LTIP with eligible employees of the Balboa Division was a critical consideration in Byrne's ultimate decision to sell Balboa to Ameris. The LTIP was a heavily-negotiated component that was key in inducing Byrne to execute the SPA. For example, in the California Action, Mr. LaHaise recognized that there were six or seven drafts of the LTIP exchanged between the parties and that the LTIP "was part of the negotiations" and was "part of a benefit that the bank proposed to Mr. Byrne" to ultimately win the acquisition. Put simply, Ameris knew how important the LTIP was to Byrne in securing the acquisition of Balboa and thus worked extensively to negotiate the final version of the LTIP to help secure the SPA.

24. Without the LTIP and assurances that the soon-to-be former Balboa employees were protected and would be fairly compensated going forward, Byrne would not have sold Balboa to Ameris. Mr. Rasmussen confirmed at trial in the California Action that the LTIP was "very important" to the overall purchase agreement and was a key part of the acquisition to ensure that Balboa's employees were retained. The LTIP was also a critical consideration

in Byrne's decision to agree to certain indemnification provisions in the SPA. During the negotiation process, Ameris insisted that Sellers indemnify Ameris for any losses associated with certain litigation that was pending against Balboa at the time. The transactions underlying that litigation had been written down to zero on Balboa's books before the acquisition date, in conjunction with the negotiation of the LTIP and the protections secured for Balboa's employees. Because the purchase price was calculated at 3.1 times Balboa's closing equity, that write-down meant Sellers absorbed the associated loss in the purchase price itself, and Section 5.14 of the SPA

correspondingly directs recoveries from that litigation above $1,800,000, net of costs, to the Trusts, returning to Sellers the upside on assets whose cost Sellers had already borne. The indemnification provisions in Section 8 thus layered residual litigation exposure on Sellers on top of a purchase price that already carried the loss. Byrne was willing to take on the risk that Sellers would have to indemnify Ameris only because he understood that the soon-to-be-former Balboa employees would be sufficiently protected and compensated post-acquisition. Accordingly, Sellers agreed to the indemnification provisions found in Section 8 of the SPA.

~~22. On December 10, 2021, Ameris entered into the SPA with Sellers and agreed to the~~

25. Ameris, through its employees and representatives, made it clear that it knew the importance of the LTIP to Byrne's decision to choose Ameris over other competitive bidders. Balboa's investment bank, KBW, marketed Balboa in 2021 and contacted 164 depository institutions—30 of which executed confidentiality agreements, six of which attended management meetings, and four of which submitted indications of interest on May 26 and 27, 2021, including Ameris. The two leading bids were within approximately one percent of one another on cash consideration. Byrne asked the bidders three times, through KBW, whether they would improve their bids, without sufficient progress. Ultimately, Ameris, in its August 2, 2021 letter of intent, signed by LaHaise and accepted by Byrne, eliminated the earn-out component of Ameris's prior indication of interest, increased Ameris's all-cash consideration to 310% of Balboa's closing equity, approximately $182 million, and committed to the uncapped incentive pool that became the LTIP. Ameris's pre-closing agreement to comply with the LTIP was what distinguished Ameris from the rest of the bidders and ultimately swayed Mr. Byrne in choosing Ameris over the other bidders.

26. On the same day—December 10, 2021—Ameris both entered into the SPA with Sellers and agreed to the LTIP for the former Balboa employees. Although the LTIP is not

expressly referenced in the SPA, the LTIP was negotiated contemporaneously with the SPA as an integral component of the overall acquisition transaction.

LTIP.

27. 23. Ameris, contrary to its pre-closing representations to Byrne (who remained as CEO of Balboa post-acquisition), breached the LTIP at its first opportunity. Specifically, beginning with the first LTIP cycle for the year 2022, which closed on December 31, 2022, Ameris intentionally miscalculated Balboa's EBT in violation of the agreed uponagreed-upon calculation methodology under the LTIP. More specifically, Ameris willfully used methods that were inconsistent with the Pioneer 1Q21 Operating Model and disregarded the "Key Assumptions" that the LTIP required to be applied.[6] Instead, Ameris calculated the EBT of Balboa using methods that intentionally lowered Balboa's EBT, and by extension, lowered or eliminated the Cash Bonus Awards earned but not received by approximately 145 Balboa employees participating in the LTIP from 2022 to 2024. Ameris's intentional miscalculations resulted in a reduction of the Incentive Pool for 2022 and eliminated the Incentive Pool for 2023, thereby depriving approximately 145 employees of the Cash Bonus Awards they rightfully earned under the LTIP for their work in 2022 and 2023.

28. 24. Sellers did not discover—and could not have reasonably discovered—Ameris's fraudulent intent and acts until after the first Cash Bonus Award became due

[6] "Key Assumptions" are defined to include the following: (a) initial direct costs will be calculated using GAAP methodology; (b) the indirect costs used will be 1%; (c) there will be no allocation of indirect Ameris expenses to Balboa by Ameris, and there will be no transfer pricing between Ameris and Balboa; (d) Balboa will not be charged for any other cost of capital other than the 1% cost of funds on the average outstanding balance on all earning assets; (e) Balboa will bear all direct costs associated with its operations, and Ameris will pass through at actual cost without markup any discounts relating to Balboa's operations that Ameris enjoys with suppliers and vendors; and (f) the allowance for loan losses calculations and expenses for Balboa will be the greater of (i) actual net charge-offs or (ii) 1.25% of net investment in direct financing leases.

following the close of the first LTIP cycle on December 31, 2022. Byrne's discovery of discrepancies in the LTIP calculations did not itself reveal that Ameris had intended not to comply with the LTIP when it entered into the SPA. As described below, Ameris continued to present those discrepancies as accounting disagreements it would resolve in good faith, while the internal communications bearing on its intent remained unknown to Sellers. Between closing and when the first Cash Bonus

Award became due, Sellers did not have access to theAmeris's internal financial systems, accounting decisions, or other information within Ameris's exclusive possession that would have been necessary to detect Ameris's departures in accounting methodologies. And, as recited above, in numerous discussions and meetings spanning many months, Ameris had previouslyrepeatedly represented to Byrne at all relevant times that it would comply with the terms of the LTIP.

29. Evidence in the California Action—namely internal correspondence among Ameris executives—reflects Ameris's strategic miscalculations of the LTIP and Ameris specifically "cherry-picking" certain factors to include in its LTIP calculation based on how these factors would lower the LTIP accrual. For example, less than two weeks after the LTIP cycle closed, Ameris representatives (including its CFO, Ms. Stokes), were strategizing how certain charge offs would negatively impact the LTIP accrual. Ameris repeatedly cherry-picked factors to include in its LTIP calculations to avoid paying Byrne what he was rightfully owed, reflecting that Ameris never intended to perform under the LTIP.

30. 25. Beginning in or about June 2023, after the close of the first LTIP cycle, Byrne complained repeatedly to Ameris about its miscalculations but understood, following conversations with Ameris personnel, those disputes to be ordinary post-closing accounting

disagreements that Ameris would try to resolve in good faith.[7] For example, Mr. LaHaise told Byrne in an email that he would only charge Balboa 1% cost of funds against the LTIP calculation as agreed upon, but evidence introduced in the California Action established that Ameris had never intended to abide by that promise and failed to remove any additional charges from the calculation.

31. Ameris's intention to never comply with the LTIP is demonstrated by, among other things, Ameris's failure to take ***any*** steps prior to closing to enable it to comply with the financial and accounting methodologies underlying the required LTIP calculations. Ameris failed to take any preparatory steps because it never intended to comply with the LTIP.

32. Ameris's failure to take any preparatory steps to comply with the LTIP is especially notable because Ameris knew, prior to entering into the SPA, that its existing accounting methodologies deviated substantially from the required methodology set forth in the Pioneer 1Q21 Operating Model and, as a result, substantial accounting and bookkeeping changes were required internally to accurately account for payments due under the LTIP.

33. ~~26. Ameris, however, never intended to perform under the LTIP.~~ Following Byrne's complaints, Sellers learned that Ameris, prior to (and after) its acquisition of Balboa, utilized financial accounting methodologies that differed materially from Balboa's financial accounting methodologies and the Pioneer 1Q21 Operating Model. ~~And~~ Ameris ~~never took~~was required to comply with the Pioneer 1Q21 Operating Model immediately following closing but failed to do so. Ameris did not take ***any*** steps prior to closing to implement the bookkeeping procedures ~~and~~that would be necessary to perform under the LTIP. Likewise, Ameris did not take

[7] Byrne's belief that Ameris would act in good faith to resolve disputes about the LTIP calculations continued into 2024, and Ameris's fraudulent conduct was not apparent during this period due to Ameris's active concealment and because Ameris's internal communications and documentations evidencing Ameris's fraud were not known to Sellers.

***any*** steps prior to closing to implement the financial accounting methodologies that would be necessary to perform under the LTIP, either prior to or immediately after closing. In fact, Ameris ***never*** took steps to implement the necessary bookkeeping procedures or financial accounting methodologies.

34. Indeed, the Ameris employee responsible for preparing the LTIP calculations—Sufhan Majid, Senior Vice President, Director of Accounting—testified at trial in the California Action[8] that he could not describe the basic formula he used to calculate the LTIP, could not identify the LTIP components, and pulled data exclusively from Ameris's own reporting software (TM-1) rather than from Balboa's accounting systems. Nicole Stokes further testified that Ameris failed to apply Balboa's "established CECL model," as was also required. Mr. Majid's and Ms. Stokes's testimony confirms that Ameris failed to take ***any*** actions prior to closing or following closing to establish the systems or procedures that would have been necessary to calculate EBT in accordance with the Pioneer 1Q21 Operating Model and Balboa's past practices, as required by the LTIP. Ameris's own accounting expert, Ms. Maryellen Sebold, admitted at the California trial that Ameris did not follow the LTIP calculations.

35. 27. It thus became clear to SellersDiscovery in the California Action further revealed to Byrne that Ameris never intended to apply Balboa's financial accounting methodologies to the newly formed Balboa divisionDivision—despite agreeing to do so in the LTIP—or otherwise honor the LTIP's terms. Instead, Ameris's plan was always (including prior to closing) to apply its own, materially different, financial accounting methodology to the newly formed Balboa divisionDivision in a way that reduced or eliminated amounts payable under the LTIP.

---

[8] Mr. Majid's testimony was introduced at trial through videotaped deposition.

36. 28. Ameris's fraudulent conduct did not end there. While Ameris personnel, starting in or about June 2023, communicated with Byrne about his concerns regarding Ameris's miscalculations and its clear breach of the LTIP, Ameris never ultimately meaningfully addressed themthe concerns or conformed its methodologies to comply with the LTIP. Instead, Quite the opposite—Ameris selected adjustments to the required LTIP calculation that pushed EBT downward, away from the threshold that would result in bonuses to Balboa's hardworking employees. And any adjustments that Ameris made after Byrne raised concerns were intentionally designed to keep the final EBT below that same threshold.

37. Ameris's internal communications demonstrate that Ameris's focus was not on ensuring that it accurately calculated the LTIP net income hurdle, but rather on creating the impression that it was.[9] Beneath the façade presented to Byrne, Ameris was behind the scenes scheming about ways to manipulate the LTIP net income hurdle to ensure Ameris would not have to pay out bonuses pursuant to the LTIP. For example, in or about January 2024, when Byrne raised additional concerns regarding the final 2023 LTIP calculations, instead of addressing Byrne's concerns regarding the accuracy of the LTIP calculations, Ameris schemed on ways to ensure that the LTIP calculations did not meet the net income hurdle—while giving Byrne the false impression that Ameris was legitimately addressing his concerns.

38. On January 15, 2024, Byrne proposed six revisions to the LTIP calculation. Upon receipt of Byrne's revised LTIP calculation, Nicole Stokes, Chief Financial Officer, and David Sparacio, Executive Vice President, Controller, discussed which of Byrne's revisions would

---

[9] Discovery in the California Action was focused on Ameris's post-closing conduct. Sellers' ability to identify particularized pre-closing internal communications, among other evidentiary support, is limited due to those documents being primarily (if not exclusively) within the possession, custody and control of Ameris.

overcome the net income hurdle, stating that "the only scenario . . . described that overcomes that hurdle is accepting items 1 plus 5 plus 6." Mr. Sparacio's email reflects Ameris's intent not to comply with the LTIP by stating "items 1 plus 6 and in case of net income of $872,770 equals LTIP net income hurdle still not met." Over the next couple days, Ms. Stokes, Mr. Sparacio, and Mr. Majid continued to analyze different variations of the calculations proposed by Byrne and assess the impact such calculations would have on the net income threshold and LTIP calculation. *Id.* At bottom, Ameris was conducting a sensitivity analysis to see to what extent they could agree with Byrne without triggering a payment owed under the LTIP.

39. Roughly one week later, on January 25, 2024, Stokes proposed charge offs for Ameris to charge against the net income hurdle to further avoid paying out Byrne under the LTIP. Ultimately, Ameris decided on Majid's proposal of "items 1 plus 5 plus 6 less the audit and professional fees and no adjustment to charge offs, net income goes up by $2,529,992 and charge offs goes up 1.88 million to $43,964,694 and the LTIP is not met by approximately 611K." *Id.* When Mr. Majid finally found a way to calculate the LTIP while leaving EBT just shy of the bonus threshold, Ms. Stokes responded with an emphatic "Thank you!" *Id.*

40. This conduct shows that instead of addressing Byrne's concerns regarding the accuracy of Ameris's LTIP calculations, Ameris terminated Byrne in June 2024 to further conceal the fact that it never intended to honor the LTIP in the first place.

~~29. Unsurprisingly, then, the United States District Court for the Central District of California, in ruling on Ameris's motion for summary judgment in pending litigation between Byrne and Ameris in that District, found that "[a] rational jury could review the numerous emails [Byrne] sent to [Ameris] regarding purported miscalculations, as well as internal communications among Ameris employees discussing his contentions, and~~

determine that [Ameris] willfully performed the LTIP calculations improperly." *Patrick Byrne v. Ameris Bank*, Case No. 8:24-cv-01989-MWC-JDE (C.D. Cal. Feb. 13, 2026), Dkt. 121 at 16.

41. Moreover, in June 2026, the California Action proceeded to trial. At trial, the claims before the jury were: (1) Ameris's wrongful termination of Byrne in violation of public policy; (2) retaliation against Byrne in violation of California Labor Code § 1102.5 (whistleblower protection); (3) failure to pay Byrne all earned wages; and (4) breach of the LTIP. *See* California Action, D.I. 227. Trial of these claims required the California Action jury to consider key facts central to the claims in this instant action. For example, to reach its verdict that Ameris engaged in its wrongful conduct "with malice, oppression, or fraud," the California Action jury heard testimony regarding the factual circumstances of the acquisition of Balboa by Ameris, the negotiation of the LTIP alongside the SPA, Ameris's application of and deviation from the LTIP's EBT calculation methodology, and Ameris's manipulation of LTIP calculations at Byrne's expense.

42. Ultimately, the California Action jury found in favor of Byrne on all counts. Furthermore, in its Findings of Fact and Conclusions of Law, the California Action Court found that Ameris violated California's Unfair Competition Law by, among other things, "breaching the LTIP and Byrne's Employment Agreement by failing to calculate the LTIP bonus pool in a manner consistent with the LTIP's terms for performance periods 2022, 2023, and 2024." D.I. 246 ¶ 46.

43. Notably, the California Action jury unanimously found that Byrne's complaints about Ameris's failure to pay earned wages were a "substantial motivating reason" for Ameris's decision to discharge Byrne, and that Ameris could not prove by clear and convincing evidence that it would have discharged Byrne for any legitimate, independent reason. This also allowed

Ameris to conceal from Byrne that he was owed an LTIP bonus payment for 2024. At trial in the California Action, Mr. LaHaise admitted that Byrne was eligible for a 2024 LTIP bonus, but no bonus was paid. Instead, Ameris paid Byrne's successor, Mr. Silva (who did not complain about the LTIP), a "management bonus" and similar position and compensation structure after Byrne was terminated.

44. The California Action's Findings of Fact and Conclusions of Law reflect the same continuous course of fraudulent and intentional misconduct underlying this action before the Court. The issues decided in the California Action—including whether Ameris breached the LTIP, whether Ameris's LTIP calculations were willfully improper, and whether Ameris acted with malice, oppression, or fraud—overlap substantially with core issues in this action. These issues were litigated and necessarily decided by the California Action jury and court, and Ameris had a full and fair opportunity to contest them. Accordingly, Ameris should be collaterally estopped from relitigating the same issues in this action.

45. 30. Given Ameris's willful breach of the LTIP at its first opportunity, as well as its failure, prior to and immediately after closing, to implement ***any*** of the bookkeeping procedures and financial accounting methodologies necessary to comply with the LTIP, it is clearsupport the conclusion that Ameris never intended to honor its terms. Instead, Ameris fraudulently represented (both by executing the LTIP and during the negotiation process with Byrne) that it would comply with the terms of the LTIP.

46. 31. As a result of these fraudulent acts, Ameris received a windfall. Not only did Ameris fraudulently induce Sellers to enter into the SPA, it turnedearned tens of millions of dollars of additional profit for Ameris as a result of the efforts of the former Balboa employees who were motivated by the promise of Cash Bonus Awards under the LTIP to go above and beyond their

duties to increase Balboa's profitability, all while being completely unaware that Ameris never intended to honor the terms of the LTIP.

47. ~~32.~~ The harms suffered by Sellers cannot be remedied by monetary damages alone.[10] Sellers would not have entered into the SPA, and would not have agreed to indemnify Ameris, had ~~it~~they known that Ameris never intended to comply with the LTIP. The indemnification obligation under the SPA is an ongoing liability of uncertain scope, making it impossible to calculate a damages figure that would fully compensate Sellers. Accordingly, rescission (or partial rescission) of the SPA is warranted.

~~33. Alternatively, Sellers seek equitable reformation of the SPA to void the indemnification provisions in Section 8 of the SPA.~~

48. ~~34.~~ Balboa, as a company, is a unique asset whose present and future value is not readily ascertainable. Thus, only equitable relief in the form of rescission ~~or reformation~~ can afford Sellers an adequate remedy.

~~35.~~ In addition, Ameris sued Sellers in Delaware Superior Court under the same SPA that Ameris fraudulently obtained by misleading Sellers into believing it would honor the terms of the LTIP. The action initiated by Ameris was captioned *Ameris Bank v. Patrick E. Byrne et al.*, C.A. No. N25C-05-071 KMM CCLD (Del. Super. Ct.) (the "Superior Court Action").

49. ~~36.~~ Ameris eventually voluntarily dismissed the Superior Court Action on February 18, 2026, and re-filed its Complaint in this Court, but not until after Sellers were forced to defend

[10] The injuries Sellers sustained due to Ameris's fraudulent conduct are separate from (and in addition to) damages Byrne personally suffered that were redressed in the California Action. The jury in the California Action awarded damages for the injuries Byrne suffered in his individual-employee capacity (specifically, employment-based compensation in the form of unpaid wages and unpaid bonuses), whereas this action seeks to redress the harms Byrne and the other Sellers suffered in their commercial-party capacity in connection with their entry into the SPA based on fraudulent misrepresentations of Ameris's intention to comply with the LTIP.

the action and respond to the Complaint on December 18, 2025 by filing a Motion to Dismiss for Improper Venue.

50. 37. By initiating the Superior Court Action, Ameris breached Section 10.8 of the SPA, which designates the "United States District Court for the District of Delaware and the Court of Chancery" as the "exclusive" venue "for the purposes of any Action arising out of [the SPA]."

51. The damages Sellers suffered as a result of Ameris's breach of Section 10.8 of the SPA constitute indemnifiable Losses under Section 8.3 of the SPA, which requires Ameris to indemnify Sellers for, among other things, "the failure of Purchaser to perform any covenant or agreement of Purchaser under this Agreement."

## COUNT I

### (Fraudulent Inducement)

52. 38. Sellers incorporate the foregoing allegations as if fully set forth herein.

53. 39. During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

54. 40. During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with

the LTIP's terms.

55. 41. These representations were false. Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

56. Moreover, Ameris's internal communications—introduced at the California Action

trial—reflect that Ameris executives deliberately analyzed which adjustments to Byrne's proposed LTIP revisions would keep EBT below the Performance Goal threshold, proposed additional changes to ensure the threshold was not met, and selected calculation methodologies specifically because they prevented LTIP payouts.

57. The LTIP was the critical differentiating factor that caused Sellers to choose Ameris over competing bidders—and Ameris was aware of the LTIP's importance in the transaction for Sellers.

58. ~~42.~~ Sellers would not have entered into the SPA had ~~it~~they known these representations were false.

59. ~~43.~~ Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

60. ~~44.~~ Ameris made these representations with the intention of inducing Sellers' reliance and to induce Sellers to enter into the SPA.

61. ~~45.~~ Sellers reasonably and justifiably relied on Ameris's misrepresentations.

62. ~~46.~~ Sellers have suffered harm due to Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

63. Sellers are ready, willing, and able to return consideration Ameris paid in connection with the parties' entry into the SPA and reserve the right to elect that remedy after Sellers have the ability to evaluate their preferred remedy following discovery in this action.

64. ~~47.~~ Accordingly, Sellers seek a remedy for Ameris's fraudulent inducement in the form of rescission or partial rescission of the SPA.

65. ~~48.~~ In addition, Sellers seek a remedy for Ameris's fraudulent inducement in the form of rescissory damages in an amount to be determined at trial.

~~49. In the alternative, Sellers request reformation of the SPA to void Section 8 therein.~~

**COUNT II**

**~~(~~Equitable Fraud (In the Alternative~~))~~ to Count I)**

66. ~~50.~~ Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

67. ~~51.~~ During the parties' negotiation of the SPA, Ameris ~~fraudulently, or with reckless indifference to the truth,~~negligently misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

68. ~~52.~~ During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

69. ~~53.~~ These representations were false. Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

70. Moreover, Ameris's internal communications—introduced at the California Action trial—reflect that Ameris executives deliberately analyzed which adjustments to Byrne's proposed LTIP revisions would keep EBT below the Performance Goal threshold, proposed additional changes to ensure the threshold was not met, and selected calculation methodologies specifically because they prevented LTIP payouts.

~~54. Sellers would not have entered into the SPA had they known these representations were false.~~

~~55. Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.~~

56. Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

57. Sellers reasonably and justifiably relied on Ameris's misrepresentations.

71. The LTIP was the critical differentiating factor that caused Sellers to choose Ameris over competing bidders—and Ameris was aware of the LTIP's importance in the transaction for Sellers.

58. Sellers have suffered harm due to Ameris's fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

59. Sellers lack an adequate remedy at law.

60. Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of rescission or partial rescission of the SPA.

61. In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

62. In the alternative, Sellers request reformation of the SPA to void Section 8 therein.

**COUNT III**

**(Equitable Fraud (In the Alternative))**

63. Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

64. During the parties' negotiation of the SPA, Ameris negligently misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

65. During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

66. These representations were false. Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated

~~EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.~~

72. ~~67.~~ Sellers would not have entered into the SPA had they known these representations were false.

73. ~~68.~~ Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

74. ~~69.~~ Ameris made these misrepresentations with the intention of inducing Sellers' reliance and to induce Sellers to enter into the SPA.

75. ~~70.~~ Sellers reasonably and justifiably relied on Ameris's misrepresentations.

76. ~~71.~~ Sellers have suffered harm due to Ameris's negligent ~~inducement of~~misrepresentations and/or omissions inducing Sellers' entry into the SPA in reliance on Ameris's material misrepresentations and/or omissions.

77. ~~72.~~ Sellers lack an adequate remedy at law.

78. ~~73.~~ Accordingly, Sellers seek a remedy for Ameris's equitable fraud in the form of rescission or partial rescission of the SPA.

79. ~~74.~~ In addition, Sellers seek a remedy for Ameris's equitable fraud in the form of rescissory damages in an amount to be determined at trial.

~~75. In the alternative, Sellers request reformation of the SPA to void Section 8 therein.~~

**COUNT ~~IV~~III**

**~~(~~Breach of Contract~~)~~/Indemnification**

80. ~~76.~~ Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

81. ~~77.~~ The SPA is a valid and enforceable contract, subject to its voidability at Sellers' option by reason of Ameris's fraud.

82. Ameris covenanted in Section 10.8 of the SPA to commence any Action arising out

of the SPA or the transactions contemplated thereby only in the Delaware Court of Chancery or the United States District Court for the District of Delaware.

83. ~~78.~~ Ameris breached Section 10.8 of the SPA by initiating the Superior Court Action.

84. Ameris voluntarily dismissed the Superior Court Action in response to Byrne arguing in the Superior Court Action that this Court and the Court of Chancery are the only appropriate courts to adjudicate Ameris's claims against Byrne under the SPA.

85. ~~79.~~ Ameris's breach of the forum-selection clause covenant in Section 10.8 of the SPA caused Sellers to suffer damages, as they were forced to defend against the Superior Court Action.

86. Delaware law, which governs the SPA, expressly recognizes that a party can recover damages for breach of a forum selection clause, including in the form of expectation damages measured by the legal fees and expenses incurred in the wrongly filed action. *See El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 40 (Del. 1995); *Namdar v. Freid*, C.A. No. 2024-0535-JTL (Del. Ch. June 6, 2025).

87. The damages Sellers suffered because of Ameris's breach of Section 10.8 of the SPA constitute indemnifiable Losses under Article VIII of the SPA.

88. Sellers have demanded Ameris provide Sellers with indemnification of their Losses arising from Ameris's breach of Section 10.8, but Ameris has failed to provide indemnification as required.

89. ~~80.~~ Accordingly, Sellers seek indemnification for the Losses they suffered as a result of Ameris's breach of Section 10.8 of the SPA, including monetary damages in an amount ~~to be determined at trial,~~ equivalent to all costs and expenses incurred by Sellers in connection with

the Superior Court Action.

**PRAYER FOR RELIEF**

WHEREFORE, ~~Plaintiffs~~Sellers request that this Court enter judgment against ~~Defendant~~Ameris awarding ~~Plaintiffs~~Sellers all appropriate relief, including the following:

a. Rescission or partial rescission of the SPA on the basis that Sellers' agreement to the same was fraudulently induced;

b. Awarding rescissory damages;

~~c. Alternatively, reformation of the SPA to void Section 8 therein;~~

c. ~~d.~~ Monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action;

d. ~~e.~~ Sellers' costs, attorneys' fees and expenses incurred in connection with this action; and

e. ~~f.~~ Such other and further relief as the Court may deem just and proper.

Dated: September 30, 2026

Respectfully submitted,

REED SMITH LLP

*/s/ DRAFT FOR MOTION TO AMEND*

Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
bchapple@reedsmith.com
jmiraglia@reedsmith.com

*Attorneys for Defendants/Counterclaim Plaintiffs Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*

OF COUNSEL:

Matthew T. Sessions (*pro hac vice*)
Stacey A. Villagomez (*pro hac vice*)
ALLEN MATKINS
2010 Main Street, 8th Floor
Irvine, CA 92614
(949) 553-1313
msessions@allenmatkins.com
svillagomez@allenmatkins.com

~~Dated: May 18, 2026~~

~~REED SMITH LLP~~

~~*/s/ Benjamin P. Chapple*~~_____ ~~Benjamin P. Chapple (No. 5871)~~
~~John T. Miraglia (No. 6682)~~
~~1201 N. Market Street, Suite 1500~~
~~Wilmington, DE 19801~~
~~(302) 778-7500~~
~~*Counsel for Plaintiffs Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*~~