# EXHIBIT 1

# PUBLIC VERSION

***Execution Version***

# STOCK PURCHASE AGREEMENT

by and among

Ameris Bank,

Balboa Capital Corporation,

Patrick E. Byrne,

and

The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001,

and

The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021

dated as of

December 10, 2021

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....1

ARTICLE II PURCHASE AND SALE OF THE SHARES ....15

Section 2.1 Sale and Transfer of Shares. ....15
Section 2.2 The Closing. ....15
Section 2.3 Purchase Price and Related Matters. ....15
Section 2.4 Post-Closing Adjustment. ....17
Section 2.5 Closing Deliveries of Sellers and the Company ....20
Section 2.6 Closing Deliveries of Purchaser. ....21

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE COMPANY ....22

Section 3.1 Authorization. ....22
Section 3.2 Execution; Validity of Agreement. ....22
Section 3.3 Consents and Approvals; No Violations. ....23
Section 3.4 Ownership of Shares. ....23
Section 3.5 Organization and Qualification of the Acquired Companies. ....23
Section 3.6 Capitalization. ....24
Section 3.7 Subsidiaries. ....25
Section 3.8 Financial Statements. ....25
Section 3.9 No Undisclosed Liabilities. ....25
Section 3.10 Absence of Certain Changes. ....26
Section 3.11 Title to Assets. ....26
Section 3.12 Real Property. ....26
Section 3.13 Customer Agreements. ....27
Section 3.14 Other Contracts and Commitments. ....28
Section 3.15 Insurance. ....31
Section 3.16 Litigation. ....31
Section 3.17 Environmental Matters. ....31
Section 3.18 Compliance with Laws. ....32
Section 3.19 Employee Benefit Plans. ....34
Section 3.20 Tax Matters. ....36
Section 3.21 Intellectual Property. ....39
Section 3.22 Labor Matters. ....41
Section 3.23 Bank Accounts. ....42
Section 3.24 Affiliate Transactions. ....43
Section 3.25 Brokers or Finders. ....43
Section 3.26 Allowance for Loans and Lease Losses ....43
Section 3.27 Books and Records ....43
Section 3.28 Internal Controls ....43
Section 3.29 OFAC; Sanctions ....44
Section 3.30 Foreign Corrupt Practices ....44
Section 3.31 Warranty; Product Liability ....45

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER........................45

Section 4.1 Organization.....................................................................................45
Section 4.2 Authorization. ..................................................................................45
Section 4.3 Execution; Validity of Agreement. ...................................................45
Section 4.4 Consents and Approvals; No Violations...........................................46
Section 4.5 Acquisition of Shares for Investment. ...............................................46
Section 4.6 Availability of Funds. ........................................................................46
Section 4.7 Litigation..........................................................................................47
Section 4.8 Brokers or Finders..............................................................................47

ARTICLE V CERTAIN COVENANTS AND AGREEMENTS.........................................47

Section 5.1 Interim Operations of the Acquired Companies. ....................................47
Section 5.2 Access; Confidentiality........................................................................50
Section 5.3 Efforts and Actions to Cause Closing to Occur. .....................................51
Section 5.4 Exclusivity. ..........................................................................................52
Section 5.5 Publicity. .............................................................................................52
Section 5.6 Employees; Employee Benefits. ...........................................................53
Section 5.7 Maintenance of Books and Records. .....................................................55
Section 5.8 Directors' and Officers' Indemnification................................................55
Section 5.9 Notification. .........................................................................................56
Section 5.10 R&W Policy.........................................................................................57
Section 5.11 Non-Competition; Non-Solicitation .......................................................57
Section 5.12 Release and Covenant Not to Sue ..........................................................59
Section 5.13 No Control of the Other Party's Business................................................59
Section 5.14 MHT Recoveries.....................................................................................59
Section 5.15 Transfer of the Reinsurance Subsidiary...................................................60

ARTICLE VI CONDITIONS TO OBLIGATIONS OF THE PARTIES..................................60

Section 6.1 Conditions to Purchaser's Obligations......................................................60
Section 6.2 Conditions to Obligations of Sellers and the Company. ............................61

ARTICLE VII TAX MATTERS ..........................................................................................62

Section 7.1 Transfer Taxes. .........................................................................................62
Section 7.2 Tax Returns...............................................................................................62
Section 7.3 Cooperation on Tax Matters. .....................................................................63
Section 7.4 Tax Contests...............................................................................................63
Section 7.5 Certain Post-Closing Actions......................................................................64
Section 7.6 Refunds; Payment of Tax Benefits. .............................................................64
Section 7.7 Miscellaneous. ...........................................................................................65

ARTICLE VIII SURVIVAL AND INDEMNIFICATION .....................................................65

Section 8.1 Survival.......................................................................................................65
Section 8.2 Indemnification of Purchaser Indemnified Parties. ......................................65
Section 8.3 Indemnification of Seller Indemnified Parties...............................................66
Section 8.4 Method of Asserting Claims.........................................................................66
Section 8.5 Time Limits on Claims. ...............................................................................69
Section 8.6 Additional Limitations on Indemnification. ..................................................69

Section 8.7 Exclusive Remedies. ....72

ARTICLE IX TERMINATION ....73

Section 9.1 Termination. ....73
Section 9.2 Effect of Termination. ....73

ARTICLE X MISCELLANEOUS ....74

Section 10.1 Fees and Expenses. ....74
Section 10.2 Amendment and Modification. ....74
Section 10.3 Notices. ....74
Section 10.4 Counterparts. ....75
Section 10.5 Entire Agreement; No Third Party Beneficiaries. ....75
Section 10.6 Severability. ....76
Section 10.7 Governing Law. ....76
Section 10.8 Consent to Jurisdiction. ....76
Section 10.9 Waiver of Jury Trial. ....76
Section 10.10 Specific Performance. ....77
Section 10.11 Retention of Counsel; Privileged Communications. ....77
Section 10.12 Waiver. ....77
Section 10.13 Assignment. ....78
Section 10.14 Exhibits and Schedules. ....78
Section 10.15 Further Assurances. ....78
Section 10.16 Interpretation. ....78

**EXHIBITS**

Exhibit A Capitalization
Exhibit B Sample Shareholders' Equity
Exhibit C Form of Escrow Agreement
Exhibit D Form of R&W Policy
Exhibit E Form of Release

# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of December 10, 2021, is entered into by and among Balboa Capital Corporation, a California corporation (the "Company"), Patrick E. Byrne, a resident of the State of California ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001 (the "Revocable Trust"), The Patrick E Byrne Irrevocable Trust U/T/A dated July 22, 2021 (the "Irrevocable Trust" and, together with the Revocable Trust, the "Trusts" and, each, a "Trust," and, collectively with Byrne, "Sellers" and, each, a "Seller"), and Ameris Bank, a Georgia state-chartered non-member bank ("Purchaser").

WHEREAS, the Trusts collectively own, beneficially and of record, all of the issued and outstanding shares of capital stock (the "Shares") of the Company;

WHEREAS, the Company owns, directly or indirectly, all of the issued and outstanding Equity Interests of each of the entities identified on Exhibit A (collectively, together with the Company, the "Acquired Companies"); and

WHEREAS, the Trusts desire to sell, and Purchaser desires to acquire, all of the Shares on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, concurrently with the execution and delivery of this Agreement and as a condition and inducement to the parties' willingness to enter into this Agreement, (a) each of the individuals listed on Annex I (each, a "Specified Employee") has entered into an agreement to be effective upon Closing (each, an "Employment Agreement") with Purchaser, or an Affiliate thereof, pursuant to which the parties thereto have agreed to certain terms regarding such Specified Employee's respective employment arrangement following the Closing and (b) each grantee of Company Options under the Company Stock Option Plan has, in exchange for such individual's receipt of his or her respective transaction bonus listed on Annex II, executed a release to be effective upon Closing in the form attached hereto as Exhibit E in favor of the Company in respect of all rights of such individual under the Company Stock Option Plan and any Company Options issued to such individual.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the respective meanings given below:

"Accessions Contract" means a Contract for replacement engines, replacement parts or other assets that are after-market items installed in a titled vehicle.

"Accrued Tax Liabilities" means all accrued and unpaid Taxes of the Acquired Companies that are first due after the Closing Date with respect to any Pre-Closing Tax Period and the pre-Closing portion of any Straddle Tax Period, as determined under Section 7.2(b), including (a) any

"applicable employment taxes" deferred pursuant to Section 2302 of the CARES Act and (b) any Taxes for which reserves are established on the balance sheet of any Acquired Company.

"Acquired Companies" is defined in the recitals hereto.

"Acquired Company Employee" is defined in Section 5.6(a).

"Action" is defined in Section 3.16.

"Affiliate" of any Person means a Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with the first Person. For purposes of this definition, the term "control," "controlled by" or "under common control with," as and with respect to any Person, means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, the right to appoint directors or managers, by contract, as trustee or executor, by proxy or agent or otherwise.

"Agreement" is defined in the introductory paragraph hereof.

"Applicable Law" means, with respect to any Person, any federal, state, national, provincial, local, municipal, non-U.S. or other law, ordinance, regulation, rule, statute, interpretation, Order, treaty or other requirement of a Governmental Entity applicable to such Person.

"Audited Financial Statements" means the audited consolidated balance sheets of the Acquired Companies as of December 31, 2019 and December 31, 2020 and the audited consolidated statements of income, stockholders' equity and cash flows for the Acquired Companies for the twelve (12) month periods then ended, together with the reports thereon of RSM US LLP, independent certified public accountants, and including the notes thereto.

"Benefit Plan" means each "employee benefit plan" as such term is defined in Section 3(3) of ERISA covering employees of any Acquired Company and any other employee or fringe benefit plan, agreement, program, policy, trust, fund, contract or arrangement, whether written or unwritten, with respect to which any Acquired Company or ERISA Affiliate has or could have any obligation.

"Business Data" means all personally-identifying information and data (whether of employees, contractors, consultants, customers or other Persons and whether in electronic or any other form or medium) that is accessed, collected, used, processed or stored by the Acquired Companies in the current conduct of their businesses.

"Business Day" means a day (other than Saturday or Sunday) on which banks are generally open for the ordinary conduct of business in Los Angeles, California, and for clarity, excluding days on which banking institutions in Los Angeles, California are authorized or required by Applicable Law to close.

"Byrne" is defined in the introductory paragraph hereof.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as amended.

"Claim Notice" is defined in Section 8.4(b).

"Closing" is defined in Section 2.2.

"Closing Date" is defined in Section 2.2.

"Closing Date Schedule" is defined in Section 2.4(a).

"Closing Indebtedness" means the Indebtedness of the Acquired Companies set forth on Schedule 1.1 that is to be repaid at the Closing.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" is defined in the introductory paragraph hereof.

"Company Business Systems" is defined in Section 3.21(e).

"Company Common Stock" means shares of the Company's common stock, no par value per share.

"Company Indemnified Persons" is defined in Section 5.8(a).

"Company Intellectual Property" means all Intellectual Property that is owned or purported to be owned by any Acquired Company or is currently used in the business of any Acquired Company.

"Company Material Adverse Effect" means any fact, change, event, circumstance or development that, individually or in the aggregate with all other facts, changes, events, circumstances, or developments, (i) has or would reasonably be expected to have a material adverse effect on the business, properties, financial condition, assets, liabilities or results of operations of the Acquired Companies taken as a whole, or (ii) prevents or materially delays or would reasonably be expected to prevent or materially delay the Sellers' or the Company's ability to consummate the Closing, excluding facts, changes, events, circumstances or developments related to or caused by Purchaser or its Affiliates; provided, however, with respect to the foregoing clause (i) that the following changes and events (and any adverse effect on the Acquired Companies resulting therefrom) shall not be taken into account in determining whether a Company Material Adverse Effect has occurred: (a) the negotiation or execution of this Agreement, any action taken by any of the Acquired Companies pursuant to this Agreement or at Purchaser's written request, (b) the consummation of the Transactions or any public announcement relating to this Agreement, (c) any failure by the Acquired Companies to meet any internal or published projections, forecasts or revenue or earnings predictions (it being understood and agreed that the facts, changes, events, circumstances, or developments giving rise to such failure that are not otherwise excluded from the definition of a Company Material Adverse Effect may be taken into account in determining whether there has been a Company Material Adverse Effect), (d) changes that are generally applicable to the industries and markets in which the Acquired Companies

operate, (e) changes in GAAP or the interpretation thereof, (f) changes in Applicable Laws or interpretations thereof by any Governmental Entity, (g) changes in global, national or regional economic, business, regulatory, market or political conditions (including the outbreak of war or acts of terrorism) or in national or global financial markets, (h) earthquakes, hurricanes, or other natural disasters, and (i) any epidemics, pandemics, disease outbreaks, or other public health emergencies; provided, further, that, with respect to clauses (d) through (g), only to the extent such changes do not adversely affect the Acquired Companies in a disproportionately adverse manner relative to other participants in the industries in which the Acquired Companies engage.

"Company Option" means a stock option with respect to Company Common Stock under the Company Stock Option Plan.

"Company PPP Loan" means SBA Loan #82882472-08 dated April 30, 2020, between BMO Harris Bank National Association, as lender, and the Company, as borrower.

"Company Product Data" means all data and information, whether in electronic or any other form or medium, that is accessed, collected, used, processed or stored by any of the Acquired Companies in the current conduct of their businesses.

"Company Proprietary Software" is defined in Section 3.21(b).

"Company Stock Option Plan" means the Balboa Capital Corporation 1998 Stock Incentive Plan, as amended.

"Company Transaction Expense Schedule" is defined in Section 2.3(c).

"Company Transaction Expenses" means, without duplication, and in each case to the extent unpaid as of immediately prior to the Closing, all fees and expenses incurred by or on behalf of any Acquired Company in connection with the negotiation and execution of the Transaction Documents, the performance of the obligations of the Acquired Companies in the Transaction Documents (at or prior to the Closing) and in connection with the performance and consummation of the Transactions whether or not billed or accrued, including (a) the fees and expenses owed by the Acquired Companies to their investment bankers, attorneys, accountants and other professionals payable in connection with this Agreement or the consummation of the Transactions, including any such fees and expenses incurred by employees of any Acquired Company or the Sellers that are paid for by any Acquired Company, (b) other than the bonuses or other payments arising under any retention bonus agreement entered into by Purchaser and certain Acquired Company Employees in connection with the Transactions, the aggregate amount of any transaction, sale, change-of-control or similar bonuses or payments owed by the Acquired Companies as a direct result of the Transactions to any current or former director, officer or employee thereof (in such capacity), including all bonuses or other amounts paid or payable in respect of cancelled Company Options, and the employer portion of any payroll, social security, unemployment or similar Tax imposed on any of the foregoing amounts, and (c) any and all fees and expenses payable to Keefe, Bruyette & Woods, Inc., as agent for the Company. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, "Company Transaction Expenses" (i) shall not be duplicative of any amounts to the extent included in the Shareholders' Equity Position (as finally determined) and (ii) shall not include any costs payable

with respect to (A) the premium and all related costs and expenses related to obtaining and binding the D&O Tail Policy, (B) filing fees incurred in connection with filings required of any party or any of its Affiliates under all Requisite Regulatory Approvals (including the HSR Act), (C) any underwriting fees and other costs and expenses relating to the R&W Policy or (D) any fees or expenses incurred by Purchaser or any Affiliate thereof.

"Competing Transaction" means any proposal or offer from any Person (other than Purchaser or its Affiliates) relating to any direct or indirect acquisition, in one transaction or a series of transactions, including any merger, consolidation, stock acquisition, asset acquisition, share exchange or similar transaction, of twenty-five percent (25%) or more of the assets or Equity Interests of the Acquired Companies.

"Confidentiality Agreement" means that certain confidentiality agreement, dated as of April 26, 2021 entered into by Purchaser (or one of its Affiliates) and the Company.

"Contract" means any agreement, contract, commitment, arrangement, understanding, note, bond, mortgage, indenture, lease, license or other instrument or obligation to which any Acquired Company is a party, including any amendments and other modifications thereto, that is legally binding on such Acquired Company or any of its assets or properties.

"Copyrights" means all original works of authorship (whether registered or unregistered), including all copyright registrations and applications to register the same.

"COVID-19" means the COVID-19 or SARS-Co-V-2 virus (or any mutation or variation thereof) or associated epidemics, pandemics or disease outbreaks.

"COVID-19 Measures" means, as applicable to a party, (i) any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure or sequester order, guideline, recommendation or similar Applicable Law of or promulgated by any Governmental Entity in connection with or in response to COVID-19 and (ii) such other reasonable measures taken by such party to the extent determined to be in good faith by such party to be reasonably necessary to avoid or mitigate material risk of physical injury or harm to any human Person (or to otherwise protect or preserve the health or safety of any human Person) in connection with or in response to COVID-19.

"Customer Agreements" is defined in Section 3.13(a).

"D&O Tail Policy" is defined in Section 5.8(b).

"Data Security Requirements" means, collectively, all of the following but only to the extent relating to privacy, security or security breach notification requirements that are applicable to the Acquired Companies due to their use of the Company Business Systems or any Business Data: (a) the Acquired Companies' own rules, policies and procedures; (b) all Applicable Laws; and (c) industry standards applicable to the industry in which the Acquired Companies' businesses currently operate and with which the Acquired Companies must comply (including the Payment Card Industry Data Security Standard (PCI DSS)).

"De Minimis Amount" is defined in Section 8.6(a)(i).

"Deductible Amount" is defined in Section 8.6(a)(ii).

"Delaware Courts" is defined in Section 8.4(b).

"Direct Claim" is defined in Section 8.4(b).

"Effective Time" means 12:01 a.m. Pacific Time on the Closing Date.

"Employment Agreement" is defined in the Recitals.

"Encumbrances" means any and all liens, charges, security interests, claims, mortgages, pledges, encumbrances, deeds of trust, judgments, voting trusts and other restrictions on title, transfer, use, voting, receipt of income or exercise of any other attribute of ownership (but excluding Permitted Encumbrances and restrictions on the transfer of the Shares imposed by federal or state securities laws).

"End User Agreements" is defined in Section 3.14(a)(xiv).

"Environmental Laws" means all Applicable Laws in effect on the date hereof and relating to pollution, human health and safety or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including Applicable Laws relating to Releases of Hazardous Substances, or otherwise relating to the use, treatment storage, disposal, transportation or handling of Hazardous Substances.

"Equity Interests" means any type of equity ownership in a Person or Rights in a Person, including shares of capital stock, partnership interests, membership interests, equity interests or any similar term under Applicable Law, including nominee, qualifying and similar shares, or any other interest entitling the holder thereof to participate in distributions, including of the income or profits of such Person, to vote for the governing body of such Person or otherwise granting any other economic, voting or other rights, obligations, benefits or interests in, or attaching to, such interests.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that is (or at any relevant time was or will be) a member of a "controlled group of corporations" with, under "common control" with, or a member of an "affiliate service group" with any Acquired Company (as such terms are defined in Sections 414(b), (c), (m) or (o) of the Code).

"Escrow Account" is defined in Section 2.3(d).

"Escrow Agent" means Citibank, N.A., or an Affiliate thereof as specified in the Escrow Agreement.

"Escrow Agreement" is defined in Section 2.3(d).

"Escrow Amount" means an amount equal to [redacted].

"Estimated Base Purchase Price" is defined in Section 2.3(a).

"Estimated Closing Date Schedule" is defined in Section 2.3(b).

"Estimated Company Transaction Expenses" is defined in Section 2.3(b).

"Estimated Shareholders' Equity Position" is defined in Section 2.3(b).

"Existing Credit Facilities" means that (i) certain Credit Agreement, by and among the Company, as borrower, the financial institutions thereto, as lenders, and BMO Harris Bank N.A., as administrative agent, dated May 15, 2015 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof); (ii) that certain Loan and Servicing Agreement, by and among BCC Funding XV LLC, as borrower, Balboa Capital Corporation, individually and as initial Servicer, Vervent Inc., as backup servicer, Capital One, N.A., as a lender, together with the other financial institutions from time to time party thereto as lenders, and Capital One, N.A., as the administrative agent, dated as of August 10, 2018 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof); (iii) that certain Amended and Restated Loan and Servicing Agreement, by and among BCC Funding IX LLC, as borrower, Balboa Capital Corporation, individually and as initial servicer, Vervent Inc., as backup servicer, Truist Bank, successor by merger to Suntrust Bank, as lender, together with the other financial institutions from time to time party thereto as lenders, and Truist Bank, successor by merger to Suntrust Bank, as the administrative agent, dated as of May 31, 2017 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof); (iv) that certain Indenture, among BCC Funding XIV, as issuer, Deutsche Bank Trust Company Americas, as trustee, and Wells Fargo Bank, National Association, as custodian, dated as of February 21, 2018 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof); (v) that certain Indenture, among BCC Funding XVI, as issuer, Deutsche Bank Trust Company Americas, as trustee, and Wells Fargo Bank, National Association, as custodian, dated as of October 17, 2019 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof); and (vi) that certain Indenture, among BCC Funding XVII, as issuer, Deutsche Bank Trust Company Americas, as trustee, and Wells Fargo Bank, National Association, as custodian, dated as of October 30, 2020 (as amended, restated, supplemented and otherwise modified and in effect from time to time in accordance with the terms thereof).

"Expiration Date" is defined in Section 2.3(d).

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each parent, brother, sister or child of such Person, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created for the benefit of one or more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his or her capacity as such custodian or guardian.

"Final Base Purchase Price" means an amount equal to (a) (3.1 multiplied by the Final Shareholders' Equity Position) (b) *minus* the aggregate amount of the Final Company Transaction Expenses.

"Final Closing Date Schedule" is defined in Section 2.4(d).

"Final Company Transaction Expenses" is defined in Section 2.4(d).

"Final Shareholders' Equity Position" is defined in Section 2.4(d).

"Fraud" means the willful and knowing commission of common law fraud in the making of the representations and warranties contained in this Agreement, as finally and conclusively determined by a court of competent jurisdiction.

"Fundamental Representations" shall mean the representations set forth in Sections 3.1 (Authorization), 3.2 (Execution; Validity of Agreement), 3.4 (Ownership of Shares), 3.6 (Capitalization), 3.7 (Subsidiaries), 3.25 (Brokers or Finders), 4.1 (Organization), 4.2 (Authorization), 4.3 (Execution; Validity of Agreement) and 4.8 (Brokers or Finders).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means any court, administrative agency, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of a foreign country or of the United States or any state, county, city or other political subdivision thereof.

"Hazardous Substances" has the meaning set forth in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" means, with respect to any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money (including all principal, interest, premiums, penalties, fees, expenses, indemnities, and breakage costs; provided, that, any redemption price over the principal amount or other prepayment penalty due in connection with the prepayment of any Closing Indebtedness, including the Company's senior unsecured note due June 1, 2026, but in each event excluding accrued and unpaid interest, shall not be considered Indebtedness), (b) all indebtedness of such Person evidenced by any note, bond, debenture, or other debt security or secured by any Encumbrance on property owned by such Person, (c) all obligations of such Person as lessee under leases that are properly recordable as capital leases under GAAP, (d) all reimbursement obligations under letters of credit, bank guarantees, and other similar contractual surety obligations entered into by or on behalf of such Person (in each case, solely to the extent drawn), (e) all Liabilities of such Person for the deferred purchase price of property or services, which are, and to the extent, required to be classified and accounted for under GAAP, as applicable, as liabilities (but excluding ordinary course trade payables that have been expensed or accrued), (f) all Accrued Tax Liabilities and (g) all indebtedness of others referred to in clauses (a) through (f) above guaranteed by such Person.

"Indemnified Party" means any Person claiming indemnification under any provision of Article VIII.

"Indemnifying Party" means any Person against whom a claim for indemnification is being asserted under any provision of Article VIII.

"Insurance Policies" is defined in Section 3.15.

"Intellectual Property" means any and all intellectual property of every kind, whether protected or arising under the laws of the United States or any other jurisdiction, including any of the following: Marks, Patents, Copyrights, Trade Secrets, Software, internet domain names and registrations, and social media accounts, the goodwill associated with the foregoing.

"Interim Management Balance Sheet Date" means September 30, 2021.

"Interim Management Financial Statements" means the unaudited consolidated balance sheet of the Acquired Companies as at the Interim Management Balance Sheet Date and the unaudited consolidated statements of income, stockholders' equity and cash flows for the Acquired Companies for the nine (9) month period then ended, in each case prepared by the management of the Acquired Companies.

"Irrevocable Trust" is defined in the introductory paragraph hereof.

"IRS" means the United States Internal Revenue Service.

"Key Employee" means any Specified Employee and any of such Specified Employees' direct reports.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

"Losses" means losses, liabilities, damages, awards, settlement payments, interest obligations, fines, Taxes, interest, deficiencies, costs, expenses, assessments and penalties including reasonable costs of investigating, preparing or defending any Action and reasonable attorneys' fees and other reasonable expenses of litigation or similar proceedings, and, only to the extent recovered by a third party in connection with a Third Party Claim, punitive, consequential or exemplary damages.

"Marks" means all trademarks and service marks, and all registrations, renewals and applications therefor, and all brand names, product names, trade dress, logos, protectable distinguishing guises and indicia, slogans and other similar designations of source or origin and, in each case, all worldwide rights, title and interest associated with the foregoing, whether registered or not, in any form including abbreviation, derivation, variation, diffusion or otherwise, whether stylized or not stylized.

"Material Contracts" is defined in Section 3.14(a).

"MHT Litigation" is defined in Section 8.2(f).

"Money Laundering Laws" is defined in Section 3.29.

"Neutral Accountant" means Ernst & Young or another independent certified public accounting firm of national or regional reputation mutually satisfactory to Purchaser and Sellers.

"Open Source Materials" means any software, coding and other materials that are distributed as "free software" (as defined by the Free Software Foundation), "open source software" (meaning software distributed under any license approved by the Open Source Initiative as set forth at www.opensource.org) or under similar licensing or distribution terms (such as the Creative Commons licenses, GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL), the Apache License and any license identified as an open source license by the Open Source Initiative (www.opensource.org)).

"Operating Document" means with respect to any corporation, limited liability company, partnership, or other legally authorized incorporated or unincorporated entity, the bylaws, operating agreement, partnership agreement, trust agreement, or other applicable documents relating to the operation, governance or management of such entity.

"Order" shall mean any order, injunction, judgment, decree, consent decree, ruling, writ, assessment, settlement, stipulation, administrative order, compliance order or arbitration award of a Governmental Entity or arbitrator.

"Ordinary Course of Business" means the conduct of the business by the Acquired Companies in substantially the same manner as such business was operated prior to and on the date of this Agreement, including operations in conformance and consistent with the Acquired Companies' practices and procedures prior to and as of the date of this Agreement, subject to compliance with COVID-19 Measures in effect from time to time.

"Organizational Document" means with respect to any corporation, limited liability company, partnership, or other legally authorized incorporated or unincorporated entity, the articles of incorporation, certificate of incorporation, articles of organization, articles of association, certificate of formation or other applicable organizational or charter documents relating to the creation of such entity.

"Patents" means issued United States and foreign patents and pending patent applications, patent disclosures, and any and all divisions, continuations, continuations-in-part, reissues, reexaminations and extensions thereof.

"Perfection Exempt Collateral" means any (i) individual units or pieces of equipment having an original cost of less than $50,000 each, including certificate of title equipment perfection of which requires a notation on the equipment's certificate of title (including certificates of title existing only in electronic form) and with respect to which the related contract is an "operating

lease" for the purposes of GAAP, (ii) equipment that is Soft Costs, (iii) equipment related to an Accessions Contract, (iv) Unfunded Equipment and (v) equipment related to a Working Capital Loan.

"Permitted Encumbrances" means: (a) statutory liens for Taxes that are not yet delinquent or Taxes that are being contested in good faith by appropriate proceedings and for which reserves are maintained in accordance with GAAP and reflected in the Audited Financial Statements or the Interim Management Financial Statements; (b) statutory, common law or civil law liens to secure obligations to landlords, lessors or renters under leases or rental agreements confined to the premises rented pursuant to which the Acquired Companies are not in default; (c) statutory, common or civil law liens in favor of carriers, warehousemen, mechanics and materialmen to secure claims for labor, materials or supplies and other like liens arising out of or incurred in the Ordinary Course of Business with respect to amounts that are not material in amount and not yet due and payable; (d) rights of a licensor or licensee of Intellectual Property granted in the Ordinary Course of Business; (e) any minor imperfection of title or recorded easements, covenants, conditions or other restrictions (including rights of way, zoning and setback requirements) that individually or in the aggregate with other such items would not reasonably be expected to result in a material reduction in the value of, or interfere in any material respect with the current use or operation of, the assets of the Acquired Companies affected by such items, and (f) Encumbrances granted under or pursuant to the Existing Credit Facilities.

"Person" means a natural person, partnership, corporation, limited liability company, trust, unincorporated association, joint venture or any other legal entity, including any Governmental Entity.

"Portfolio Tape" is defined in Section 3.13(a).

"PPP Loan" means (a) any covered loan under paragraph (46) of Section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by Section 1102 of the CARES Act, or (b) any loan that is an extension or expansion of any covered loan described in clause (a) or is a result of an analogous state or local law.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date.

"Pre-Closing Taxes" means (a) all Taxes (or the nonpayment thereof) of any Seller for any taxable period, (b) all Taxes (or the nonpayment thereof) of or imposed on the Acquired Companies for any Pre-Closing Tax Period and the portion through the end of the Closing Date for any Straddle Tax Period, determined in accordance with Section 7.2(b), (c) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Acquired Company (or any predecessor thereof) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar state, local or non-U.S. law, (d) any Taxes of any Person (other than the Acquired Companies) imposed on an Acquired Company as a transferee or successor, by Contract or pursuant to any Applicable Law, which Taxes relate to an event or transaction occurring before the Closing, and (e) any Taxes payable under Section 965 of the Code with respect to the Acquired Companies, regardless of whether an election under Section 965(h) of the Code has been made.

"Purchaser" is defined in the introductory paragraph hereof.

"Purchaser Indemnified Party" is defined in Section 8.2.

"R&W Policy" is defined in Section 5.10.

"Real Property" is defined in Section 3.12(b).

"Real Property Leases" is defined in Section 3.12(a).

"Registered Intellectual Property" means all (a) Patents, (b) registered Marks, applications to register Marks, intent to use applications or other registrations or applications related to Marks, (c) registered Copyrights and applications for Copyright registration, and (d) internet domain names.

"Regulatory Agreement" is defined in Section 3.18(c).

"Reinsurance Subsidiary" means Pacific National Re, LTD., a Turks and Caicos private company limited by shares, licensed by the Financial Services Commission of the Turks and Caicos Islands with number 4980/07.

"Release" has the meaning set forth in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

"Released Parties" is defined in Section 5.12.

"Requisite Regulatory Approvals" is defined in Section 6.1(b).

"Representative" means, with respect to any Person, any director, officer, employee, agent, manager, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Restricted Period" is defined in Section 5.11(a).

"Retention Period" is defined in Section 5.6(a).

"Review Period" is defined in Section 2.4(a).

"Reviewed Return" is defined in Section 7.2(a).

"Revocable Trust" is defined in the introductory paragraph hereof.

"Rights" mean, with respect to any Person, (a) securities or obligations, directly or indirectly, convertible into or exercisable or exchangeable for, or giving any other Person (i) any right, directly or indirectly, to subscribe for or acquire, (ii) any options, puts, calls or commitments relating, directly or indirectly, to, or (iii) any stock appreciation right or other instrument the value of which is determined in whole or in part by reference to the market price, book or other value of, in each case of subclauses (i) through (iii), shares of capital stock, units or other Equity Interests of such first Person, or (b) obligations of any Person or any of its Subsidiaries to offer, issue, sell,

purchase, return or redeem, or cause to be offered, issued, sold, purchased, returned or redeemed, any Equity Interests of such Person or any of its Subsidiaries, whether pursuant to any security, obligation, right, instrument, agreement, contract, commitment, option, undertaking or other arrangement or understanding (including, for the avoidance of doubt, upon exercise of any options, warrants or convertible loans or securities), whether fixed or contingent and whether or not in writing.

"Sanctioned Countries" is defined in Section 3.28.

"Sanctions" is defined in Section 3.28.

"SBA" is defined in Section 3.18(b)(ii).

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" or "Sellers" is defined in the introductory paragraph hereof.

"Seller Indemnified Party" is defined in Section 8.3.

"Seller Tax Contest" is defined in Section 7.2(b).

"Sellers' Knowledge" means the actual knowledge of Byrne, Phil Silva or Rob Rasmussen.

"Shareholders' Equity Position" means the total shareholders' equity of the Acquired Companies, as determined on a consolidated basis as of the Effective Time (after giving effect to the payment of any Company Transaction Expenses and reflecting all Indebtedness as of the Closing) determined in accordance with GAAP using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used by the Company in preparation of its Audited Financial Statements. For illustration and the avoidance of doubt, Shareholders' Equity Position is to be calculated pursuant to the methodology set forth on the attached Exhibit B (the "Sample Shareholders' Equity").

"Shares" is defined in the recitals hereto.

"Soft Costs" means property designated as soft costs in accordance with the Company's credit and collection policy, including franchise financing, leasehold improvements, inventory financing, disposable property (including dental implants and medical supplies), property improvement plans, towels, bedding and any other property with little or no residual value upon termination of the related Contract.

"Software" shall mean computer software or firmware in any form, including object code, source code, computer instructions, commands, programs, modules, methodologies, routines, procedures, rules, libraries, specifications, macros, algorithms, architecture, tools and scripts, device drivers, databases and database schema and all documentation of or for any of the foregoing, and including all prior versions thereof.

"Specified Employee" is defined in the recitals hereto.

"Statement of Objection" is defined in Section 2.4(b).

"Straddle Tax Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to a Person, an Affiliate directly or indirectly controlled by such Person.

"Tax Contests" means any U.S. federal, state, local or non-U.S. audits, examinations, investigations or other administrative proceedings or court proceedings with respect to any Tax or any Tax Return.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto and any amendment thereof.

"Taxes" means any U.S. federal, state, local, or non-U.S. taxes, fees, levies, imposts, duties, tariffs or other assessments or charges of whatever kind, including any taxes or other charges based upon, measured by, or otherwise related to income, gross receipts, unemployment compensation, payroll, social security, workers' compensation, estimated, transfer, excise, privilege, property, escheat, unclaimed property, value added, goods and services, ad valorem, franchise, license, sales, use, and any other tax or similar governmental charge, together with any interest and penalties, additions to tax or additional amounts imposed with respect thereto (including any penalties, fines or other amounts imposed as a result of a failure to timely, correctly or completely file any Tax Return).

"Territory" is defined in Section 5.11(a).

"Third Party Claim" is defined in Section 8.4(a).

"Third Party Claim Notice" is defined in Section 8.4(a).

"Title IV Benefit Plan" means a Benefit Plan that is subject to Section 302 or Title IV of ERISA or Section 412 of the Code, including any Benefit Plan that is a "multiemployer plan" within the meaning of Section 3(37)(A) of ERISA.

"Trade Secret" means trade secrets, including, technology, know-how, methods, processes, templates, source code, pricing information, specifications, inventions and improvements (whether or not patentable or reduced to practice), formulae, reports, data, customer lists, mailing lists, business plans, or other proprietary and confidential information, in each case, (a) that derive independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and (b) that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Transaction Documents" means, collectively, this Agreement, the Escrow Agreement and each other agreement, certificate, instrument and document executed and delivered in connection with the Transactions.

"Transactions" means all of the transactions provided for in, or contemplated by, this Agreement and the other Transaction Documents.

"Treasury Regulations" means the United States Treasury Regulations promulgated under the Code, and any reference to any particular Treasury Regulation section shall be interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

"Trust" and "Trusts" are defined in the introductory paragraph hereof.

"Unfunded Equipment" means any equipment related to a prefunded contract that has not yet been delivered to the applicable obligor.

"Voting Debt" is defined in Section 3.6(b).

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act.

"Working Capital Loan" means a direct working capital loan made to an obligor pursuant to which an obligor may grant a security interest in certain of its assets, but with respect to which a UCC financing statement may not be filed to perfect such security interest.

## ARTICLE II
## PURCHASE AND SALE OF THE SHARES

**Section 2.1** **Sale and Transfer of Shares**. On the terms and subject to the conditions of this Agreement, at the Closing, the Trusts shall sell, transfer and deliver to Purchaser all of the Shares, free and clear of all Encumbrances, and Purchaser shall purchase and acquire all of the Shares from the Trusts.

**Section 2.2** **The Closing**.

Unless this Agreement has been terminated pursuant to Article IX, and subject to the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VI, the closing of the Transactions (the "Closing") shall take place at the offices of Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202 or remotely via the electronic exchange of documents and signatures, on the first Business Day of the calendar month following the calendar month in which the conditions set forth in Article VI have been satisfied or waived in writing (excluding conditions that, by their terms, cannot be satisfied until the Closing, but the Closing shall be subject to the satisfaction or waiver of such conditions), unless otherwise mutually agreed upon in writing by Purchaser and Sellers, or at such other place or on such other date as Purchaser and Sellers may mutually agree (the date on which the Closing occurs is referred to herein as the "Closing Date"); provided, however, that, if such conditions are satisfied on the first Business Day of a calendar month, the Closing shall occur no later than the third (3rd) Business Day of such calendar month, unless otherwise mutually agreed upon in writing by Purchaser and Sellers.

**Section 2.3** **Purchase Price and Related Matters**.

(a) Estimated Base Purchase Price. At the Closing, Purchaser shall pay to the Trusts an amount in cash equal to [redacted] and (iii) *minus* the Escrow Amount, by wire transfer of immediately available funds, in the amounts of and to such accounts as designated in writing by Sellers prior to the Closing.

(b) Estimated Closing Date Schedule. Prior to the Closing, Sellers shall deliver to Purchaser a schedule (the "Estimated Closing Date Schedule") setting forth (i) the Shareholders' Equity Position as of September 30, 2021, which such Shareholders' Equity Position the parties to this Agreement have agreed to treat as an estimate of the Shareholders' Equity Position as of the Closing Date solely for the purposes of facilitating the calculation of the Estimated Base Purchase Price payable at the Closing (the "Estimated Shareholders' Equity Position"), and reasonable detail of the calculations supporting Sellers' computation thereof and (ii) an estimate of the Company Transaction Expenses to be paid at Closing (the "Estimated Company Transaction Expenses") as determined in accordance with Section 2.3(c). The Estimated Closing Date Schedule will be prepared in good faith and calculated pursuant to the methodology used in preparation of the Sample Shareholders' Equity and the Company Transaction Expense Schedule. Following the delivery of the Estimated Closing Date Schedule, to the extent reasonably required, Sellers shall, and shall cause the Acquired Companies to, at Purchaser's sole expense, make the back-up materials and books and records used in preparing the Estimated Closing Date Schedule available to Purchaser and its Representatives (provided such Representatives are subject to a duty of confidentiality and Purchaser shall be responsible to Sellers for any breaches of such duty of confidentiality by any such Representatives) upon reasonable notice for the sole purpose of assisting the Purchaser and their Representatives in their review of the Estimated Closing Date Schedule; provided, however, that such access shall be during regular business hours and in a manner that does not interfere with the normal operation of the business of the Acquired Companies. Prior to the Closing, the parties shall cooperate in good faith to answer any questions and resolve any issues raised by Purchaser and its Representatives in connection with their review of the Estimated Closing Date Schedule, and Sellers shall in good faith consider any reasonable comments of Purchaser thereon; provided that the failure of the Sellers to agree to incorporate any such comments shall not delay the Closing.

(c) Company Transaction Expenses. Prior to the Closing, Sellers shall deliver to Purchaser a schedule (the "Company Transaction Expense Schedule") setting forth the Estimated Company Transaction Expenses to be paid at the Closing, and reasonable detail of the calculations supporting Sellers' computation thereof, including the payees thereof and the payment instructions for each payee. At the Closing, Purchaser shall (on behalf of the Acquired Companies), or shall cause the Acquired Companies to (and shall provide sufficient funds to the Acquired Companies to enable them to), pay all of the Estimated Company Transaction Expenses identified on the Company Transaction Expense Schedule; provided, however, that with respect to any such payments to be made to employees of the Acquired Companies that are compensatory in nature, Purchaser shall provide sufficient funds to the Acquired Companies to enable them to make such payments,

which Purchaser shall cause the Acquired Companies to make when due, subject to, and net of, the amount of any applicable employment, payroll and income Tax withholdings.

(d) Escrow Amount. At the Closing, Purchaser shall transfer the Escrow Amount in immediately available funds to the Escrow Agent, to be held in an escrow account with the Escrow Agent (the "Escrow Account") and disbursed pursuant to the terms and conditions of this Agreement and an escrow agreement by and among Purchaser, Byrne and the Escrow Agent substantially in the form attached hereto as Exhibit C (the "Escrow Agreement"). The Escrow Amount will be held in escrow and disbursed by the Escrow Agent pursuant to the terms of this Agreement and the Escrow Agreement; provided, however, that the Escrow Agreement shall provide for the disbursement at the direction of Byrne (on behalf of the Trusts in the amounts of and to such accounts as designated in writing by Sellers) of the funds remaining in the Escrow Account as of the twelve (12) month anniversary of the Closing Date (the "Expiration Date"). In the event an indemnification claim arises under Section 8.2 and notice of such claim has been provided to the Sellers prior to the Expiration Date, an amount equal to the aggregate amount of Purchaser's good faith estimate of unsatisfied claims for Losses of the Purchaser Indemnified Party properly made on or prior to such date shall be retained from the Escrow Amount in the Escrow Account until the applicable underlying claims are resolved in accordance with Article VIII and the Escrow Agreement, and shall then be applied or distributed as provided for in this Agreement and the Escrow Agreement. The parties shall give such notices and shall take such other action is as necessary under the Escrow Agreement to cause the funds to be released from the Escrow Account to the applicable party in accordance with this Agreement.

(e) R&W Policy. At the Closing, Purchaser shall pay all remaining premium amounts, fees and expenses, if any, due to the insurer(s) and broker(s) with respect to the R&W Policy.

**Section 2.4 Post-Closing Adjustment.**

(a) Delivery of Closing Date Schedule. Within sixty (60) days following the Closing Date, Purchaser shall prepare and deliver to Sellers a schedule (the "Closing Date Schedule") setting forth a statement of Purchaser's determination of (i) the Shareholders' Equity Position as of the Closing Date and reflecting the components (and the amounts thereof) necessary to compute the Shareholders' Equity Position as of the Closing Date, (ii) the Company Transaction Expenses, (iii) the computation of the Final Base Purchase Price as of the Closing Date and (iv) Purchaser's calculation of the amount payable, if any, pursuant to Section 2.4(d) based on the foregoing. The Shareholders' Equity Position and Company Transaction Expenses reflected on the Closing Date Schedule will be determined in good faith and calculated pursuant to the methodology used in preparation of the Sample Shareholders' Equity, the Company Transaction Expense Schedule, the Estimated Shareholders' Equity Position and the Estimated Company Transaction Expenses. Sellers shall have the right to review the Closing Date Schedule for a period of thirty (30) days following the delivery of the Closing Date Schedule by Purchaser (the "Review Period"). During the Review Period and the resolution by Purchaser, Sellers and, if applicable, the Neutral Accountant of any disputes as set forth in Section 2.4(c), to the extent reasonably

required, Purchaser shall, at Sellers' sole expense, make the work papers, back-up materials and books and records used in preparing the Closing Date Schedule available to Sellers and their Representatives (provided such Representatives are subject to a duty of confidentiality and Sellers shall be responsible to Purchaser for any breaches of such duty of confidentiality by any such Representatives) upon reasonable notice for the sole purpose of assisting the Sellers and their Representatives in their review of the Closing Date Schedule, and any delay in making such documents and materials available solely and directly caused by Purchaser shall result in an automatic extension of the Review Period by a number of days equal to such delay; provided, however, that such access shall be during regular business hours and in a manner that does not interfere with the normal operation of the business of the Purchaser. Purchaser and Sellers agree that the purpose of preparing the Closing Date Schedule and determining the Shareholders' Equity Position, the Company Transaction Expenses and the related purchase price adjustment contemplated by this Section 2.4 is to measure the Shareholders' Equity Position and the Company Transaction Expenses against the Estimated Shareholders' Equity Position and the Estimated Company Transaction Expenses, respectively, consistent with the Acquired Companies' historical accounting methods, policies, and practices, and such processes are not intended to permit the introduction of different judgments, accounting methods, policies, principles, practices, procedures, classifications or estimation methodologies for the purpose of preparing the Closing Date Schedule or determining the Shareholders' Equity Position or Company Transaction Expenses. Without limiting the generality of the foregoing, the deferred tax assets set forth in the Shareholders' Equity Position shall be determined consistent with the Acquired Companies' historical accounting methods, policies, and practices.

(b) Objections. Sellers shall have the right to object to any amount or computation appearing in the Closing Date Schedule by notifying Purchaser in writing of such objections prior to the expiration of the Review Period, setting forth Sellers' objections in reasonable detail as to each disputed item (the "Statement of Objection"). If Sellers do not deliver a Statement of Objection prior to the expiration of the Review Period, the Shareholders' Equity Position and the Company Transaction Expenses (together with all components thereof, and the amounts of such components, necessary to compute such amounts) and the Final Base Purchase Price, in each case as set forth on the Closing Date Schedule, shall be determinative for purposes of this Section 2.4 and shall be final and binding on all of the parties to this Agreement. Furthermore, any item or amount to which no dispute is raised in the Statement of Objection shall be final and binding on all of the parties at the expiration of the Review Period.

(c) Resolution of Disputes. If Sellers deliver a Statement of Objection prior to the expiration of the Review Period, Sellers and Purchaser shall, during the twenty (20) day period following the delivery of the Statement of Objection, attempt in good faith jointly to resolve the matters on the Closing Date Schedule to which Sellers objected. In the event Sellers and Purchaser cannot resolve all of such matters by the end of such twenty (20) day period, any party may immediately engage the Neutral Accountant to resolve any items that remain in dispute. Each of Purchaser, on the one hand, and Sellers, on the other hand, shall present its position on the disputed items to the Neutral Accountant in writing, and the parties shall require the Neutral Accountant, within thirty (30) days

thereafter, acting as an expert and not an arbitrator, to resolve only the matters objected to by Sellers and not resolved by Sellers and Purchaser with respect to the determination of the Shareholders' Equity Position and the Company Transaction Expenses. Each of the parties shall provide the work papers, back-up materials, books and records and other information to the Neutral Accountant to the extent reasonably required. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Sellers and Purchaser in their written submissions to the Neutral Accountant. The Neutral Accountant shall render a written decision as to each disputed matter, including a statement in reasonable detail of the basis for its decision. All fees and expenses of the Neutral Accountant in connection with any dispute under this Section 2.4(c) shall be borne by Sellers, on the one hand, and Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Sellers or Purchaser, respectively, bears to the aggregate amount actually contested by Sellers and Purchaser. The decision of the Neutral Accountant with respect to the disputed items of the Closing Date Schedule submitted to it will be final and binding on the parties.

(d) Final Closing Date Schedule. The Shareholders' Equity Position (the "Final Shareholders' Equity Position") and the Company Transaction Expenses (the "Final Company Transaction Expenses"), each as finally determined pursuant to Section 2.4(b) or Section 2.4(c) and the Final Base Purchase Price based thereon, shall be determinative for purposes of this Section 2.4 and shall be final and binding on all of the parties to this Agreement. All components, and the amounts of such components, necessary to compute the Final Shareholders' Equity Position and Final Company Transaction Expenses and the Final Base Purchase Price based thereon, are referred to herein, collectively, as the "Final Closing Date Schedule."

(e) Payment.

(i) If the Final Base Purchase Price is less than the Estimated Base Purchase Price (as finally determined pursuant to this Section 2.4 and as set forth in the Final Closing Date Schedule), then the Trusts shall pay an amount equal to such shortfall to Purchaser via wire transfer of immediately available funds no later than the fifth (5th) Business Day following the completion of the Final Closing Date Schedule; provided, further, that Byrne shall be jointly and severally liable with the Trusts in respect of the Trusts' obligations pursuant to this Section 2.4(e)(i)

(ii) If the Final Base Purchase Price exceeds the Estimated Base Purchase Price (as finally determined pursuant to this Section 2.4 and as set forth in the Final Closing Date Schedule), then Purchaser shall pay to the Trusts an amount equal to such excess via wire transfer of immediately available funds, in the amounts of and to such accounts as designated in writing by Sellers, no later than the fifth (5th) Business Day following the completion of the Final Closing Date Schedule.

(iii) If the Final Base Purchase Price equals the Estimated Base Purchase Price, then there shall be no payment pursuant to this Section 2.4(e).

(f) Final and Binding Adjustment. Each party hereto acknowledges and agrees that the adjustment provisions set forth in this Section 2.4 shall be final and binding on Purchaser and Sellers with respect to (i) determining whether or not any adjustment is required be made to the Estimated Base Purchase Price pursuant to this Agreement and (ii) determining the amount of any such adjustment.

**Section 2.5 Closing Deliveries of Sellers and the Company.**

At the Closing, Sellers and the Company (as applicable) shall deliver, or cause to be delivered, to Purchaser the following:

(a) Certificate(s) and Stock Power. Stock certificate(s) representing all of the Shares, free and clear of all Encumbrances, duly endorsed in blank in a proper form for transfer or accompanied by a duly executed stock power in blank in a proper form for transfer.

(b) Bring down Certificate. A certificate duly executed by each Seller and a duly authorized officer of the Company as of the Closing Date as to the satisfaction of the conditions set forth in Sections 6.1(c), (d) and (h).

(c) Escrow Agreement. The Escrow Agreement, duly executed by Byrne and the Escrow Agent.

(d) Tax Certificate. For each Seller (or, in the case of a Seller that is a disregarded entity for U.S. federal income Tax Purposes, the beneficial owners of such Seller), a duly executed IRS Form W-9.

(e) Required Consents. Evidence that the third party consents or approvals listed on Schedule 2.5(e) have been obtained in form and substance reasonably satisfactory to Purchaser.

(f) Secretary's Certificate. A certificate of the Secretary of the Company, duly executed as of the Closing Date, certifying and attaching (i) a true, correct, and complete copy of the Organizational Documents and Operating Documents of each Acquired Company (other than the Reinsurance Subsidiary) and (ii) a true, correct, and complete copy of resolutions of the board of directors and shareholders of the Company authorizing the execution, delivery, and performance of this Agreement.

(g) Good Standing Certificates. Certificate from the Secretaries of State (or other appropriate officials) of the jurisdictions of formation of the Acquired Companies dated within five (5) Business Days prior to the Closing Date certifying that the Acquired Companies are in good standing.

(h) Corporate Documents. The share books, share ledgers, minute books, share certificates and corporate seals of the Acquired Companies, as directed by Purchaser and to the extent reasonably available.

(i) Company Stock Option Plan. Evidence that the Company Stock Option Plan has been terminated in form and substance reasonably satisfactory to Purchaser.

(j) Payoff Letters. Executed payoff letters, in form and substance reasonably satisfactory to Purchaser, with respect to all Closing Indebtedness of the Acquired Companies as of the Closing Date, certifying the full amount of such Closing Indebtedness and containing an agreement of the applicable lenders thereto that, if the aggregate amount so identified is paid to the applicable lender, creditor or agent on the Closing Date, such Closing Indebtedness shall be repaid in full and all Encumbrances affecting any Equity Interests, properties or assets of the Acquired Companies will be released.

(k) Reinsurance Subsidiary Transfer. Documentation reasonably satisfactory to Purchaser evidencing the transfer by the Company of all Equity Interests in the Reinsurance Subsidiary in accordance with Section 5.15.

(l) Other Agreements. The respective agreements and other documents and instruments specified herein, and any other customary certificates or other instruments as Purchaser may reasonably request in order to give effect to this Agreement.

**Section 2.6 Closing Deliveries of Purchaser.**

At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers or the other applicable Persons:

(a) Estimated Base Purchase Price. The Estimated Base Purchase Price and the other amounts required to be paid by Purchaser at the Closing pursuant to Article II, to the Trusts (in the amounts of and to such accounts as designated in writing by Sellers) and the other applicable Persons identified therein.

(b) Bring down Certificate. A certificate duly executed by a duly authorized officer of Purchaser as of the Closing Date as to the satisfaction of the conditions set forth in Sections 6.2(c) and (d).

(c) Escrow Agreement. The Escrow Agreement, duly executed by Purchaser and the Escrow Agent, and deposit of the Escrow Amount with the Escrow Agent as provided in Section 2.3(d).

(d) Evidence of D&O Tail Policy. Evidence of the D&O Tail Policy, pursuant to Section 5.8(b).

(e) R&W Policy Fees. Payment of the remaining premium amounts, fees and expenses with respect to the R&W Policy as provided in Section 2.3(e).

(f) Other Instruments. The respective agreements and other documents and instruments specified herein and any other customary certificates or other instruments as the Sellers may reasonably request in order to give effect to this Agreement.

**Section 2.7 Withholding.**

Purchaser, the Acquired Companies and the Escrow Agent shall be entitled to deduct and withhold (or cause to be deducted and withheld) from any amount otherwise payable pursuant to this Agreement (including amounts payable pursuant to the Escrow Agreement) such amounts as may be required to be deducted and withheld therefrom pursuant to Applicable Law. To the extent that amounts are so deducted or withheld, such amounts (a) shall be timely remitted to the applicable Governmental Entity and (b) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made. In the event that Purchaser determines that withholding from any payment contemplated hereunder is required under Applicable Law (other than withholding on any compensatory payments or withholding on account of a failure to deliver IRS Form W-9 pursuant to Section 2.5(d)), Purchaser shall (x) use commercially reasonable efforts to notify the applicable recipient at least five (5) Business Days prior to the Closing Date or any subsequent date that the applicable payment is to be made and (y) reasonably cooperate with such recipient, including providing such recipient with an opportunity to provide any form or documentation, or take such other steps, in order to reduce or avoid such withholding.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE COMPANY

Except as set forth in the Schedules to this Article III, Sellers and the Company, jointly and severally, hereby represent and warrant to Purchaser as follows:

### Section 3.1 Authorization.

The Company has the requisite corporate power and authority to execute, deliver and perform this Agreement and each of the other Transaction Documents to which it is a party and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the other Transaction Documents to which the Company is a party and the consummation of the Transactions by the Company have been duly and validly approved by all requisite corporate action under the Organizational Documents and Operating Documents of the Company. Byrne has the requisite power and authority and is legally competent to execute, deliver and perform this Agreement and each of the other Transaction Documents to which he is a party and to consummate the Transactions. Each Trust is duly organized and validly existing under the Applicable Laws of its jurisdiction of formation, as applicable, and has full power and authority to carry on its operations as now being conducted and to own, lease and operate its assets. Each Trust, and the trustee(s) thereof, in its capacity as trustee(s), has the requisite power and authority to execute, deliver and perform this Agreement and each of the other Transaction Documents to which it is a party and to consummate the Transactions. The execution, delivery and performance of this Agreement and the other Transaction Documents to which each Trust is a party by each such Trust and the consummation by each such Trust of the Transactions have been duly and validly approved by all requisite action under the Operating Documents of each such Trust.

### Section 3.2 Execution; Validity of Agreement.

This Agreement has been duly executed and delivered by each Seller and the Company, and when executed and delivered by each Seller and the Company, each other Transaction Document to which such Seller or the Company is a party will be duly executed and delivered by

such Seller or the Company. This Agreement constitutes, and, when executed and delivered by such Seller or the Company, each other Transaction Document to which such Seller or the Company is a party will constitute (in each case assuming due and valid authorization, execution and delivery by the other parties hereto and thereto), a legal, valid and binding obligation respectively of such Seller or the Company, enforceable against such Seller or the Company, respectively, in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Applicable Laws of general application affecting enforcement of creditors' rights generally and (b) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any such proceeding may be brought.

**Section 3.3 Consents and Approvals; No Violations**.

Except as set forth in Schedule 3.3 and for the notices, filings, permits, authorizations, consents and approvals as may be required under, and other applicable requirements of the HSR Act and the Turks and Caicos Islands Insurance Ordinance Cap. 16.06 and accompanying Insurance Regulations, none of the execution, delivery or performance of this Agreement or any other Transaction Document by any Seller or the Company, the consummation by any Seller and the Company of the Transactions or compliance by any Seller and the Company with any of the provisions hereof or of any other Transaction Document to which any Seller or the Company is a party will (a) violate, conflict with or result in any breach of any provision of the Operating Documents or Organizational Documents (if applicable) of any Seller or any Acquired Company, (b) require any material filing with or notice to, or the obtaining of any material permit, authorization, consent or approval of, any Governmental Entity or other Person by any Seller or any Acquired Company, (c) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, acceleration, modification or loss of any material benefit) under, any of the terms, conditions or provisions of any Contract to which any Seller or any Acquired Company or any of its Affiliates is a party or by which any of the properties or assets of any Acquired Company are bound or affected or cause the creation of any Encumbrance upon any of the properties or assets of any Acquired Company, or (d) violate in any material respect any Applicable Laws applicable to any Seller or any Acquired Company, excluding from the foregoing clause (c) such violations, breaches or defaults that would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.

**Section 3.4 Ownership of Shares**.

Each Trust is the sole record and beneficial owner of the Shares owned by such Trust, and, except for Encumbrances contained in the Company's Operating Documents or Organizational Documents, each such Trust has good and valid title to the Shares free and clear of any Encumbrances.

**Section 3.5 Organization and Qualification of the Acquired Companies**.

Each Acquired Company is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of incorporation or formation, as applicable and has full

power and authority to carry on its business as it is now being conducted and to own, lease and operate its properties and assets. Each Acquired Company is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction in which such qualification is required, except for those jurisdictions in which the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect. Sellers have previously made available true, correct and complete copies of the Organizational Documents and Operating Documents of the Acquired Companies, each as amended to the date hereof, and such Organizational Documents and Operating Documents are in full force and effect and the Acquired Companies are not in violation of any of the provisions of such Organizational Documents. Except for the Reinsurance Subsidiary and as set forth in Schedule 3.5, the Acquired Companies constitute all of the Subsidiaries of the Company.

**Section 3.6 Capitalization.**

(a) Capitalization. As of the date of this Agreement, the authorized capital stock of the Company consists of 30,000,000 shares of voting common stock and 3,000,000 shares of non-voting common stock, no par value per share. With respect to each Acquired Company, Schedule 3.6(a) sets forth (i) the total number of authorized Equity Interests, (ii) the number and class of Equity Interests issued and outstanding, and (iii) the record owner of all the issued and outstanding Equity Interests of such Acquired Company. All of the outstanding Equity Interests of each Acquired Company are (A) duly authorized and validly issued, (B) to the extent applicable, fully paid and non-assessable, (C) have not been issued in violation of any Contract to which Sellers or the Company are party or are subject to or in violation of preemptive or similar rights, (D) have been offered, issued, sold and delivered by the Acquired Companies in compliance in all material respects with Applicable Laws and (E) are free and clear of any Encumbrances. There are no declared but unpaid dividends or distributions with regard to any issued and outstanding Equity Interests of the Acquired Companies.

(b) Other Securities. Except as set forth in Schedule 3.6(b) or Section 3.6(c), (i) there are no outstanding securities or obligations convertible into or exchangeable for Equity Interests of any Acquired Company, (ii) there are no outstanding or authorized Rights obligating any Acquired Company to issue, transfer or sell or cause to be issued, transferred or sold any Equity Interests or other securities convertible into, exchangeable for, or evidencing the right to subscribe for or purchase Equity Interests, (iii) there are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to any Acquired Company, and (iv) there are no Contracts to which any Acquired Company, or to the Sellers' Knowledge, any other Person is a party relating to the voting, issuance, purchase, redemption, registration, dividend, disposition, repurchase or transfer of any of the Equity Interests of such Acquired Company, (v) there are no bonds, indentures, notes or other indebtedness providing for the right to vote (or convertible into securities that have the right to vote) on any matters on which holders of the Equity Interests of any of the Acquired Companies may vote ("Voting Debt") and (vi) the Acquired Companies have no obligation to, and are not party or otherwise subject to any Contract obligating any of them to, purchase, redeem or otherwise acquire any of its capital stock or any interests therein.

(c) Company Options. Schedule 3.6(c) sets forth a list of all Company Options granted or purported to be granted by the Company, including for each such Company Option, (i) the name of the holder, (ii) the grant date or purported grant date, (iii) the number of shares, (iv) the exercise price, (v) the vesting schedule or vesting status, and (vi) the expiration date. All such Company Options are covered by (A) an option award agreement in the form provided to Purchaser prior to the date hereof, other than with respect to details set forth in the preceding sentence, and (B) a release in the form attached hereto as Exhibit E in favor of the Company.

**Section 3.7 Subsidiaries.**

Except for Equity Interests in other Acquired Companies as set forth on Schedule 3.6(a), and, solely as of the date hereof, Equity Interests in the Reinsurance Subsidiary, no Acquired Company owns any Equity Interests in any corporation, association, trust, limited liability company, partnership, joint venture or other Person, or owns any interest convertible into, or exchangeable or exercisable for, any Equity Interests of any corporation, association, trust, limited liability company, partnership, joint venture or other Person.

**Section 3.8 Financial Statements.**

Schedule 3.8 contains true and complete copies of the Audited Financial Statements and the Interim Management Financial Statements. The Audited Financial Statements have been prepared in accordance with GAAP consistently applied during the periods involved (except as may be stated in the notes thereto), and present fairly, in all material respects, the consolidated financial position of the Acquired Companies as of the dates thereof and their consolidated results of operations, stockholders' equity and cash flows for the periods covered thereby. The Interim Management Financial Statements present fairly, in all material respects, the consolidated financial position of the Acquired Companies as of the date of such statements and their consolidated results of operations, stockholders' equity and cash flows for the period covered thereby; provided, however, that the Interim Management Financial Statements are subject to normal year-end audit adjustments (none of which would, alone or in the aggregate, be materially adverse to the financial condition of the Acquired Companies, taken as a whole) and do not contain the disclosures to be found in notes to audited financial statements. The Audited Financial Statements and Interim Management Financial Statements have been prepared in accordance with the books and records of the Acquired Companies (which books and records are accurate and complete and reflect actual, bona fide transactions).

**Section 3.9 No Undisclosed Liabilities.**

Except as set forth on Schedule 3.9, the Acquired Companies have no material Liabilities except for (a) Liabilities set forth on, or adequately reserved against in, the Interim Management Financial Statements as of the Interim Management Balance Sheet Date, (b) Liabilities incurred in the Ordinary Course of Business subsequent to the Interim Management Balance Sheet Date and which are not, individually or in the aggregate, material to the Acquired Companies, taken as a whole (none of which arises from breach of Contract or violation of Applicable Law), and (c) Liabilities incurred pursuant to this Agreement or necessary to consummate the Transactions.

**Section 3.10 Absence of Certain Changes.**

Except (a) as set forth in Schedule 3.10 and (b) actions taken by the Acquired Companies in connection with this Agreement and the Transactions, since the Interim Management Balance Sheet Date (i) the Acquired Companies have conducted operations in the Ordinary Course of Business, and (ii) there has not occurred (A) any event that, if such event had occurred between the date of this Agreement and the Closing Date, would violate the provisions of Section 5.1(a)-(v) hereof or (B) any Company Material Adverse Effect.

**Section 3.11 Title to Assets.**

Except for properties and assets sold since the Interim Management Balance Sheet Date in the Ordinary Course of Business, each Acquired Company owns, or, in the case of property held under a lease or other Contract, has an enforceable leasehold interest in, or adequate rights to use, all of the material properties and assets (including Intellectual Property) reflected on the Interim Management Financial Statements free and clear of all Encumbrances, except for (a) Encumbrances disclosed in the Interim Management Financial Statements and (b) Encumbrances set forth on Schedule 3.11.

**Section 3.12 Real Property.**

(a) Real Property. None of the Acquired Companies owns or has ever owned any real property. Schedule 3.12(a) contains a true, correct and complete list of all leases and subleases to which any Acquired Company is a party as lessee or sublessee of any real property (the "Real Property Leases"), true, correct and complete copies of which have been made available to Purchaser. Each of the Real Property Leases is (i) a legal, valid and binding obligation of the Acquired Company party thereto, (ii) a valid leasehold interest of the Acquired Companies, free and clear of any Encumbrances (subject to the terms of such Real Property Lease), and (iii) enforceable against such Acquired Company and, to the Sellers' Knowledge, the other party or parties thereto in accordance with its terms, in each case except (A) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Applicable Laws of general application affecting enforcement of creditors' rights generally and (B) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any such proceeding may be brought. Neither the Acquired Company party thereto nor, to the Sellers' Knowledge, any other party to a Real Property Lease, is in material breach of or default under any Real Property Lease. No Acquired Company has received any written notice of termination or cancellation with respect to any Real Property Lease. All rent and other sums and charges due and payable under the Real Property Leases have been paid. To the Sellers' Knowledge, the real property subject to the Real Property Leases (collectively, the "Real Property") is in conformity in all material respects with all Applicable Laws, including all applicable zoning laws, ordinances and regulations affecting such Real Property. The Company is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any Real Property. Except as set forth in Schedule 3.12, there has been no rent deferred under any Real Property Lease or otherwise that is currently

unpaid or outstanding, and true, correct and complete copies of any such deferral arrangements and agreements have been provided to Purchaser.

(b) Utilities; Condemnation. The Real Property is supplied with utilities suitable for the operation of the business presently conducted thereon. There does not exist any pending or, to the Sellers' Knowledge, threatened, condemnation or eminent domain proceeding with respect to any of the Real Property.

**Section 3.13 Customer Agreements.**

(a) Portfolio Tape. The Company has made available to Purchaser one or more electronic data files that list all outstanding loan and lease agreements pursuant to which an Acquired Company is lender or lessor ("Customer Agreements") as of November 30, 2021 (the "Portfolio Tape"). The information contained in the Portfolio Tape is true, correct and complete in all material respects as of the date thereof.

(b) Ordinary Course Transactions. Each Customer Agreement arose out of a bona fide business transaction entered into in the Ordinary Course of Business.

(c) Collateral; Enforceability. Except as would not, individually or in the aggregate, be material to the Company, each Customer Agreement and each loan or lease underlying or relating to each such Customer Agreement currently outstanding (i) is evidenced by notes, agreements or other evidences of indebtedness that are true, genuine and valid, (ii) to the extent secured, has been secured by valid Encumbrances on the collateral described in the documents relating to such Customer Agreement and which, with the exception of Perfection Exempt Collateral, have been perfected and (iii) is a valid and binding obligation of the Acquired Company party thereto and is enforceable against such Acquired Company and, to the Sellers' Knowledge, against the lessee, obligor or borrower thereunder in accordance with its terms, in each case except (A) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Applicable Laws of general application affecting enforcement of creditors' rights generally and (B) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any such proceeding may be brought.

(d) Compliance with Applicable Laws. Each Customer Agreement has been solicited, entered into, maintained, serviced and collected by the Acquired Companies and remains in compliance in all material respects with Applicable Laws, with the relevant notes or other credit or security documents, and with the applicable Acquired Company's written underwriting standards. The Acquired Companies possess all material documents necessary for the servicing and enforcement of the Customer Agreements. No Acquired Company is or, during the past three (3) years, has been subject to any fine, suspension, Order or other agreement or sanction by, or any reduction in any loan purchase commitment from, any Governmental Entity or other investor, or any federal or state agency relating to the origination, sale or servicing of Customer Agreements.

(e) No Defaults. No Acquired Company is in material breach of or material default under any Customer Agreement, and no event has occurred which, with notice and/or lapse of time, would constitute a material default by any Acquired Company thereunder. None of the Customer Agreements pursuant to which any Acquired Company has sold loans, leases or pools of loans or leases, participations in loans or leases, or pools of loans or leases, contains any obligation to repurchase such loans, leases or interests therein solely on account of a payment default by the obligor on any such loan or lease.

(f) Delinquencies. Schedule 3.13(f) sets forth a complete and correct report as of November 30, 2021 of total delinquencies under the Customer Agreements with respect to which the lessee, obligor or borrower thereunder is delinquent in the payment of any scheduled payment thereunder by more than ninety (90) days.

**Section 3.14 Other Contracts and Commitments.**

(a) Material Contracts. Schedule 3.14(a) sets forth, as of the date hereof, a true, correct and complete list of each Contract (excluding (x) the Real Property Leases and (y) the Customer Agreements disclosed in the Portfolio Tape) to which any Acquired Company is a party, or by which it is, or any of its assets and properties are, bound, that:

(i) provides for aggregate payments after the date hereof by any Acquired Company or to any Acquired Company of more than $150,000 annually;

(ii) involves an instrument evidencing or securing any Indebtedness or an agreement with any bank, finance company or similar organization relating to Indebtedness of any Acquired Company, or the mortgaging, pledging or otherwise placing an Encumbrance on any asset or group of assets of the Acquired Companies;

(iii) restricts any Acquired Company from engaging in its business, or limits any Acquired Company from engaging in any line of business, anywhere in the world or during any period of time (including with respect to exclusivity, non-competition, or the solicitation, hiring or engagement of any Person or the solicitation of any customer);

(iv) is a distributor, consultant or sales representative Contract that is not terminable by the Acquired Company party thereto at will or by giving notice of ninety (90) days or less;

(v) is a lease pursuant to which any Acquired Company is the lessee of personal property, including any finance or operating lease, but excluding leases relating solely to personal property calling for rental or similar periodic payments of less than $100,000 per year;

(vi) is a limited liability company, joint venture or partnership agreement (excluding Operating Documents of other Acquired Companies);

(vii) relates to the disposition or acquisition by any Acquired Company after the date of this Agreement of a line of business, operation or material amount of assets not in the Ordinary Course of Business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or contains a put, call or similar right involving the purchase or sale of any Equity Interests or assets of any Person with (A) any continuing payment obligations of any Acquired Company (including indemnification, “earn-out” or other contingent obligations), or (B) any covenants, indemnities or other material obligations with respect to such Contracts that are still in effect;

(viii) is with any current employee or director of one or more of the Acquired Companies with an annual remuneration (salary, any target variable compensation and bonus) in excess of $150,000;

(ix) is with any labor union, association or body representing any employee of any Acquired Company;

(x) is for the settlement, conciliation or similar agreement with any Person pursuant to which any of the Acquired Companies (A) is obligated to pay after the date of this Agreement consideration in excess of $150,000 individually or in the aggregate or (B) is or will be subject to injunctive or equitable relief;

(xi) is with any Governmental Entity;

(xii) is with any Seller (or Affiliate or Family Member thereof), on the other hand, that will continue in effect after the Closing, other than the Transaction Documents;

(xiii) guarantees the obligations of, or performance of any acts by, any other Person (other than another Acquired Company);

(xiv) (A) pursuant to which any Acquired Company is granted a right to use any third party Intellectual Property that is material to the business as currently conducted, other than non-exclusive licenses for commercially available or off-the-shelf Software or Software that is subject to click-through or shrink wrap agreements entered into by any Acquired Company in the Ordinary Course of Business, (B) pursuant to which any Acquired Company grants a third party the right to use any Company Intellectual Property that is material to the business as currently conducted, other than Customer Agreements, any Contract with any end user of any Acquired Company’s products or services which is entered into in the Ordinary Course (“End User Agreements”) or any marketing agreement which contains an incidental trademark license to use any Acquired Company’s Marks in the scope of providing such services, (C) covering the settlement of any claims related to any Intellectual Property and (D) pursuant to which any Acquired Company is prohibited or restricted in any manner from using any material Company Intellectual Property owned by any Acquired Company;

(xv) other than those Contracts set forth in Section 3.14(a)(ii), provides for indemnification by any Acquired Company of any Person, except for Customer Agreements, End User Agreements, and non-material Contracts entered into in the Ordinary Course of Business;

(xvi) contains any standstill or similar agreement pursuant to which any Acquired Company has agreed not to acquire assets or equity interests of another Person;

(xvii) grants any "most favored nation", right of first refusal, right of first offer or similar rights with respect to any assets, rights or properties of any of the Acquired Companies;

(xviii) requires any Acquired Company to purchase all of its requirements of any good or service from a single source;

(xix) limits the payment of dividends by any Acquired Company;

(xx) is both (A) not made in the Ordinary Course of Business and (B) which would reasonably be expected to be material to the Acquired Companies, taken as a whole; or

(xxi) requires any Acquired Company to enter into any Contract for any of the foregoing.

(such items referred to in subsections (i) through (xxi) above, collectively, the "Material Contracts"). Except as set forth in Schedule 3.14(a), the Sellers have made available to Purchaser true, correct and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect.

(b) Validity. Each of the Material Contracts is (i) a legal, valid and binding obligation of the Acquired Company party thereto, and (ii) enforceable against such Acquired Company and, to the Sellers' Knowledge, the other party or parties thereto in accordance with its terms, in each case except (A) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Applicable Laws of general application affecting enforcement of creditors' rights generally and (B) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any such proceeding may be brought.

(c) Defaults. Except as set forth on Schedule 3.14(c), neither the Acquired Company party thereto, nor, to the Sellers' Knowledge, any other party to a Material Contract, is in material breach of or violation of, or material default under, has failed to perform any material obligation thereunder, or has repudiated any material provision of, any Material Contract. No Acquired Company has received any written notice of termination, cancellation, material breach or default, or event that, with or without notice or lapse of time, would constitute such a material default or breach with respect to any Material Contract, or would give any Person the right to accelerate the maturity or

performance of any Material Contract. No Acquired Company nor, to the Sellers' Knowledge, any other party thereto, is threatening any cancellation, termination, acceleration, adverse modification or non-renewal of any Material Contract. To the Sellers' Knowledge, there are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable under current or completed Material Contracts with any Person and no such Person has made demand for such renegotiation.

**Section 3.15 Insurance.**

Schedule 3.15 contains a true, correct and complete list of each insurance policy maintained by any Acquired Company as of the date hereof with respect to its properties, assets or operations (including premium, term and type of coverage), excluding those insurance policies listed on Schedule 3.19(a) that insure benefits provided under a Benefit Plan (the "Insurance Policies"). All of the Insurance Policies are in full force and effect, the Acquired Companies are not in default with respect to their obligations under any Insurance Policy, and during the current policy year no Acquired Company has received or given written notice of termination or cancellation of any Insurance Policy. As of the date hereof, there is no claim pending under any of the Insurance Policies as to which coverage has been denied or disputed by the underwriters of such Insurance Policies. True, correct and complete copies of all such Insurance Policies have been made available to Purchaser prior to the date of this Agreement. The Insurance Policies are sufficient for compliance with Applicable Laws, Real Property Leases, Customer Agreements, and Material Contracts.

**Section 3.16 Litigation.**

Except as set forth in Schedule 3.16, there is no civil, criminal or administrative action, suit, claim, proceeding, litigation, arbitration, hearing, investigation, opposition, dispute, demand, written inquiry, or audit (collectively, "Action") to which an Acquired Company is a party (either as plaintiff or defendant) that is pending or, to Sellers' Knowledge, threatened against any Acquired Company or any of the properties and assets of the Acquired Companies where the amount in controversy exceeds $100,000. None of the Acquired Companies is subject to any outstanding Order which has or would reasonably be expected to have the effect of prohibiting or impairing the business or operations of the Acquired Companies. No Person has asserted a claim and, to the Sellers' Knowledge, no claim is threatened against the Sellers or the Acquired Companies based upon the Sellers or the Company entering into this Agreement or any of the other Transaction Documents (nor, to the Sellers' Knowledge, is there any reasonable basis for any Person to assert a claim). No litigation pending against the Company, as disclosed in Schedule 3.16, is expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

**Section 3.17 Environmental Matters.**

(a) Compliance; No Releases. Except as set forth in Schedule 3.17(a), (i) the Acquired Companies are in compliance with all applicable Environmental Laws in all material respects, (ii) during the past three (3) years, the Acquired Companies have not received any written notice from any Governmental Entity or third party alleging that the

Acquired Companies are not in compliance with any Environmental Law, which noncompliance remains unresolved, and (iii) with respect to any of the Real Property, there has been no Release of a Hazardous Substance by any Acquired Company. There are no pending or, to the Sellers' Knowledge, threatened environmental claims against the Acquired Companies. No Acquired Company has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, or exposed any Person to, any substance, or owned, occupied, or operated any facility or property contaminated by substance, which would be reasonably expect to give rise to material Liabilities pursuant to Environmental Laws. No Acquired Company has assumed, undertaken, provided an indemnity with respect to, or otherwise become subject to, any material Liability of any other Person relating to any Environmental Laws.

(b) Approvals. Schedule 3.17(b) contains a true, correct and complete list of all material permits, licenses and approvals issued by any Governmental Entity under applicable Environmental Laws with respect to the use of the Acquired Companies' properties or the operation of their respective businesses.

**Section 3.18 Compliance with Laws.**

(a) The Acquired Companies are, and for the last three (3) years have been, operating in material compliance with Applicable Laws. The Acquired Companies have been granted all material permits, licenses and approvals required to be obtained by the Acquired Companies from any Governmental Entity under Applicable Laws with respect to the use of the Acquired Companies' properties or the operation of their respective businesses, and such permits, licenses and approvals are in full force and effect. Schedule 3.18(a) contains a true, correct and complete list of all such permits, licenses and approvals. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any material permit, license or approval of any Acquired Company, including the consummation of the Transactions. During the past three (3) years, none of the Acquired Companies has received any written notice from any Governmental Entity to the effect that any Acquired Company is not in compliance in all material respects with any Applicable Law or Order (nor, to the Seller's Knowledge, do any grounds for such notice exist).

(b) COVID-19 Pandemic.

(i) Since the announcement of an official Order by Governmental Entities related to COVID-19 applicable to the Acquired Companies, the Acquired Companies have complied, in all material respects, with all Applicable Laws relating to COVID-19, including those relating to (A) shelter-in-place and quarantine orders, (B) the maintenance of safe and acceptable working conditions, including by making disclosures regarding positive cases of COVID-19 among employees or service providers of the Acquired Companies, (C) employee benefits, privacy or labor and employment, including with respect to the furlough or termination of employees or the reduction or modification of compensation or employee benefits, if any, and (D) the Families First Act.

(ii) No Acquired Company has applied for, or been a borrower under, any similar Paycheck Protection Program loan other than the Company as borrower under the Company PPP Loan. At all times since the date that the Company applied for the Company PPP Loan, the Company (a) has been an eligible "small business" for a PPP Loan under the CARES Act, and (b) complied with the rules and regulations of the Small Business Administration of the United States ("SBA"), the Small Business Act, and the CARES Act in all material respects. The Acquired Companies' application for the Company PPP Loan and application for forgiveness of the Company PPP Loan, including all representations and certifications contained in the foregoing applications or any related application thereto, were true and correct in all material respects and were otherwise completed in all material respects with SBA guidance available to the Acquired Companies as of the date of the foregoing applications. The Acquired Companies used the proceeds of the Company PPP Loan solely for the purposes permitted by Applicable Laws, including but not limited to the CARES Act, Paycheck Protection Program and all applicable rules and regulations in connection therewith. All disclosures and representations made by the Company on its PPP Loan application form (SBA Form 2483) and its forgiveness application (Loan Forgiveness Application revised June 16, 2020) were true and correct in all respects at the time such statements were made. The Company received notice from SBA that the entirety of the Company PPP Loan has been forgiven and, to the Sellers' Knowledge, none of the Acquired Companies has any Liability related thereto. To the Sellers' Knowledge, no Governmental Entity, other law enforcement agency, or BMO Harris Bank has initiated or threatened any proceeding or investigation relating to the Company PPP Loan, nor is any such proceeding or investigation pending. The Company is not subject to any fine, administrative agreement, order, or sanction relating to the Company PPP Loan.

(c) None of the Acquired Companies is subject to any cease-and-desist or other Order or enforcement action issued by, or is a party to any Contract with, or is a party to any commitment letter or similar undertaking to, or is subject to any Order or directive by, or has been ordered to pay any civil money penalty by, or has been during the past three (3) years, a recipient of any supervisory letter from, or during the past three (3) years, has adopted any policies, procedures or board resolutions at the request or suggestion of, any Governmental Entity that currently restricts in any material respect or would reasonably be expected to restrict in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit or risk management policies, its management or its business (each a "Regulatory Agreement"), nor have any of the Acquired Companies been advised, during the past three (3) years, by any Governmental Entity that it is considering issuing, initiating, ordering or requesting any such Regulatory Agreement.

(d) No Governmental Entity has initiated or has pending any Actions or, to the Sellers' Knowledge, investigation into the business or operations of any of the Acquired Companies during the past three (3) years, except where such Actions or investigations would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

(e) None of the Acquired Companies is a party to any, and there are no outstanding or pending or, to the Sellers' Knowledge, threatened, legal, administrative, arbitral or other Actions or governmental or regulatory investigations of any nature against any of the Acquired Companies or any of their current or former directors or executive officers (i) that would reasonably be expected to, either individually or in the aggregate, have a Company Material Adverse Effect, or (ii) of a material nature challenging the validity or propriety of this Agreement or the transactions contemplated by this Agreement.

(f) There is no Order or regulatory restriction imposed upon any of the Acquired Companies or the assets of the Acquired Companies (or that, upon consummation of the Transactions, would apply to the Purchaser or any of its affiliates) that (i) would, individually or in the aggregate, be reasonably likely to result in a material restriction on any of the Acquired Companies' businesses or (ii) would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

**Section 3.19 Employee Benefit Plans.**

(a) Benefit Plans. Schedule 3.19(a) contains a true, correct and complete list of all Benefit Plans. The Company has made available to Purchaser a true, correct and complete copy of each Benefit Plan including any amendments thereto, and, with respect to each Benefit Plan, to the extent applicable (i) the current summary plan description (if required) and all current summaries of benefits and coverage, (ii) the annual report on Forms 5500 for the prior plan year to the extent required under Applicable Law, (iii) any actuarial valuations for the prior plan year, (iv) material Contracts including trust agreements, insurance contracts, and administrative services agreements, as applicable, (v) the most recent determination, opinion or advisory letter for any Benefit Plan intended to be qualified under Section 401(a) of the Code and (vi) any non-routine correspondence with the Department of Labor, the IRS or any other Governmental Entity regarding the Benefit Plan during the past three (3) years. Each Benefit Plan has been established, maintained, funded and administered in all material respects in accordance with its terms and the terms of any related contracts or agreements, and in compliance in all material respects with the applicable requirements of ERISA, the Code and other Applicable Laws. No Actions with respect to any Benefit Plan are pending or, to the Sellers' Knowledge, threatened, and there are no facts that reasonably would be expected to give rise to any such Actions against any Benefit Plan, any fiduciary with respect to a Benefit Plan or the assets of a Benefit Plan (other than routine claims for benefits). No Benefit Plan is subject to any Applicable Laws other than those of the United States or any state, county or municipality in the United States.

(b) Effect of Transaction. Except as provided in Schedule 3.19(b), no Benefit Plan contains any provision that would give rise to any acceleration, vesting, obligation to fund, increase in benefits or compensation, severance, termination or other payments as a result of the Transactions. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (either alone or in combination with another event) result in: (i) any payment becoming due, or increase the amount of any compensation due, to any current or former employee, director or non-employee service provider of the Acquired Companies or (ii) the payment of any amount that could, individually or in

combination with any other such payment, constitute an "excess parachute payment," as defined in 280G(b)(1) of the Code (without regard to 280G(b)(4) of the Code). Each Benefit Plan may be amended or terminated before or after the consummation of the Transactions, and no such amendment that reduces (to the extent permitted by Applicable Law), or does not increase benefits, will result in the imposition of any liability on the Acquired Companies or Purchaser (other than ordinary administrative costs associated with a plan termination).

(c) No Post-Employment Obligations; Health Plan Matters. No Benefit Plan that is an employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) provides for, and no Acquired Company otherwise has any obligation to provide, continuing benefits or coverage for any current or former participant, employee, other service provider, or beneficiary of a participant, employee or other service provider after such participant's or service provider's termination of service, except to the extent required by Applicable Law. There has been no violation of Sections 4975 through 4980 or Sections 4980B through 4980I of the Code or Sections 601-608 of ERISA by any Acquired Company or ERISA Affiliate. The Acquired Companies maintains a health plan that satisfies the requirements for "minimum essential coverage" under Section 4980H(a) of the Code (as applicable to "applicable large employers" within the meaning of Section 4980H(a) of the Code, without regard to whether an Acquired Company is an "applicable large employer"), which minimum essential coverage satisfies an affordability safe harbor under Treasury Regulation Section 54.4980H-5 and provides "minimum value" as defined in Treasury Regulation Section 54.4980H-1(a)(28), and the Acquired Companies have offered such minimum essential coverage to all "full-time employees" (within the meaning of Section 4980H of the Code) and their dependents.

(d) Title IV Benefit Plans and Other Plans. No Acquired Company or ERISA Affiliate maintains a Title IV Benefit Plan, and no liability under Title IV or Section 302 of ERISA has ever been incurred by any Acquired Company or ERISA Affiliate. No Benefit Plan is, and no Acquired Company or ERISA Affiliate has ever contributed to, or been obligated to contribute to, a (i) "multiemployer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA), (ii) "multiple employer plan" (as defined in 29 C.F.R. § 4001.2) or a plan subject to Section 413(c) of the Code, (iii) "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA or other Applicable Law), or (iv) "voluntary employees' beneficiary association" (as defined in Section 501(c)(9) of the Code) or other funded arrangement for the provision of welfare benefits.

(e) Tax Qualified Status. Each Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and is the subject of a favorable unrevoked determination, opinion or notification letter issued by the IRS as to its qualified status under the Code, and to the Sellers' Knowledge, no circumstances have occurred that would reasonably be expected to adversely affect the tax qualified status of any such Benefit Plan. Except as set forth on Schedule 3.19(e), the assets of each such Benefit Plan consist solely of cash and actively traded securities.

(f) Contributions Made. Prior to the Closing Date, the Acquired Companies shall have made all contributions required to be made to or with respect to each Benefit

Plan as of the Closing Date and paid or accrued all liabilities on account of any Benefit Plan. All contributions that are due have been made within the time periods, if any, prescribed by ERISA and the Code, and all contributions for any period ending on or before the Closing Date that are not yet due have been made to each such plan or accrued in accordance with the past custom and practice of the Acquired Companies and any applicable accounting requirements.

(g) Code Section 409A. No Company Stock Option Plan is or was subject to Section 409A of the Code. Each Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code has a plan document that satisfies the requirements of Section 409A of the Code and has been operated in compliance with the requirements of Section 409A of the Code and in material compliance with its terms, in each case such that no Tax is or has been due or payable under Section 409A of the Code. No Acquired Company has any obligation to provide any "gross up" payment for any income or other Taxes, and neither the execution and delivery of this Agreement nor the consummation of the Transactions will entitle the recipient of any payment or benefit to receive any such "gross up" payment

(h) No Benefit Plan is, and no Acquired Company or ERISA Affiliate has contributed to, or been obligated to contribute to, a welfare benefit plan that is self-insured by one or more Acquired Company.

**Section 3.20 Tax Matters.**

(a) Tax Returns. Each Acquired Company has timely filed (or has had timely filed on its behalf) all Tax Returns required to be filed by it. All Tax Returns filed by or with respect to each of the Acquired Companies are true, correct and complete in all material respects.

(b) Payment. Each Acquired Company has timely paid (or has had timely paid on its behalf) all Taxes due and payable by it. There are no Encumbrances for Taxes on any asset of any Acquired Company except for Encumbrances for Taxes not yet due and payable.

(c) Proper Tax Accruals. The unpaid Taxes of the Acquired Companies (i) did not as of the date of the Interim Management Financial Statements exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Interim Management Financial Statements (rather than in any notes thereto) and (ii) will not, as of the Closing Date, exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies in filing their Tax Returns.

(d) Withholding Taxes. Each Acquired Company has timely withheld and remitted to the appropriate Governmental Entity all Taxes required to have been withheld and remitted by it in connection with amounts paid or owing to any employee, independent contractor, creditor, or other third party, and each Acquired Company has complied with all reporting obligations (including properly and timely filing IRS Forms W-2 and 1099)

with respect to any such withholding or such amounts paid or owing to any employee, independent contractor, creditor, or other third party.

(e) Tax Contests. No Tax Contests are presently pending with regard to any Tax Returns filed by or on behalf of any Acquired Company. No Acquired Company has received from any Governmental Entity any written notice indicating an intent to investigate or open any Tax Contest with respect to any Acquired Company.

(f) Extensions. There are no outstanding requests, agreements, consents or waivers to extend the statutory period of limitations applicable to the assessment of any Taxes or deficiencies against any Acquired Company or the filing of any Tax Return of any Acquired Company.

(g) Jurisdictions. No written claim has been made by a Tax authority in a jurisdiction where any Acquired Company does not pay Taxes or file Tax Returns that such Acquired Company is subject to Taxes in such jurisdiction, and no Acquired Company has a branch, permanent establishment or other taxable presence or nexus other than in the jurisdictions in which it currently files Tax Returns. No Acquired Company is or has been a resident for Tax purposes in any jurisdiction outside the country of its formation.

(h) No Accounting Adjustments. No Acquired Company is or has been required to make any adjustment pursuant to Section 481(a) of the Code (or any similar provision of state, local or non-U.S. Tax law) by reason of any change in accounting methods, and there is no application pending with any Governmental Entity requesting for permission of any changes in any accounting methods, and no Governmental Entity has proposed any such adjustment or change in accounting method.

(i) No Spin-off Transactions. During the last two years, no Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 of the Code or Section 361 of the Code (or any similar or corresponding provision of state, local or non-U.S. Tax law).

(j) USRPHC. The Company is not, and has never been, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(k) Post-Closing Income Items. No Acquired Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in, or use of an improper method of, accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax law) executed prior to the Closing, (iii) intercompany transactions entered into prior to the Closing or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax law) existing prior to the Closing, (iv) installment sale or open transaction disposition made prior to the Closing or (v) prepaid amount received prior to the Closing.

(l) Affiliations. None of the Acquired Companies (i) has been a member of an affiliated, consolidated, combined or unitary group for Tax purposes, (ii) has any actual or potential liability for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. law), as a transferee or successor, by Contract or otherwise, or (iii) is a party to any Tax allocation, Tax indemnification or Tax sharing agreement (other than such agreements (A) the primary subject matter of which is not Taxes or (B) with another Acquired Company).

(m) No Other Interests. No Acquired Company has ever owned (directly or by attribution) any interest in either (i) a Person organized under the laws of, or treated as a resident of, any jurisdiction outside the United States (other than an Acquired Company) or (ii) a partnership or arrangement treated as a partnership for U.S. federal, state, local, or non-U.S. Tax purposes. Schedule 3.20(m) lists the entity classification of each Acquired Company for U.S. federal income Tax purposes, and, unless otherwise noted on Schedule 3.20(m), each Acquired Company has had such classification at all times since its incorporation or formation, as applicable. At all times since formation, the Company has been treated as a "C corporation" within the meaning of Section 1361(a)(2) of the Code.

(n) Reportable Transactions. No Acquired Company is or has been a party to any "reportable transaction" as defined in Section 6707A(c)(1) of the Code (or any similar or corresponding provision of state, local or non-U.S. Tax law).

(o) Transfer Pricing. The Acquired Companies have maintained documentation (including any applicable transfer pricing studies) in connection with material related party transactions in accordance with Sections 482 and 6662 of the Code and the Treasury Regulations promulgated thereunder and any comparable provision of state, local or non-U.S. law.

(p) No Expatriated Entities. No Acquired Company currently domiciled outside of the United States (i) is or was a "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the Code or is treated as a U.S. corporation under Section 7874(b) of the Code; (ii) was created or organized in the United States such that such entity would be taxable in the United States as a domestic entity pursuant to Treasury Regulations Section 301.7701-5(a) or (iii) has made an entity classification election pursuant to Section 897(i) of the Code.

(q) Subpart F Income. None of the Purchaser or any of its Affiliates will be required to include in taxable income under Section 951 of the Code with respect to any Acquired Company for any taxable period (or portion thereof) ending after the Closing Date a material amount of income arising from transactions or events occurring in a taxable period (or portion thereof) ending on or prior to the Closing Date.

(r) CARES Act. The Acquired Companies have not elected to defer any Taxes payable by the Acquired Companies pursuant to Section 2302 of the CARES Act.

The representations and warranties set forth in this Section 3.20, and the portions of Section 3.10 and Section 3.19 as relate to Taxes, constitute the only representations and warranties in this

Agreement with respect to Taxes. Other than Sections 3.20(k) and 3.20(q), nothing in this Agreement shall be construed as providing a representation or warranty with respect to the existence, amount, expiration date, or limitations on (or availability of) any Tax attribute (including methods of accounting) of any Acquired Company in any Tax period (or portion thereof) beginning on or after the Closing Date.

**Section 3.21 Intellectual Property.**

(a) Registered Intellectual Property. Schedule 3.21(a) contains a true, correct and complete list of all Company Intellectual Property owned or purported to be owned by any Acquired Company that is Registered Intellectual Property, specifying as to each item, as applicable: the nature of the item, including the title of the item; the owner of the item; the jurisdictions in which the item is issued or registered or in which an application for issuance or registration has been filed; and the issuance, registration or application numbers and dates. Except as set forth in Schedule 3.21(a), all necessary registration, maintenance and renewal fees currently due in connection with the Registered Intellectual Property identified on Schedule 3.21(a) have been paid, and all such registrations for the Registered Intellectual Property are in full force and effect and have not expired or been abandoned, except for Intellectual Property expiring at the end of its statutory term or abandoned in the reasonable business judgement of an Acquired Company. There are no oppositions, cancellations, invalidity proceedings, interferences or re-examination proceedings presently pending with respect to such Registered Intellectual Property owned by any Acquired Company, the adverse resolution of which would be reasonably likely to impair the operations or business of any of the Acquired Companies.

(b) Other Intellectual Property. Schedule 3.21(b) contains a list of any material common law Marks owned or purported to be owned by any Acquired Company, and any material Software owned or purported to be owned by any Acquired Company ("Company Proprietary Software"), including the name of and a brief description for each.

(c) Ownership and Right to Use. The Acquired Companies exclusively own or have a valid right to use (in each case, free and clear of any Encumbrances) all Company Intellectual Property, and have during the past three (3) years exclusively owned or had a valid right to use (in each case, free and clear of any Encumbrances) all Company Intellectual Property, or otherwise had the rights, to use all Intellectual Property owned by any other Person that was used during such period in the conduct of the Acquired Companies' business, in each case to the extent necessary for such use, modification, or exploitation. To the Sellers' Knowledge, the Company Intellectual Property is sufficient to operate the business of the Acquired Companies as currently conducted.

(d) Non-Infringement. To the Sellers' Knowledge, the operation of the business of the Acquired Companies as currently conducted does not infringe or misappropriate any Intellectual Property rights of any other Person. During the past three (3) years, no Acquired Company has received any written notice from any other Person challenging the right of such Acquired Company to use any of the Company Intellectual Property. The Acquired Companies have not made any written claims against third parties within the past three (3) years alleging infringement of the Company Intellectual Property,

and, to the Sellers' Knowledge, no third party is infringing or misappropriating any of the Acquired Companies' rights in any of the Company Intellectual Property.

(e) Computer Systems. The computer systems, including Software, hardware (whether general or special purpose), electronic data processing, information, record keeping, communications, telecommunications, networks, interfaces, platforms, servers, peripherals, information technology assets, computer systems and related infrastructure, equipment and facilities, including any outsourced systems and processes that are owned or used by an Acquired Company in the current conduct of its business (collectively, the "Company Business Systems") are (i) sufficient in all material respects for the needs of the Acquired Companies' businesses as they are currently conducted and (ii) in good working condition, ordinary wear and tear expected, to perform all computing, information technology and data processing operations used in the operation of the Acquired Companies' business as they are currently conducted. The Acquired Companies have maintained and currently maintain commercially reasonable security, disaster recovery and business continuity plans and procedures, including measures designed to protect the integrity and security of transactions executed through the Company Business Systems. To the Sellers' Knowledge, there has not been any material failure with respect to any of the Company Business Systems that has not been remedied or replaced in all material respects.

(f) Open Source Materials. Except as set forth in Schedule 3.21(d), the use of Open Source Materials incorporated into the Company Proprietary Software by the Acquired Companies does not give rise to any obligations that would require any Acquired Company to make any public disclosure, distribution or general availability of any material proprietary software source code owned by an Acquired Company, or limit the rights of the Acquired Companies to enforce rights in material Intellectual Property used in the business or operations of the Acquired Companies against any Person. No Acquired Company has received any written notice or complaint that it has failed to comply with the terms and conditions of any license to any Open Source Materials incorporated into the Company Proprietary Software, and no Acquired Company is in breach of, nor has breached any, of the terms or conditions of any license to any such Open Source Materials in any material respect. No Acquired Company has distributed or made available as Open Source Materials, or agreed to distribute or make available as Open Source Materials (including by contribution to an open source project or community), any material software developed by any Acquired Company that the Company intends to remain proprietary.

(g) Data Security Requirements. The Acquired Companies and the conduct of their businesses are in compliance in all material respects with all Data Security Requirements, including that the Acquired Companies' use and dissemination of any personally identifiable information concerning individuals is in compliance in all material respects with all Applicable Laws, and, except as set forth on Schedule 3.21(g), there have not been, to the Sellers' Knowledge, any (i) actual incidents of data security breaches, or (ii) unauthorized access or use of any of the Company Business Systems, or unauthorized acquisition, destruction, damage, disclosure, loss, corruption, alteration, or use of any Business Data, which in either case has caused or is reasonably likely to cause a Company Material Adverse Effect. The Acquired Companies use commercially reasonable efforts

to protect the confidentiality of the Acquired Companies' confidential information and Trade Secrets, and, to the Sellers' Knowledge, no material Trade Secrets or material confidential information have been used by or disclosed to any third party, except pursuant to binding written agreements with confidentiality provisions entered into in the ordinary course of business.

(h) Company Product Data. The Acquired Companies: (i) exclusively own and possess all right, title and interest in and to or (except to the extent that Company Product Data is available in the public domain other by virtue of a breach of any rights of the Acquired Companies) have the right pursuant to a valid and enforceable written agreement to use all Company Product Data, and (ii) have rights to use all of the Company Product Data in the operation of their businesses as currently conducted.

(i) IP Assignments. To the Sellers' Knowledge, none of the Acquired Companies has received any written notice from any such current or former employee, officer, consultant, contractor or founder claiming to have any ownership right or license in or to any Company Intellectual Property. Schedule 3.21(i) sets forth a list of all current and former contractors and consultants engaged by any Acquired Company who have been, to the Sellers' Knowledge, involved with the creation or development of Portal360, Balboa Quote, Balboa Lease or Balboa Score, except to the extent any such independent contractors and consultants have executed written agreements assigning all right, title and interest in and to all such Intellectual Property rights created or developed by such independent contractor or consultant to the applicable Acquired Company.

**Section 3.22 Labor and Employment Matters.**

(a) Employees. Schedule 3.22(a) sets forth a list of all employees of the Acquired Companies including for each such employee his or her (i) name, (ii) employing entity, (iii) job title, (iv) hire date, (v) full time or part-time status, and whether on leave or actively at work, (vi) exempt or non-exempt designation, (vii) work location, (viii) current salary or hourly wage rate, (ix) incentive compensation, (x) fringe benefits, other than those applicable to all employees and listed on Schedule 3.19(a), and (xi) immigration status. No employee of the Acquired Companies has a principal place of employment outside the United States, is subject to the labor and employment Applicable Laws of any country other than the United States, or, except as set forth on Schedule 3.22(a), is or has been employed as a "leased employee" or employed through a staffing agency, professional employer organization or similar entity. Except as set forth on Schedule 3.22(a), to Sellers' Knowledge, no Key Employee intends to terminate his or her employment with the Acquired Companies.

(b) Labor Difficulties. There is no labor strike, slowdown, stoppage or lockout actually pending, or, to the Sellers' Knowledge, threatened against any Acquired Company. No Acquired Company has experienced any labor strike, slowdown, stoppage or lockout during the past three (3) years.

(c) Collective Bargaining Agreements. There are no collective bargaining agreements with any labor organization to which any Acquired Company is a party, and

no Acquired Company has ever been party to or had any obligation with respect to any such agreement.

(d) Certification. No labor union is certified by the National Labor Relations Board as bargaining agent for any employees of any Acquired Company.

(e) Charges. There is no unfair labor practice charge or complaint against any Acquired Company pending or, to the Sellers' Knowledge, threatened before the National Labor Relations Board. Except as set forth on Schedule 3.22(e), there are no controversies pending or, during the past three (3) years, threatened between the Acquired Companies, on the one hand, and any of their employees or former employees, on the other. Except as set forth on Schedule 3.22(e), no investigation, review, complaint or proceeding by any Governmental Entity or employee or former employee with respect to the Acquired Companies in relation to the employment of any individual is pending or, to the Sellers' Knowledge, threatened, nor have the Acquired Companies received any notice indicating an intention to conduct the same.

(f) Closings; Layoffs. During the past three (3) years, (i) no Acquired Company has effectuated a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment, and (ii) there has not occurred a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of any Acquired Company. Schedule 3.22(f) lists those employees of the Acquired Companies who have suffered an "employment loss" (as defined in the WARN Act) in the ninety (90) days preceding the date of this Agreement or had a reduction in hours of at least 50% in the 180 days preceding this Agreement.

(g) Employment Requirements. Each of the Acquired Companies is and at all times has been in material compliance with all Applicable Law governing the employment of labor and the engagement of other service providers, including all contractual commitments and all such Applicable Law relating to immigration, Form I-9s, wages, hours, affirmative action, collective bargaining, discrimination, civil rights, safety and health, workers' compensation, reporting of compensation and benefits, and the collection and payment of income, employment and other Taxes. None of the Acquired Companies is, or has been during the last three (3) years, a government contractor. Each individual who has been classified by an Acquired Company as a non-employee (such as an independent contractor or consultant) has been properly classified. The Acquired Companies have, or will have no later than the Closing Date, paid all accrued salaries, bonuses, commissions, wages, severance and any other amounts due to be paid to the employees of the Acquired Companies through the Closing Date (other than amounts to be paid in the normal course on the first regularly scheduled payroll date following the Closing Date).

**Section 3.23 Bank Accounts.**

Schedule 3.23 sets forth a true, correct and complete list of the names of all banks in which any Acquired Company maintains an account or safe deposit box and the names of all Persons authorized to draw thereon or having signatory power or access thereto.

**Section 3.24** **Affiliate Transactions**.

Except as set forth on Schedule 3.24 or pursuant to this Agreement or the other Transaction Documents, none of Byrne, the Trusts or any officer or director of any Acquired Company (or Affiliate of any Acquired Company or, to the Sellers' Knowledge, any Family Member thereof) (a) has any financial interest in any property used by any Acquired Company, (b) has a financial interest in any transaction with any Acquired Company or (c) has engaged in any transaction or entered into any Contract with any Acquired Company (other than, in each case, with respect to services provided to, and normal compensation and benefits owed by, the Acquired Companies to employees in the Ordinary Course of Business).

**Section 3.25** **Brokers or Finders**.

None of Sellers or any Acquired Company, nor any of its Affiliates, has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions, except for advisory fees and expenses payable to Keefe, Bruyette & Woods, Inc. that will be included in the Company Transaction Expenses.

**Section 3.26** **Allowance for Credit Losses**.

The allowance for credit losses reflected in the Audited Financial Statements and Interim Management Financial Statements was, as of the date of each of the Audited Financial Statements and Interim Management Financial Statements, respectively, determined in accordance with GAAP.

**Section 3.27** **Books and Records**.

The books and records of the Acquired Companies have been and are being maintained in the Ordinary Course of Business and in accordance with GAAP, where applicable, and any other Applicable Laws, and are complete and accurate in all material respects to reflect all meetings, consents, and other actions of the boards of directors and stockholders of the Acquired Companies.

**Section 3.28** **Internal Controls**.

The Company has established and maintains a system of internal accounting controls sufficient to provide reasonable assurances (a) that transactions, receipts and expenditures of the Acquired Companies are being executed and made only in accordance with appropriate authorizations of management and the board of directors of the Acquired Companies, (b) that transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with GAAP and (ii) to maintain accountability for assets, (c) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Acquired Companies and (d) that the amounts recorded for assets on the books and records of the Acquired Companies are compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Neither the Acquired Companies nor, to the Sellers' Knowledge, the Company's independent auditors, any current or former employee, consultant or director of any Acquired Company, has identified any fraud that involves the Company's management or other current or former employees, consultants, officers or director of any

Acquired Company who have a role in the preparation of financial statements or the internal accounting controls utilized by the Acquired Companies. Neither the Acquired Companies nor, to the Sellers' Knowledge, any director, officer, employee, auditor, accountant or representative of the Acquired Companies has received any material complaint, allegation, assertion or claim, in each case, regarding deficient accounting or auditing practices, procedures, methodologies or methods of the Acquired Companies or their respective internal accounting controls or any material inaccuracy in the Company's financial statements. To the Sellers' Knowledge, there are no significant deficiencies or material weaknesses in the design or operation of the Acquired Companies' internal controls that could adversely affect the Acquired Companies' ability to record, process, summarize and report financial data.

**Section 3.29 OFAC; Sanctions.**

None of the Acquired Companies or, to Sellers' Knowledge, any director, officer, agent, employee, Affiliate or other Person acting on behalf of any Acquired Company (a) has engaged in any services (including financial services), transfers of goods, Software, or technology, or any other business activity related to (i) Cuba, Iran, North Korea, Sudan, Syria or the Crimea region of Ukraine claimed by Russia ("Sanctioned Countries"), (ii) the government of any Sanctioned Country, (iii) any Person located in, resident in, formed under the laws of, or owned or controlled by the government of, any Sanctioned Country, or (iv) any Person made subject of any sanctions administered or enforced by the United States Government, including the list of Specially Designated Nationals of the U.S. Department of the Treasury's Office of Foreign Assets Control, or by the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), (b) has engaged in any transfers of goods, technologies or services (including financial services) that may assist the governments of Sanctioned Countries or facilitate money laundering or other activities proscribed by United States law, (c) is a Person currently the subject of any Sanctions, or (d) is located, organized or resident in any Sanctioned Country.

**Section 3.30 Foreign Corrupt Practices.**

No Acquired Company, or, to Sellers' Knowledge, any director, officer, agent, employee or other Person acting on behalf of any Acquired Company has, in the course of its actions for, or on behalf of, any Acquired Company (a) used any corporate funds of any Acquired Company for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds of any Acquired Company, (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, (d) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment to any Person, private or public, regardless of form, whether in money, property or services, to obtain favorable treatment in securing business to obtain special concessions for any Acquired Company, to pay for favorable treatment for business secured or to pay for special concessions already obtained for any Acquired Company, (e) established or maintained any unlawful fund of monies or other assets of any Acquired Company, or (f) since the Interim Management Balance Sheet Date, violated or is in violation of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the Bank Secrecy Act, or the USA PATRIOT ACT of 2001 (collectively, the "Money Laundering Laws"). There is no Action by or before any Governmental Entity or any arbitrator

with respect to the Money Laundering Laws pending or, to Sellers' Knowledge, threatened against any Acquired Company.

**Section 3.31 Warranty; Product Liability.**

(a) No Customer Agreement contains a product or service warranty relating to any equipment leased or loaned thereunder, other than service warranties provided by the manufacturer of such equipment. Other than as set forth in Schedule 3.16, the Company has not received any written notice or other written communication from any Person regarding any actual, alleged, possible or potential product liability claim (whether on account of any express or implied warranty, for property damage or personal injury or otherwise).

(b) To the Sellers' Knowledge, there are no defects in any equipment subject to a Customer Agreement which would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules to this Article IV, Purchaser hereby represents and warrants to Sellers as follows:

**Section 4.1 Organization.**

Purchaser is a bank, duly organized, validly existing and in good standing under the Applicable Laws of the State of Georgia. Purchaser has the requisite corporate power and authority to carry on its business as it is now being conducted and to own, lease and operate its properties and other assets.

**Section 4.2 Authorization.**

Purchaser has the requisite corporate power and authority to execute, deliver and perform this Agreement and each other Transaction Document to which it is a party and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement and each other Transaction Document to which it is a party and the consummation of the Transactions by Purchaser have been duly authorized by all requisite corporate action on the part of Purchaser.

**Section 4.3 Execution; Validity of Agreement.**

This Agreement has been duly executed and delivered by Purchaser and, when executed and delivered by Purchaser, each other Transaction Document to which Purchaser is a party will be duly executed and delivered by Purchaser, and no other actions are necessary on the part of Purchaser to authorize the execution, delivery and performance of this Agreement and the Transactions. This Agreement constitutes, and when executed and delivered by Purchaser, each other Transaction Document to which Purchaser is a party will constitute (in each case assuming due and valid authorization, execution and delivery by the other parties hereto or thereto), a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its

terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Applicable Laws of general application affecting enforcement of creditors' rights generally and (b) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any such proceeding may be brought.

**Section 4.4** **<u>Consents and Approvals; No Violations</u>**.

Except for the notices, filings, permits, authorizations, consents and approvals as may be required under, and other applicable requirements of, the HSR Act, the Turks and Caicos Islands Insurance Ordinance Cap. 16.06 and accompanying Insurance Regulations, and the Financial Institutions Code of Georgia, none of the execution, delivery or performance of this Agreement or any other Transaction Document by Purchaser, the consummation by Purchaser of the Transactions or compliance by Purchaser with any of the provisions of this Agreement or of any other Transaction Documents will (a) violate, conflict with or result in any breach of any provision of the Organizational Documents or Operating Documents of Purchaser, (b) require any material filing with or notice to, or the obtaining of any material permit, authorization, consent or approval of, any Governmental Entity or other Person by Purchaser, (c) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, acceleration, modification or loss of any material benefit) under, any of the terms, conditions or provisions of any Contract to which Purchaser or any of its Affiliates is a party or by which any of them may be bound, or (d) violate in any material respect any Applicable Laws applicable to Purchaser, in the case of clause (c) excluding such violations, breaches or defaults that would not, individually or in the aggregate, be reasonably likely to have a material adverse effect on Purchaser's ability to consummate the Transactions.

**Section 4.5** **<u>Acquisition of Shares for Investment</u>**.

Purchaser is acquiring the Shares for its own account, for investment only, and not with a view to any resale or public distribution thereof in violation of the Securities Act. Purchaser shall not offer to sell or otherwise dispose of the Shares in violation of any Applicable Law. Purchaser acknowledges that (a) the Shares have not been registered under the Securities Act or any state securities laws, (b) there is no public market for the Shares and there can be no assurance that a public market will develop, and (c) it is capable of bearing the economic risk of its investment in the Shares. Purchaser is an "Accredited Investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.

**Section 4.6** **<u>Availability of Funds</u>**.

Purchaser has and as of Closing will have sufficient immediately available funds in cash or cash equivalents, available lines of credit or other sources of immediately available funds to pay the Estimated Base Purchase Price and all other amounts payable by Purchaser pursuant to this Agreement and to effect the Transactions. Purchaser has not incurred any obligation, commitment, restriction or liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or liability of any kind, in any case which would impair or adversely affect such funding.

**Section 4.7 Litigation.**

There is no Action pending or, to Purchaser's knowledge, threatened against Purchaser that questions or challenges the validity of this Agreement or any of the other Transaction Documents or any action taken or to be taken by Purchaser in connection with this Agreement or any of the other Transaction Documents.

**Section 4.8 Brokers or Finders.**

Neither Purchaser nor any of its Affiliates has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions, except for advisory fees and expenses payable to Piper Sandler Companies.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS

**Section 5.1 Interim Operations of the Acquired Companies.**

During the period from the date hereof to the earlier of the date of termination of this Agreement pursuant to Section 9.1 or the Closing Date, except (a) as contemplated or permitted by this Agreement, (b) as disclosed on Schedule 5.1, (c) as consented to by Purchaser in writing (such consent not to be unreasonably withheld, conditioned or delayed), or (d) as required to comply with Applicable Law, including COVID-19 Measures (provided, in the case of subsection (d), that Sellers provide reasonable notice to Purchaser of such actions), the Company shall, and shall cause each other Acquired Company to (i) operate in the Ordinary Course of Business, (ii) use commercially reasonable efforts to (A) preserve intact its and their present business organization and advantageous business relationships with third parties (including lessors, suppliers, distributors and customers) and officers, employees and independent contractors, (B) keep available the services of the present executive officers and Key Employees of the Acquired Companies, (C) maintain, renew, keep in full force and effect and preserve all material permits and licenses necessary for the conduct of its business as currently conducted, and (D) comply in all material respects with Applicable Laws and obligations under Material Contracts, Customer Agreement and Real Property Leases, and (iii) not do any of the following:

(a) amend its Organizational Documents or Operating Documents;

(b) sell or transfer any assets of the Acquired Companies other than dispositions in the Ordinary Course of Business or which are not material to the Acquired Companies' business or financial condition (taken as a whole);

(c) adopt a plan of merger, share exchange, share acquisition, reorganization, complete or partial liquidation, or dissolution or resolutions providing for or authorizing such a merger, liquidation or dissolution, restructuring, recapitalization or reorganization (other than consolidations, mergers or reorganizations among wholly owned Subsidiaries of the Company as of the date of this Agreement), or a letter of intent, memorandum of understanding or agreement in principle with respect thereto;

(d) adjust, split, combine, reclassify, issue, sell, transfer, dispose of, pledge or encumber any of its Equity Interests, Rights, or other securities convertible or exchangeable for, any of its Equity Interests;

(e) directly or indirectly redeem, purchase or otherwise acquire any of its Equity Interests or any instrument, obligation or security which is convertible into, exercisable or exchangeable for, consists of or includes a right to acquire such Equity Interests;

(f) issue any Voting Debt;

(g) (i) modify any of the material terms of any outstanding Indebtedness, or (ii) assume or guarantee the obligations of any other Person, except on behalf of another Acquired Company in the Ordinary Course of Business;

(h) create any Encumbrance on any of its assets that materially detracts from the value of such asset;

(i) (i) make any change in the compensation payable and benefits to any of its directors, officers, employees, or individual independent contractors, other than (A) normal recurring increases in the Ordinary Course of Business to employees other than those at director-level and above, such increase not to exceed, in the aggregate, five percent (5%) of the payroll of the Acquired Companies, or (B) as required by any Benefit Plan, employment agreement, severance plan or retention plan existing on the date hereof, a complete copy of which has been provided to Purchaser on or prior to the date hereof, without the exercise of any upward discretion, (ii) adopt, terminate or, other than as required by Applicable Law, amend any Benefit Plan, or arrangement that would be a Benefit Plan if in effect on the date hereof, or (iii) grant any stock options or other equity or incentive awards, or (iv) hire or terminate, other than for cause, any directors, officers, employees, or individual independent contractors, other than hiring or termination of employees whose expected or actual annual compensation is less than $150,000;

(j) voluntarily permit any material Insurance Policy naming it as a beneficiary or a loss payable payee to be canceled or terminated without giving notice to Purchaser, except policies providing coverage for losses not in excess of $1,000,000 that are replaced without diminution of or gaps in coverage;

(k) make any change in the accountants of the Acquired Companies or any accounting or auditing methods, principles or practices, including reserving methodologies, or any material change in depreciation or amortization policies or rates, or any material change in the terms of, or manner in which the Acquired Companies extends, warranties, discounts, rebates or credits to customers or receives warranties, discounts, rebates or credits from suppliers or other vendors, except as required by GAAP or Applicable Laws after the date hereof;

(l) make or change any Tax election (except to the extent consistent with past practice), change any annual Tax accounting period, adopt or change any Tax accounting method, file any amended Tax Return (except in the Ordinary Course of Business), enter

into any closing agreement, settle or compromise any Tax claim or assessment, surrender any right to claim a Tax refund, offset or other reduction in material liability with respect to Taxes, or waive or extend any statute of limitations with respect to any Tax, or fail to pay any Tax as it becomes due;

(m) make any material changes in its policies and practices with respect to interest rates or fee pricing with respect to any Customer Agreement, lending, investment, originating, acquiring, selling, underwriting, servicing, buying or selling rights to servicing, hedging and risk and asset management policies or fail to follow such policies or take any actions that would be, or result in, an exception to any such policy, other than in the Ordinary Course of Business;

(n) other than in the Ordinary Course of Business, write-down of the value of any asset or write-off as uncollectible any accounts or notes receivable of the Acquired Companies or any portion thereof, other than write-downs or write-offs that are reserved for on the Audited Financial Statements or Interim Management Financial Statements or which do not exceed $150,000 in the aggregate;

(o) make or commit to make expenditures not reflected on the Company's 2021 capital plan/budget, a copy of which has been made available to Purchaser, in excess of $150,000 in the aggregate;

(p) commence any Action or settle any Action involving money damages in excess of $100,000 in the aggregate or that would impose any material restriction on the business operations of the Acquired Companies;

(q) other than in the Ordinary Course of Business, terminate, amend, assign, or waive any material provision of any Material Contract, Customer Agreement or Real Property Lease or enter into any Contract that would be a Material Contract or Real Property Lease if in existence as of the date hereof;

(r) fail to renew or maintain or otherwise lose or forego ownership or the benefit of any material Intellectual Property rights, except for Intellectual Property expiring at the end of its statutory term (including all available renewal terms) or abandoned in the reasonable business judgment of an Acquired Company;

(s) enter into any new line of business or change in any material respect its material operating policies except as required by Applicable Law or by a Governmental Entity;

(t) other than with respect to the Reinsurance Subsidiary, discontinue any line of business or dissolve or wind up any of the Acquired Companies;

(u) other than in the Ordinary Course of Business, forgive or cancel any third party Indebtedness owed to any Acquired Company; or

(v) agree, authorize, resolve, arrange or commit to do any of the things described in subsections (a) through (v) above.

**Section 5.2 Access; Confidentiality.**

(a) Access to Books and Records. During the period from the date hereof to the earlier of the date of termination of this Agreement pursuant to Section 9.1 or the Closing Date, the Company shall, and Sellers shall cause each Acquired Company to (i) give Purchaser and its authorized Representatives reasonable access to all books, records, Contracts, Tax Returns, personnel, offices and other facilities and properties of the Acquired Companies, (ii) permit Purchaser to make such copies and inspections thereof as Purchaser may reasonably request and (iii) cause the officers of the Acquired Companies to furnish Purchaser with such financial and operating data and other information with respect to the business of the Acquired Companies as Purchaser may from time to time reasonably request; provided, however, that any such access, copies and inspections shall be at Purchaser's expense, at a reasonable time, under the supervision of the Acquired Companies' personnel and in such a manner as to maintain the confidentiality of this Agreement and the Transactions and not to interfere with the normal operation of the business of the Acquired Companies. Notwithstanding the foregoing, prior to the Closing (or until the date of termination of this Agreement pursuant to Section 9.1), Purchaser and its Affiliates, directly or indirectly through their respective Representatives, shall not contact customers, suppliers, employees or other stakeholders or business partners of the Acquired Companies without the express written consent of Byrne or the Company; provided, however, that Purchaser and its Affiliates, to the extent they have independent relations with any such third parties at the date hereof, may continue to have contact with such third parties in the Ordinary Course of Business. Nothing herein shall require any Seller or any Acquired Company to disclose any information to Purchaser if such disclosure would, as determined in such Seller's or such Acquired Company's sole discretion, (w) cause significant competitive harm to Sellers, the Acquired Companies or their Affiliates if the Transactions are not consummated, (x) jeopardize any attorney-client or other legal privilege, (y) contravene any Applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement (including any confidentiality agreement that relates to a party other than the Acquired Companies to which any Seller, any Acquired Company or any of their respective Affiliates is a party) or (z) contravene any obligation of secrecy or confidentiality to any Governmental Entity; provided, that the parties hereto shall seek to make reasonable substitute disclosure arrangements in the circumstances in which the foregoing restrictions apply.

(b) Confidentiality Agreement. The provisions of the Confidentiality Agreement shall remain binding and in full force and effect on and after the date hereof in accordance with its terms until the Closing. The information contained in this Agreement or delivered to Purchaser or its authorized Representatives pursuant to or in connection with this Agreement shall be deemed for all purposes to be subject to the restrictions contained in the Confidentiality Agreement until the Closing.

(c) Confidential Information. Except as required by Applicable Law, Sellers and each Acquired Company will keep confidential and not, directly or indirectly, reveal, report, publish, disclose or transfer any information contained in this Agreement or delivered to Sellers or any Acquired Company or their authorized Representatives pursuant to or in connection with this Agreement, and information regarding Purchaser and its

Affiliates and the negotiations preceding this Agreement, other than to its Representatives, and each will use such information solely in connection with the Transactions, and if the Transactions are not consummated for any reason, each will promptly return to Purchaser or destroy, at Sellers' or the Company's election (as applicable), without retaining any copies thereof, any schedules, documents or other written confidential information related to Purchaser or its Affiliates obtained from Purchaser and its Affiliates in connection with this Agreement and the Transactions, and will direct all of its Representatives to whom it may have disclosed such information to do the same. Following the Closing, except as required by Applicable Law, Sellers will keep confidential and not directly or indirectly reveal, report, publish, disclose or transfer any Evaluation Material (as defined in the Confidentiality Agreement, with respect to the Acquired Companies) or other confidential information of Purchaser and its Affiliates (whether furnished by Purchaser or any Acquired Company to Sellers or their Representatives or prepared by Sellers or their Representatives which contain or otherwise reflect or are generated from such confidential information), and will not use such information for their own benefit or for the benefit of any other Person (other than the Acquired Companies and Purchaser), and will direct all of its Representatives to do the same. Notwithstanding the foregoing limitations, Sellers will not be required to keep confidential or return any information that (i) is known or available through other lawful sources not bound by a confidentiality agreement with Purchaser or any Acquired Company, (ii) is or becomes publicly known or generally known in the industry through no fault of Sellers or its Representatives, (iii) is requested or required to be disclosed pursuant to Applicable Law (including securities laws of any jurisdiction and rules and regulations of any applicable stock exchange), provided Purchaser is given reasonable prior notice (under the circumstances and if permitted by Applicable Law) of such disclosure or (iv) relates solely to the income Tax aspects and consequences of the Transactions, provided Purchaser is given reasonable prior notice or consents thereto. For the avoidance of doubt, the foregoing restrictions shall not be deemed to prohibit the use or disclosure of any confidential or other information by any Seller Indemnified Party in connection with asserting or contesting any claim under Article VII or Article VIII hereof or in connection with any Action under Section 10.10 hereof.

**Section 5.3 Efforts and Actions to Cause Closing to Occur**.

Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the Company, Sellers and Purchaser shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable (subject to any Applicable Laws) to consummate the Closing as promptly as practicable, including (a) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing, (b) the obtaining of all approvals, authorizations, consents (including the consents listed on Schedule 2.5(e)), Orders, licenses, permits, qualifications, exemptions or waivers from any Governmental Entity or other Person as may be required or appropriate in connection with the consummation of the Transactions, including the making of any filing or application required to be made under the Financial Institutions Code of Georgia, and (c) the execution and delivery of any additional instruments necessary to consummate the Transactions and to fully carry out the purposes of this Agreement. The parties will furnish each other with all necessary information and cooperate with each other in connection with the preparation of such filings, submissions and registrations and

seek to secure the expiration or termination of all applicable waiting periods under the HSR Act and to obtain all such approvals, authorizations, consents (including the consents listed on Schedule 2.5(e)), Orders, licenses, permits, qualifications, exemptions or waivers from any Governmental Entity or other Person as soon as practicable following the date of this Agreement. In addition, no party hereto shall take any action (or fail to take any action) after the date hereof that could reasonably be expected to result in the Transactions not being consummated on a timely basis, or adversely affect or materially delay (x) the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Entity or other Person required to be obtained prior to Closing, or (y) the ability of any party hereto to perform its obligations under this Agreement. Nothing contained in this Agreement shall require any party hereto to pay any consideration (except filing and application fees) to any other Person from whom any such approvals, authorizations, consents, Orders, licenses, permits, qualifications, exemptions or waivers are requested. Notwithstanding the foregoing, in no event shall Purchaser be required, and Sellers and the Acquired Companies shall not be permitted (without Purchaser's prior written consent in its sole discretion), to take any action, or commit to take any action or to accept any restriction, commitment, or condition, involving Purchaser or the Acquired Companies, which would reasonably be expected to be materially financially burdensome to the business, operations, financial condition or results of operations of Purchaser's and its Affiliates' businesses (taken as a whole) or of the businesses of the Acquired Companies (taken as a whole).

**Section 5.4 Exclusivity.**

During the period from the date hereof to the earlier of the date of termination of this Agreement pursuant to Section 9.1 or the Closing Date, Sellers and the Company shall not, and shall not authorize or cause another Acquired Company, any of its or their Affiliates and Representatives to, directly or indirectly (a) solicit, initiate, facilitate or encourage any Competing Transaction or any inquiries or the making of any proposal that constitutes or could reasonably be expected to lead to a Competing Transaction, or (b) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or otherwise cooperate in any way with, or execute or enter into any Contract with respect to, any Competing Transaction. Upon execution and delivery of this Agreement, Sellers and the Company shall, and shall instruct the Acquired Companies and its and their Affiliates and Representatives to, immediately cease all existing discussions or negotiations with any Person (other than Purchaser and its Affiliates) conducted on or before the date hereof with respect to any Competing Transaction unless and until this Agreement is terminated pursuant to Section 9.1.

**Section 5.5 Publicity.**

The initial press release, if any, with respect to the execution of this Agreement shall be a joint press release mutually acceptable to Purchaser and Sellers. Thereafter, until the termination of this Agreement pursuant to Section 9.1 or the Closing, each of Sellers, the Company and Purchaser shall not (and shall not permit any of its Affiliates to) issue or cause the release or publication of any press release or other external announcement with respect to this Agreement or the Transactions without prior approval of the other (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that nothing herein shall prevent any Person from making any public announcement (whether in a press release, periodic securities filing or

other external announcement) required by Applicable Law or the rules of any stock exchange or quotation system applicable to such Person.

**Section 5.6 Employees; Employee Benefits.**

(a) Employee Compensation; Benefits. For a period of at least twelve (12) months following the Closing Date (the "Retention Period"), any employee employed by the Acquired Companies as of the Closing Date (each an "Acquired Company Employee") who is terminated by Purchaser or an Affiliate without Cause (as defined below) and who does not have a right to severance pursuant to an employment or other agreement with Purchaser and its Affiliates shall, subject to agreeing to a standard separation agreement that includes a release of all claims against Purchaser, its Affiliates and their related parties, and non-solicitation and non-disparagement provisions, receive from Purchaser the severance benefits set forth on Schedule 5.6(a). "Cause" shall mean any of the following: (i) an Acquired Company Employee's conviction of or plea of nolo contendere to a felony or other criminal act involving moral turpitude, (ii) the commission by the Acquired Company Employee of an act of fraud, theft or embezzlement, or an act of comparable dishonesty, with respect to the Acquired Companies, (iii) an Acquired Company Employee's willful and continued failure to perform such Acquired Company Employee's duties to the Purchaser and its Affiliates (other than on account of disability), (iv) an Acquired Company Employee's willful misconduct or gross negligence in connection with the Acquired Company Employee's duties to, or the business of, Purchaser and its Affiliates, or (v) an Acquired Company's material breach of any agreement with, or workplace policy of, the Purchaser and its Affiliates. During each Acquired Company Employee's employment during the Retention Period, Purchaser shall, or shall cause the Acquired Companies to, provide to each such Acquired Company Employee (x) except as may be set forth in an Employment Agreement, cash compensation that is equal to or greater than the cash compensation currently provided by the Acquired Companies to each such employee, and (y) benefits, including group medical coverage, that are substantially similar in the aggregate to similarly situated employees of Purchaser and its Affiliates, in each case excluding any change in control or equity-based compensation or benefits, defined benefit pension benefits and post-termination welfare benefits.

(b) Service Credit. Effective from and after the Closing Date, employees of the Acquired Companies who are employed by Purchaser or the Acquired Companies shall be given credit for all purposes (other than benefit accrual) under the employee benefit plans, programs, policies and arrangements maintained from time to time by Purchaser or the Acquired Companies and made available to such employees for such employees' service with the Acquired Companies, to the same extent and for the same purposes that such service was taken into account under a corresponding Benefit Plan of the Acquired Companies as of the Closing Date; provided, however, that no such service shall be credited to the extent that it would result in a duplication of benefits. Purchaser shall use commercially reasonable efforts to credit amounts paid by employees of the Acquired Companies who are employed by Purchaser or the Acquired Companies under the Acquired Company's employee welfare benefit plans, as defined in Section 3(1) of ERISA, in the plan year in which the Closing occurs towards deductibles and co-insurance limits

under any corresponding employee welfare benefit plans of Purchaser and its Affiliates in which such employees participate in the plan year in which the Closing occurs.

(c) Certain Continuing Benefits. Effective from and after the Closing Date, Purchaser and the Acquired Companies shall be solely responsible for providing continuing benefits or coverage for any participant or any beneficiary of a participant who is or becomes a qualified beneficiary prior to, on or after the Closing Date under any Benefit Plan that as of the Closing Date is subject to the requirements of Code Section 4980B or Section 601 (et seq.) of ERISA, or mandated by other Applicable Law, whether such obligation to provide continuing benefits or coverage under any such Benefit Plan arises prior to, on or after the Closing Date.

(d) WARN Act Compliance. At or within five (5) Business Days following the Closing, the Acquired Companies shall deliver to Purchaser an updated version of the list of employment losses and hours reductions in Schedule 3.22(f). Provided that the Company meets the obligation in the proceeding sentence, Purchaser shall cause the Acquired Companies to employ and retain for such period of time following the Closing Date such number of employees of the Acquired Companies as shall be necessary to avoid any liability of Sellers for a violation of the WARN Act, attendant to the Acquired Companies' (or their Affiliates') failure to notify employees of a "mass layoff" or "plant closing" (as such terms are defined in the WARN Act) as a result of employment losses occurring before and after the Closing Date. For the avoidance of doubt, Purchaser's obligations under this Section 5.6(d) shall not limit Seller's obligations with respect to the representations and warranties under Article III. Purchaser shall be liable and responsible for any notification required under the WARN Act (or under any similar state or local Applicable Laws), and Purchaser shall indemnify and hold the Seller Indemnified Parties harmless from and against any Losses incurred by any Seller Indemnified Party as a result of Purchaser's or the Acquired Companies' failure to comply with the provisions of the WARN Act on or after the Closing Date or Purchaser's failure to comply with the provisions of this Section 5.6(d)

(e) Plan Termination. If requested by Purchaser in a writing delivered to the Company following the date hereof and no later than five (5) Business Days prior to the Closing Date, Sellers and the Acquired Companies shall take all necessary action (including the adoption of resolutions and plan amendments and the delivery of any required notices) to terminate, contingent upon the occurrence of the Closing, any Benefit Plan that is an "employee benefit plan" within the meaning of Section 3(3) of ERISA requested by Purchaser, such termination to be effective as of not later than the day prior to the Closing Date for any such Benefit Plan that is intended to constitute a tax-qualified defined contribution plan under Section 401(a) of the Code with a cash or deferred feature under Section 401(k) of the Code and not later than the Closing Date for any other such Benefit Plan. All resolutions, plan amendments, notices and other documents prepared to effectuate such terminations shall be subject to advance review and approval by Purchaser.

(f) No Third Party Beneficiaries. All provisions contained in this Section 5.6 with respect to employee benefit plans or employee compensation are included for the sole benefit of the respective parties hereto and shall not create any right in any other Person,

including any employee or former employee of the Acquired Companies or any participant or beneficiary in any Benefit Plan. No provision of this Agreement shall be deemed to be an amendment to any Benefit Plan or other plan, policy, program or arrangement of Purchaser or its Affiliates.

**Section 5.7** **Maintenance of Books and Records**.

(a) Each party hereto shall preserve (and Purchaser shall cause the Acquired Companies to preserve), for a period of six (6) years following the Closing Date, all pre-Closing Date records possessed by or under the control of such party relating to the Acquired Companies. During the six (6)-year period following the Closing Date, upon any reasonable request from the other party hereto or its Representatives, the party (or Acquired Company, as applicable) holding such records shall (a) provide to the requesting party or its Representatives reasonable access to such records during normal business hours and (b) permit the requesting party or its Representatives to make copies of such records, in each case at the cost of the requesting party; provided, however, that nothing in this Section 5.7 shall require any party to disclose information to the other party if such disclosure would (x) jeopardize any attorney-client or other legal privilege, (y) violate any Applicable Law or any confidentiality agreement that relates to a party other than the Acquired Companies or (z) contravene any obligation of secrecy or confidentiality to any Governmental Entity. Records may be sought under this Section 5.7 for any reasonable purpose, including to the extent reasonably required in connection with the audit, accounting, Tax, litigation, federal securities disclosure or other similar proper business purpose of the party seeking such records.

(b) At or promptly following the Closing, Sellers shall cause one or more CD-ROMS or flash drives, in PC-readable format, that contain readable working Adobe or other (*i.e.*, Microsoft Office) portable document format files that set forth all of the documents uploaded to the electronic data site hosted by FIRMEX from the date of the Confidentiality Agreement through three (3) Business Days prior to Closing.

**Section 5.8** **Directors' and Officers' Indemnification**.

(a) Indemnification of Certain Persons. For a period of six (6) years following the Closing Date, in the event of any threatened or actual Action, whether civil, criminal or administrative, including any such Action by or in the right of any Acquired Company, in which any of the present or former officers or directors of any Acquired Company (collectively, the "Company Indemnified Persons") is, or is threatened to be, made a party by reason of the fact that he or she is or was, prior to the Closing Date, a director, officer, employee or agent of any Acquired Company or of another corporation, partnership, joint venture, trust or other enterprise at the request of any Acquired Company, whether such claim arises before or after the Closing Date, Purchaser shall cause the applicable Acquired Company to indemnify and hold harmless, at least to the same extent and on terms and conditions no less favorable than those provided for in the Organizational Document or Operating Document of the applicable Acquired Company in effect immediately prior to the date of this Agreement, each such Company Indemnified Person against any Losses in connection with any such Action. Purchaser shall cause the Acquired Companies to keep

in effect, in their respective Organizational Documents and Operating Documents, a provision that provides for indemnification of the Company Indemnified Persons to the extent required under this Section 5.8(a).

(b) Insurance Coverage. Purchaser shall obtain, prior to the Closing, a prepaid extended non-cancelable reporting period endorsement or a run-off policy under the Company's existing directors' and officers' liability insurance coverage for the Company Indemnified Persons that shall provide such Company Indemnified Persons with coverage for a period of six (6) years after the Closing Date comparable to and, as to scope of coverage and amount, not less favorable in any material respect than, the policy or policies maintained by the Acquired Companies immediately prior to the date of this Agreement for the benefit of such individuals (the "D&O Tail Policy"). On or prior to the Closing Date, Purchaser shall deliver to Sellers evidence of the continuation of such coverage. Following the Closing, the Acquired Companies shall, and Purchaser shall cause the Acquired Companies to, maintain the D&O Tail Policy in full force and effect, and continue to honor the obligations thereunder for the term thereof.

(c) Non-Exclusive Indemnification; Attorneys' Fees. This Section 5.8 is intended to be for the benefit of, and shall be enforceable by, each of the Company Indemnified Persons and their respective heirs and successors, each of whom is an intended third-party beneficiary of this Section 5.8. The indemnification provided for herein shall not be deemed exclusive of any other rights to which any Company Indemnified Person is entitled, whether pursuant to Applicable Law, Contract or otherwise. Purchaser shall cause the Acquired Companies to pay all expenses, including reasonable attorneys' fees, that may be incurred by any Company Indemnified Person that is the prevailing party in any action or proceeding to enforce its rights under this Section 5.8.

(d) Successors and Assigns. In the event that following the Closing, Purchaser, any Acquired Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and will not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, to the extent necessary to effectuate the purposes of this Section 5.8, Purchaser shall, and shall cause the Acquired Companies to, make proper provision so that the successors and assigns of Purchaser or the Acquired Companies, as the case may be, shall succeed to the obligations set forth in this Section 5.8. The provisions of this Section 5.8 shall survive consummation of the Closing.

**Section 5.9 Notification.**

The Company, Sellers and Purchaser shall each promptly advise the other of (a) any notice or other communication from any Governmental Entity in connection with the Transactions or, (b) any fact, change, event or circumstance (i) that has had or would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect, or (ii) which it believes would or would be reasonably likely to give rise, individually or in the aggregate, to the failure of a condition in Article VI; provided, that any failure to give notice in accordance with the foregoing with respect to any breach shall not be deemed to constitute a violation of this Section 5.9 or the

failure of any condition set forth in Section 6.1 or Section 6.2 to be satisfied, or otherwise constitute a breach of this Agreement by the party hereto failing to give such notice, in each case unless the underlying breach would independently result in a failure of the conditions set forth in Section 6.1 or Section 6.2 to be satisfied.

**Section 5.10 R&W Policy.**

As of the date hereof, Purchaser, at its sole cost and expense, has bound a representation and warranty insurance policy in connection with the Transactions in the form attached hereto as Exhibit D (the "R&W Policy") that (a) provides coverage up to a limit of [redacted], (b) has been issued for the benefit of the Purchaser Indemnified Parties and (c) expressly states that, other than with respect to Losses suffered or incurred by them proximately caused by a Seller's Fraud, the insurer may not seek to or enforce, and to the fullest extent waives any right of subrogation, rights of contribution or any right of assignment it might have, against any Seller or any Affiliate thereof. Purchaser will not, and will cause its Affiliates and Representatives not to, take any action (or omit to take any action) to amend, waive or otherwise modify any provision of the R&W Policy in any manner that would allow the insurer thereunder or any other Person to subrogate or otherwise make or bring any action or proceeding against any Seller or any Affiliate thereof or any past, present or future director, officer, employee or advisor of any of the foregoing based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement, except in the case of Fraud. The Company and the Sellers shall cooperate, during ordinary business hours and with reasonable prior notice, with Purchaser's efforts and provide assistance as reasonably requested by Purchaser to cause the R&W Policy to be issued and remain in full force and effect, and shall use commercially reasonable efforts to assist and cooperate with Purchaser Indemnified Parties in connection with any claim by such Purchaser Indemnified Parties under the R&W Policy; *provided* that such assistance and cooperation shall not require the Company or the Sellers to acknowledge or confirm the breach of any representation or warranty made herein.

**Section 5.11 Non-Competition; Non-Solicitation.**

(a) Subject to Section 5.11(b), for a period of three (3) years commencing on the Closing Date (the "Restricted Period"), regardless of whether Byrne remains employed as an employee of any Acquired Company, each Seller agrees that it will not, and will cause its respective Affiliates not to (i) take any steps to establish or acquire, directly or indirectly own, manage, operate, control, engage in, or participate in the ownership, management or operation of or engagement in a commercial equipment leasing or small business lending business (the "Competing Business") within the United States (the "Territory") or (ii) own an Equity Interest in any Person that, to Sellers' Knowledge, engages in the Competing Business in the Territory; provided, however, that the foregoing shall not be violated by Byrne's provision of services to or for the benefit of Purchaser or its Affiliates (including the Acquired Companies).

(b) Notwithstanding anything to the contrary contained in Section 5.11(a): (i) Section 5.11(a) shall not apply to passive ownership, solely as an investment, of five percent (5%) or less of the securities of any Person that are listed and traded on a nationally recognized securities exchange or market, and (ii) Sellers and its Affiliates may acquire

any business or interests in or securities of any Person or Persons that derived five percent (5%) or less of its total annual revenues in its most recent fiscal year from activities that constitute a Competing Business, and Section 5.11(a) shall not have any application thereto.

(c) During the Restricted Period, regardless of whether Byrne is employed as an employee of any Acquired Company, Sellers shall not, and shall not permit any of its respective Affiliates to, directly or indirectly, (i) hire or solicit any employee, independent contractor or other service provider of any Acquired Company or any such person who has left such employment within twelve (12) months of such solicitation or hiring, except soliciting or hiring pursuant to a general solicitation to the public which are not based on any list of, or directed at any such current or former employees, consultants, independent contractors, freelancers or other service providers of any Acquired Company and (ii) solicit any customer of any Acquired Company to engage in any Competing Business with Byrne, any of his Affiliates or with any other Person, whether or not affiliated with Byrne.

(d) During the Restricted Period, regardless of whether Byrne is employed as an employee of any Acquired Company, Sellers shall not, and shall not permit any of its respective Affiliates to, directly or indirectly, (a) make or publish in verbal or written form any disparaging remarks or negative comments to any third party, or (b) knowingly encourage, assist, or direct any third party to make such disparaging remarks or negative comments, in each case, regarding, concerning or alluding to any of Purchaser or its Affiliates, any Acquired Company or any of their equityholders, businesses, products, services or activities. This obligation will apply regardless of whether the disparaging remarks or negative comments legally constitute libel or slander. Notwithstanding the foregoing, nothing in this Agreement shall be construed to preclude truthful disclosures (i) in response to lawful process as required by Applicable Law, or (ii) in any Action enforcing or defending rights under this Agreement or any Transaction Document, or any employment or consulting agreement between such Seller and Purchaser or any Acquired Company.

(e) Sellers acknowledge that a breach or threatened breach of this Section 5.11 would give rise to irreparable harm to Purchaser, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by any Seller of any such obligations, Purchaser or the Company (after the Closing) shall, in addition to any and all other rights and remedies that may be available to each of them in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(f) In recognition of the business objectives of the parties hereto in entering into this Agreement and the Transactions and the consideration paid therefor, each of the parties hereto acknowledges and agrees that (i) the foregoing non-competition provisions, including the temporal, geographic and scope-of-activity restrictions, non-solicitation provisions and non-hire provisions do not impose a greater restraint than is necessary to protect the legitimate business interests of the other parties hereto and are reasonable under the circumstances and (ii) the parties hereto would not be willing to consummate the

Transactions without each Seller entering into the restrictive covenants set forth herein. If, at any time, the provisions of this Section 5.11 shall be determined to be invalid or unenforceable by reason of being vague or unreasonable as to duration, geographic area or scope, this Section 5.11 shall be considered divisible and shall be deemed amended to only such duration, geographic area or scope as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction.

**Section 5.12 Release and Covenant Not to Sue.**

Subject to and effective as of the Closing, each Seller hereby releases and discharges the Acquired Companies, and, to the extent related to the Acquired Companies, Purchaser, and any such party's Affiliates and Representatives (collectively, the "Released Parties") from and against any and all claims, demands, obligations, agreements, debts and liabilities whatsoever, whether known or unknown, both at law and in equity, which any Seller now has, has ever had or may hereafter have against any of the Released Parties arising on or prior to the Closing Date or on account of or arising out of any matter occurring on or prior to the Closing Date, whether or not relating to claims pending on, or asserted after, the Closing Date. From and after the Closing, each Seller hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing or causing to be commenced, any claim of any kind against any Released Party, based upon any matter released hereby. Notwithstanding anything herein to the contrary, the restrictions set forth herein shall not apply to (a) any claims any Seller may have against any Released Party pursuant to the terms and conditions of this Agreement or any other Transaction Document, (b) any claims in Byrne's capacity as an employee of the Acquired Companies for vested rights under an employee benefit plan or for normal compensation for the payroll period during which the Closing occurs, or (c) any claims any Seller may have, in his or its capacity as a Company Indemnified Person, in connection with any rights to indemnification pursuant to (i) the Organizational Documents or Operating Documents of any Acquired Company (as in effect on the date hereof) or (ii) insurance coverage under the D&O Tail Policy.

**Section 5.13 No Control of the Other Party's Business.**

Nothing contained in this Agreement is intended to give Purchaser, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing. Prior to the Closing, the Acquired Companies shall exercise, consistent with the terms of this Agreement, control over their own operations.

**Section 5.14 MHT Recoveries.**

In the event that the aggregate amount recovered by the Acquired Companies pursuant to their respective claims and/or counterclaims in the MHT Litigation, or otherwise collected by the Acquired Companies from the counterparties in the MHT Litigation, exceeds an amount equal to $1,800,000 (net of any actual costs or expenses incurred in connection with securing or obtaining such recovered amounts, including reasonable costs of investigating, preparing or defending any Action and reasonable attorneys' fees and other reasonable expenses of litigation or similar proceedings, or costs incurred in collection of amounts due thereunder, other than any costs or expenses for which a Purchaser Indemnified Party has received an indemnification payment under Article VIII of this Agreement (and any reduction in payment to Sellers under this Section 5.14

shall be deemed to satisfy Sellers' indemnification obligation under Article VIII to the extent of such reduction)). Purchaser agrees and acknowledges that Purchaser shall, promptly following the receipt of any such proceeds after either (a) the receipt of a final and non-appealable Order of any court of competent jurisdiction or (b) entry into a duly executed settlement in any case constituting the MHT Litigation, as applicable, cause the applicable Acquired Company to pay such excess to the Trusts via wire transfer of immediately available funds, in the amounts of and to such accounts as designated in writing by Sellers.

**Section 5.15 Transfer of the Reinsurance Subsidiary.**

Prior to the Closing, the Sellers or the Company shall use its reasonable best efforts to transfer, effective no later than as of the Closing, all of the Equity Interests of the Reinsurance Subsidiary to Byrne, the Trust, or one or more of his or their applicable Affiliates (other than an Acquired Company) pursuant to documentation in form and substance reasonably acceptable to Purchaser and in compliance with Applicable Law, with no further Liability to any Acquired Company, Purchaser or any of their respective Affiliates in a manner such that, following such transfer, the Reinsurance Subsidiary shall not be a Subsidiary of any Acquired Company. Prior to consummation of such transfer, Sellers or the Company shall submit draft documentation related to the transfer of the Equity Interests of the Reinsurance Subsidiary, including without limitation any agreements or regulatory filings relating to the transfer, to Purchaser for its review and comment and allow Purchaser reasonable time to conduct its review and provide comments. Seller shall incorporate all reasonable comments provided by Purchaser.

## ARTICLE VI
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

**Section 6.1 Conditions to Purchaser's Obligations.**

The obligations of Purchaser to consummate the Transactions shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived, if legally permissible, by Purchaser:

(a) Statutes; Court Orders. No statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity that prohibits the consummation of the Closing; there shall be no Order in effect precluding consummation of the Closing; provided, that the parties shall use their reasonable best efforts to have any such Order vacated or lifted; and there shall not be pending any Action by any Governmental Entity seeking to prohibit the consummation of the Closing or the performance of any of the other Transactions.

(b) Regulatory Approval. The waiting period, if applicable, under the HSR Act in connection with the Transactions shall have expired or been terminated, and all approvals, authorizations, clearances, exemptions, waivers, permits, non-objections, and consents required from any Governmental Entity (including the Georgia Department of Banking and Finance) in connection with the Transactions (the "Requisite Regulatory Approvals") shall have been obtained.

(c) Representations and Warranties. The representations and warranties of Sellers and the Company set forth in Article III, other than the Fundamental Representations of the Sellers and the Company shall be true and correct on and as of the Closing Date (or in the case of representations and warranties that are expressly made as of a specified date, such representations and warranties shall be true and correct as of such specified date), except to the extent that the failure of such representations and warranties to be so true and correct would not have a Company Material Adverse Effect; provided, that, for purposes of this sentence, those representations and warranties which are qualified by references to "material," "material respects," "Company Material Adverse Effect" or similar qualifications shall be deemed not to include such qualifications. The Fundamental Representations of the Sellers and the Company shall be true and correct in all but *de minimis* respects on and as of the Closing Date (or in the case of representations and warranties that are expressly made as of a specified date, such representations and warranties shall be true and correct in all but *de minimis* respects as of such specified date).

(d) Covenants and Obligations. Sellers and the Company shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with by Sellers and the Company at or before the Closing.

(e) Deliveries by Sellers and the Company. Sellers and the Company shall have delivered or caused to be delivered to Purchaser those items required to be delivered pursuant to Section 2.5.

(f) R&W Policy. Purchaser shall have received the R&W Policy and confirmed that, subject to Purchaser's obligations to pay any remaining premiums, fees and expenses and to deliver any customary certifications or similar documents required thereunder, the R&W Policy is in effect as of the Closing Date.

(g) Employment Agreements. Each Employment Agreement shall be in full force and effect.

(h) Absence of Company Material Adverse Effect. Since the date hereof, there shall not have occurred a Company Material Adverse Effect.

**Section 6.2 Conditions to Obligations of Sellers and the Company.**

The obligations of Sellers and the Company to consummate the Transactions shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived, if legally permissible, by Sellers and the Company:

(a) Statutes; Court Orders. No statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity that prohibits the consummation of the Closing; there shall be no Order in effect precluding consummation of the Closing; provided, that the parties shall use their reasonable best efforts to have any such Order vacated or lifted; and there shall not be pending any Action by any Governmental Entity seeking to prohibit the consummation of the Closing or the performance of any of the other Transactions.

(b) Regulatory Approval. The waiting period, if applicable, under the HSR Act in connection with the Transactions shall have expired or been terminated, and all Requisite Regulatory Approvals shall have been obtained.

(c) Representations and Warranties. The representations and warranties of Purchaser set forth in Article IV, other than the Fundamental Representations of Purchaser, shall be true and correct on and as of the Closing Date (or in the case of representations and warranties that are expressly made as of a specified date, such representations and warranties shall be true and correct as of such specified date), except to the extent that the failure of such representations and warranties to be so true and correct would not have a material adverse effect on the ability of Purchaser to consummate the Transactions; provided, that, for purposes of this sentence, those representations and warranties which are qualified by references to "material," or "material respects," or similar qualifications shall be deemed not to include such qualifications. The Fundamental Representations of Purchaser shall be true and correct in all but *de minimis* respects on and as of the Closing Date (or in the case of representations and warranties that are expressly made as of a specified date, such representations and warranties shall be true and correct in all but *de minimis* respects as of such specified date).

(d) Covenants and Obligations. Purchaser shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with by Purchaser at or before the Closing.

(e) Deliveries by Purchaser. Purchaser shall have delivered to Sellers or the other applicable Persons those items required to be delivered by Purchaser pursuant to Section 2.6.

## ARTICLE VII
## TAX MATTERS

**Section 7.1 Transfer Taxes.**

Notwithstanding anything herein to the contrary, all transfer, documentary, sales, use, stamp, registration, and other similar Taxes (including any penalties and interest) incurred in connection with the transfer of the Shares pursuant to this Agreement shall be borne by Purchaser, and Purchaser will, at its expense, file all necessary Tax Returns and other documentation required with respect to all such Taxes.

**Section 7.2 Tax Returns.**

(a) Purchaser shall, at its expense, prepare or cause to be prepared, and timely file, or cause to be timely filed, all Tax Returns for the Acquired Companies required to be filed after the Closing Date with respect to any Pre-Closing Tax Period or Straddle Tax Period. All such Tax Returns shall be prepared on a basis consistent with past practice (except as otherwise required by Applicable Law). At least thirty (30) days prior to the date (including extensions) on which any such Tax Return that is an income Tax Return to be prepared by Purchaser (a "Reviewed Return") is due, Purchaser shall submit such Reviewed Return to Sellers for their review and comment. Purchaser shall incorporate all

reasonable comments to the extent such comments are consistent with past practice (except as otherwise required by Applicable Law) that are provided by Sellers no later than five (5) Business Days prior to the due date or filing of such Reviewed Return.

(b) With respect to any Straddle Tax Period, the allocation of Taxes shall be determined on an interim closing of the books as of the close of business on the Closing Date, except for ad valorem Taxes and other Taxes imposed on annual or periodic basis, which shall be prorated on a daily basis. Any deductions attributable to any of the Company Transaction Expenses, any employee bonuses, severance payments, debt prepayment fees, capitalized debt costs, or any other liabilities paid on the Closing Date or that are taken into account in the determination of the Final Shareholders' Equity Position shall be for the benefit of Sellers and allocated to the Pre-Closing Tax Period ending on the Closing Date to the extent permitted by Applicable Law. For purposes of a Tax that is imposed as a result of the application of any rule under Subpart F of Subchapter N of the Code, the taxable period shall be assumed to end on the Closing Date using a "closing of the books" method. All deductions of the Acquired Companies attributable to the Transactions (including, any deductions attributable to the Company Transaction Expenses, amounts included in Indebtedness, or other compensatory payments) shall be taken into account to the extent "more likely than not" deductible (or at a higher level of confidence) in the Pre-Closing Tax Period or the portion of the Straddle Tax Period ending on the Closing Date, as applicable, and applying the seventy-percent safe harbor election under Revenue Procedure 2011-29 to any "success-based fees."

**Section 7.3** **Cooperation on Tax Matters**.

After the Closing, upon reasonable written notice, Purchaser (or the Acquired Companies) and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance (to the extent within the control of such party) relating to the Acquired Companies (including access to books, records and personnel) as is reasonably requested for the filing of all Tax Returns (including any extensions thereof), the making of any election related to Taxes, the preparation for any Tax Contest, and the prosecution or defense of any action related to any Tax Return. Purchaser (on behalf of itself and the Acquired Companies) and Sellers agree to retain all books and records with respect to Tax matters and pertinent to the Acquired Companies relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by any Acquired Company or Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Governmental Entity.

**Section 7.4** **Tax Contests**.

(a) Purchaser and Sellers shall notify the other party within ten (10) Business Days of receipt of any written notice of any Tax Contest for any Acquired Company with respect to any Pre-Closing Tax Period or Straddle Tax Period; provided, however, that the failure to timely provide such notice shall not relieve Sellers of any obligation to indemnify Purchaser except to the extent that Sellers are actually and materially prejudiced by such failure.

(b) Sellers shall have the right to elect the control of any Tax Contest for any Acquired Company with respect to a Pre-Closing Tax Period (a "Seller Tax Contest") at their expense and to employ counsel of their choice; provided, however, that (i) prior to assuming control of any Seller Tax Contest, Sellers shall notify Purchaser in writing that Sellers are electing the control of such Seller Tax Contest, (ii) Sellers shall diligently prosecute such Seller Tax Contest and shall keep Purchaser reasonably informed of the status of such Seller Tax Contest, (iii) Purchaser shall have the right to participate in any such Seller Tax Contest, and (iv) Sellers shall not settle any Tax Contest without the prior written consent of Purchaser (which consent may not be unreasonably withheld, conditioned or delayed).

(c) Purchaser shall have the right to control all Tax Contests with respect to the Acquired Companies for a taxable period beginning on or prior to the Closing Date other than a Seller Tax Contest for which the Sellers have elected the control pursuant to Section 7.4(b) (a "Purchaser Tax Contest"); provided, however, that (i) Purchaser shall diligently prosecute such Purchaser Tax Contest and shall keep Sellers reasonably informed of the status of such Purchaser Tax Contest, (ii) Sellers shall have the right to participate, at their own expense, in any such Purchaser Tax Contest solely to the extent that such Purchaser Tax Contest relates to a taxable period (or portion thereof) ending on or prior to the Closing Date or to a Straddle Period as a whole, and (iii) Purchaser shall not settle any such Purchaser Tax Contest without the prior written consent of Sellers (which consent may not be unreasonably withheld, conditioned or delayed) if such settlement would result in a material obligation of Sellers to indemnify Purchaser. Notwithstanding any other provision of this Section 7.4(c), Sellers shall not have a right to participate in any Tax Contest involving Purchaser or any of Purchaser's Affiliates except to the extent that a Tax Contest involves an Acquired Company.

**Section 7.5 Certain Post-Closing Actions.**

Purchaser shall not (and Purchaser shall not cause or permit any Acquired Company or any other Person to) (a) file (except pursuant to Section 7.2) or amend a Tax Return of any of the Acquired Companies with respect to any Pre-Closing Tax Period or Straddle Tax Period, (b) file or amend any Tax election with respect to any of the Acquired Companies with respect to a taxable period beginning before the Closing Date or (c) take any action on or after the Closing Date that would increase Sellers' material liability for, or obligations with respect to, Taxes, except, in each case with the prior written consent of Sellers (such consent not to be unreasonably withheld, delayed or conditioned).

**Section 7.6 Refunds; Payment of Tax Benefits.** The Sellers shall be entitled to any Tax refunds or credits that are actually received in cash (or used to reduce an actual Tax payment) by Purchaser or any Acquired Company attributable to Taxes paid by the Sellers or any Acquired Company with respect to any taxable period (or portion thereof) ending on or prior to the Closing Date. Purchaser shall pay to the Sellers the amount of any such refund or the amount of any such credit (in the amounts of and to such accounts as designated in writing by Sellers), in each case net of any actual, out-of-pocket cost or expense (including any and all Taxes) incurred in connection with the receipt of such refund or use of such credit within five (5) days of receipt or realization thereof by such Acquired Company.

**Section 7.7** **Miscellaneous**.

(a) To the extent any provisions of this Article VII regarding the process for dispute resolution with respect to Taxes conflict with the provisions regarding the process for dispute resolution generally in Article VIII, the provisions of this Article VII shall control with respect to claims hereunder for Losses that are Tax-related and other disputes regarding Taxes hereunder. Except to the extent otherwise required pursuant to a final determination or the good faith settlement of any Tax Contest or for amounts treated as interest pursuant to Section 483 or 1274 of the Code, any payment made after the Closing pursuant to Section 2.4 or to indemnification obligations under Article VIII shall be treated as an adjustment to the purchase price for Tax purposes.

(b) Solely for the purposes of this Article VII, a Seller shall be deemed to have given its written consent if it has not responded within ten (10) days following written request therefor.

## ARTICLE VIII
## SURVIVAL AND INDEMNIFICATION

**Section 8.1** **Survival**.

Subject to Section 8.5, the parties hereto agree that their respective representations, warranties, covenants and agreements contained in this Agreement or in any certificate delivered by any party hereto at the Closing shall survive the Closing and the consummation of the Transactions.

**Section 8.2** **Indemnification of Purchaser Indemnified Parties**.

Subject to the limitations and other provisions of this Article VIII, from and after the Closing, Sellers, jointly and severally, shall indemnify and hold harmless Purchaser, its Affiliates (including, after the Closing, the Acquired Companies), their respective Representatives, and the respective successors, heirs and assigns of each of the foregoing, other than the current officers, directors, or stockholders of any Acquired Company as of the Closing (each, a "Purchaser Indemnified Party") from and against Losses incurred by such Purchaser Indemnified Party to the extent resulting from or arising out of:

(a) The breach, or the inaccuracy, of any representation or warranty made by the Company or any Seller to Purchaser in Article III or in any certificate furnished by the Company or any Seller to Purchaser pursuant to this Agreement; provided, however, that, for purposes of determining the existence of any breach or inaccuracy of such representation or warranty of the Company or a Seller or the amount of Losses arising out of or resulting from any breach or inaccuracy of such representation or warranty of the Company or a Seller, all references to "material," "material respects," or "Company Material Adverse Effect," or similar qualifications shall be disregarded (other than those set forth in (i) the definitions of Material Contract and Permitted Encumbrances and (ii) Sections 3.8 and 3.10(ii)(B));

(b) Pre-Closing Taxes;

(c) any Indebtedness of an Acquired Company as of the Closing or Company Transaction Expenses, in each case to the extent neither paid at Closing nor included in the calculation of the Final Shareholders' Equity Position;

(d) The assets, liabilities, properties, obligations, operations, or business of the Reinsurance Subsidiary or the transfer of the Reinsurance Subsidiary as described in Section 5.15;

(e) The failure of any Seller to perform any covenant or agreement of such Seller under this Agreement;

(f) (i) *Dr. Jaideep Patel v. Scott Postle, Balboa Capital Corporation, et al.*, (ii) *Samuel Feng, M.D. v. America's MHT, Inc., et al*, (iii) any appeal of either the foregoing (i)-(ii), or (iv) other Action substantially related to the facts and circumstances underlying the foregoing (i)-(ii) (clauses (i)-(iv), collectively, the "MHT Litigation"); and

(g) the Company PPP Loan.

**Section 8.3 Indemnification of Seller Indemnified Parties.**

Subject to the limitations and other provisions of this Article VIII, from and after the Closing, Purchaser shall indemnify and hold harmless each Seller, his or its Affiliates, his, its and their respective Representatives, and his, its and their respective successors, heirs, assigns (each, a "Seller Indemnified Party") from and against Losses incurred by such Seller Indemnified Party to the extent resulting from or arising out of:

(a) The breach or inaccuracy of any representation or warranty made by Purchaser to Sellers in Article IV or in any certificate furnished by Purchaser to Sellers pursuant to this Agreement; provided, however, that, for purposes of determining the existence of any breach or inaccuracy of such representation or warranty of the Purchaser or the amount of Losses arising out of or resulting from any breach or inaccuracy of such representation or warranty of the Purchaser, all references to "material," "material respects," or "material adverse effect," or similar qualifications shall be disregarded; or

(b) the failure of Purchaser to perform any covenant or agreement of Purchaser under this Agreement, or the failure of any Acquired Company to perform any covenant or agreement of such Acquired Company to be performed after the Closing under this Agreement.

**Section 8.4 Method of Asserting Claims.**

All claims for indemnification by any Indemnified Party under this Article VIII shall be asserted and resolved as follows:

(a) Third Party Claims. If any claim or demand in respect of which an Indemnified Party might seek indemnity under this Article VIII is asserted against such Indemnified Party by a Person other than a party hereto (a "Third Party Claim"), the Indemnified Party shall give written notice (the "Third Party Claim Notice") and the details

thereof including an estimate of the claimed Losses to the extent then ascertainable (which estimate shall not be conclusive of the final amount of such Third Party Claim) and copies of all relevant pleadings, documents and information to the Indemnifying Party within a period of twenty (20) days following the assertion of the Third Party Claim against the Indemnified Party; provided, however, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have actually and materially prejudiced the Indemnifying Party or shall have resulted in the expiration of the time period set forth in Section 8.5. Within thirty (30) days (or such lesser number of days set forth in the Third Party Claim Notice as may be required by court proceeding in the event of a litigated matter) after its receipt of the Third Party Claim Notice, the Indemnifying Party shall give notice to the Indemnified Party, in writing, of whether the Indemnifying Party elects to assume the defense of such Third Party Claim under this Article VIII; it being understood that by assuming the defense of a Third Party Claim the Indemnifying Party shall conclusively acknowledge its obligation to indemnify the Indemnified Party, subject to the limitations of Section 8.6, with respect to all or a significant portion of such Third Party Claim.

If the Indemnifying Party notifies the Indemnified Party that it elects to assume the defense of a Third Party Claim, then, subject to the limitations and restrictions provided in the R&W Policy, such defense shall be controlled by the Indemnifying Party, who shall diligently defend such Third Party Claim to a final conclusion or settlement, at the discretion of the Indemnifying Party; provided, however, that unless consented to by the Indemnified Party (which consent shall not be unreasonably withheld), the Indemnifying Party shall not enter into any settlement that (i) requires the taking or restriction of any action (including the payment of money and competition restrictions) by the Indemnified Party or any of its Affiliates, other than the delivery of a release for such Third Party Claim, or (ii) would result in a finding or admission (A) of a violation of Applicable Law or violation of the rights of any Person by the Indemnified Party or any of its Affiliates or (B) that would have an adverse effect on other claims made or threatened against the Indemnified Party or any of its Affiliates. The Indemnified Party will cooperate fully in such defense, including making available to the Indemnifying Party all books, records and documents within the Indemnified Party's control or that it can reasonably obtain relating to the Third Party Claim; it being understood that, subject to the immediately following sentence, the costs and expenses of the Indemnified Party relating thereto shall be Losses and shall be indemnified by the Indemnifying Party in accordance with this Article VIII. The Indemnified Party, at its expense, may participate in and employ separate counsel of its choosing, but not control, the defense of any Third Party Claim assumed by the Indemnifying Party pursuant to this Section 8.4(a). If the Indemnifying Party denies its obligation to indemnify the Indemnified Party with respect to a Third Party Claim, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within a period of thirty (30) days from the date of such notice, either party may resort to litigation in accordance with Section 8.4(c).

Notwithstanding the foregoing, the Sellers as Indemnifying Party shall not be entitled to assume the defense of any Third Party Claim if a Purchaser Indemnified Party or any insurer is required to assume the defense of such Third Party Claim pursuant to the

terms and conditions of any insurance policy, and no Indemnifying Party shall be entitled to assume or continue the defense of a Third Party Claim if: (i) the Indemnifying Party fails to respond to a Third Party Claim Notice delivered by the Indemnified Party within thirty (30) days after receiving such Third Party Claim Notice, (ii) the Third Party Claim involves any material customer or supplier of an Acquired Company or any of its Affiliates, (iii) the aggregate amount reasonably expected to be incurred in connection with such Third Party Claim and all other outstanding claims on the Escrow Amount exceeds the remainder of the Escrow Amount, (iv) the Third Party Claim involves criminal or quasi-criminal allegations, or is brought by a Governmental Entity that has supervisory or enforcement jurisdiction over the Indemnified Party, (v) the Third Party Claim involves as its primary remedy injunctive or equitable relief (as opposed to monetary damages), (vi) if in the reasonable opinion of outside counsel to the Indemnified Party there is a conflict of interest between the Indemnified Party and the Indemnifying Party in the conduct of such defense,(vii) the Indemnifying Party fails to use diligent, reasonable, and professional efforts in the defense of a claim following notice and a thirty (30) day opportunity to cure any such failure, or (viii) the Third Party Claim relates to Taxes for a Straddle Tax Period.

If the Indemnifying Party (i) elects not to defend the Indemnified Party against a Third Party Claim, whether by not giving the Indemnified Party timely notice of its desire to so defend or otherwise, or (ii) is not entitled to defend the Third Party Claim under this Section 8.4(a), then the Indemnified Party shall have the right to conduct and control, through counsel of its choosing, the settlement or defense of such Third Party Claim, and the Indemnifying Party will cooperate fully in such defense, including making available to the Indemnified Party all books, records and documents within the Indemnifying Party's control or that it can reasonably obtain relating to the Third Party Claim; it being understood that the Indemnified Party's rights to indemnification for a Third Party Claim shall not be adversely affected by assuming the defense of such Third Party Claim. The Indemnifying Party, at its expense, may participate in and employ separate counsel of its choosing, but not control, the defense of any Third Party Claim assumed by the Indemnified Party pursuant to this Section 8.4(a).

(b) Direct Claims. In the event any Indemnified Party has a claim under this Article VIII against any Indemnifying Party that does not involve a Third Party Claim (a "Direct Claim"), the Indemnified Party shall give written notice (the "Claim Notice") and the details thereof, including an estimate of the claimed Losses to the extent then ascertainable (which estimate shall not be conclusive of the final amount of such Direct Claim), and copies of all relevant information and documents in possession of the Indemnified Party or its Affiliates, to the Indemnifying Party within a period of thirty (30) days following the discovery or receipt of notification of the claim by the Indemnified Party; provided, however, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have actually and materially prejudiced the Indemnifying Party or shall have resulted in the expiration of the time period set forth in Section 8.5. The Indemnifying Party will notify the Indemnified Party within a period of thirty (30) days after the receipt of the Claim Notice by the Indemnifying Party whether the Indemnifying Party disputes its liability to the Indemnified Party under this Article VIII with respect to such claim. If the

Indemnifying Party does not respond within such thirty (30) day period, the Indemnifying Party will be deemed to have accepted the Direct Claim.

If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party disputes its liability with respect to a claim described in a Claim Notice, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within a period of thirty (30) days from the date of such notice, either party may resort to litigation in accordance with Section 8.4(c).

(c) Resolution of Disputes. Any dispute submitted to litigation pursuant to this Section 8.4(c) shall be finally and conclusively determined by litigation in a court of competent jurisdiction. Each party to this Agreement agrees that the state and federal courts located in the State of Delaware (the "Delaware Courts") shall have exclusive jurisdiction to hear and determine any Action, and to settle any disputes, which may arise out of or in connection with this Agreement and, for such purposes, consents to submit itself to the personal jurisdiction of such courts. Each of the parties hereto (i) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (ii) agrees that it shall not bring any action relating to this Agreement or any of the Transactions in any court other than a Delaware Court.

**Section 8.5 Time Limits on Claims.**

Except as otherwise provided in this Section 8.5, the representations and warranties of each of the parties hereto set forth in this Agreement or in any certificate delivered by any party hereto and any claims with respect thereto shall survive the Closing and the consummation of the Transactions and continue until the Expiration Date, at which time they shall expire and be of no further force and effect, except that (i) the Fundamental Representations shall survive until the six (6) year anniversary of the Closing Date and (ii) the representations and warranties contained in Section 3.20 (Tax Matters) shall survive until the date that is sixty (60) days after the expiration of the statute of limitations applicable to such representation or warranty. No claim or action shall be brought under this Article VIII for breach of any covenant or agreement contained in this Agreement more than twelve (12) months following the last day upon which such covenant or agreement is required to be performed; provided, however, that the covenants and agreements contained in this Agreement that are to be performed at or prior to the Closing will terminate at, and shall not survive, the Closing. Notwithstanding the preceding portion of this Section 8.5, any claim relating to the breach of a representation, warranty, covenant or agreement set forth herein that is asserted in writing pursuant to Section 8.4 prior to the applicable survival end date described above shall survive until such claim is finally resolved and satisfied in accordance with this Article VIII. Purchaser and Sellers agree that this Section 8.5 is intended to modify the applicable statute of limitations period(s) with respect to claims hereunder. Nothing in this Section 8.5 shall limit the right of Purchaser to make claims under the R&W Policy in accordance with the terms thereof.

**Section 8.6 Additional Limitations on Indemnification.**

Notwithstanding any other provision of this Agreement:

(a) Individual Claim Threshold; Deductible; Sole Recourse.

(i) No Purchaser Indemnified Party or Seller Indemnified Party shall make an indemnity claim under Section 8.2(a) or Section 8.3(a) with respect to an individual item of Loss unless and until the amount of Losses suffered by the Purchaser Indemnified Parties (collectively) or the Seller Indemnified Parties (collectively), respectively, arising from the same set of facts and circumstances exceeds $25,000 (the "De Minimis Amount"); provided, however, that the De Minimis Amount shall not apply to any Losses in respect of Fraud or breaches of Fundamental Representations. All such Losses arising from the same set of facts and circumstances that do not exceed the De Minimis Amount in the aggregate shall be excluded when determining whether the Deductible Amount referred to in Section 8.6(a)(ii) has been satisfied.

(ii) No Purchaser Indemnified Party or Seller Indemnified Party shall be entitled to recover for an indemnification claim under Section 8.2(a) or Section 8.3(a) unless, until and only to the extent that the Purchaser Indemnified Parties (collectively) or the Seller Indemnified Parties (collectively), respectively, have suffered or incurred actual Losses under such Section aggregating in excess of the Escrow Amount (the "Deductible Amount"), whereupon the Purchaser Indemnified Parties or the Seller Indemnified Parties, respectively, shall be entitled to claim indemnification only for the amount of such Losses in excess of the Deductible Amount, subject to the other limitations set forth herein; provided, however, that the Deductible Amount shall not apply to any Losses in respect of Fraud or breaches of Fundamental Representations.

(iii) Except with respect to Fraud and breaches of Fundamental Representations, (A) the right of the Purchaser Indemnified Parties to seek (and the obligation of the Sellers to provide) indemnification pursuant to Section 8.2(a) shall be limited to the recovery of the amount of the Escrow Amount then held in the Escrow Account, and (B) no Purchaser Indemnified Party shall seek recovery pursuant to Section 8.2(a) from any Seller, any Affiliate of Seller, or any other source or Person, other than the Escrow Amount then held in the Escrow Account or the insurer under the R&W Policy.

(iv) No Purchaser Indemnified Party or Seller Indemnified Party shall be entitled to recover for an indemnification claim under this Article VIII, respectively, in an aggregate amount greater than twenty-five percent (25%) of the Final Base Purchase Price, except with respect to Fraud.

(b) Order of Satisfaction of Claims.

(i) Any indemnification obligation of Sellers pursuant to Section 8.2(a) (other than with respect to Fraud), Section 8.2(b) or Section 8.2(c) (with respect to Indebtedness) shall be satisfied, subject to the limitations set forth in Section 8.6(a), where applicable, (A) first, from the Escrow Account, (B) second, from the R&W Policy, subject to the retention, caps and limitations thereof, and (C) third, in the

case of breaches of Fundamental Representations, Section 8.2(b) or Section 8.2(c) (with respect to Indebtedness), from Sellers directly; provided that, to the extent any such indemnification obligation is to be satisfied from the Escrow Account, the Sellers and Purchaser shall deliver a joint written instruction, instructing the Escrow Agent to pay an amount equal to such obligation, up to amount of funds then available in the Escrow Account.

(ii) Any indemnification obligation of Sellers pursuant to Section 8.2 (other than as set forth above under Section 8.6(b)(i)) shall be satisfied (A) first, from the Escrow Account, and (B) second, from Sellers directly; provided, however, that to the extent that any indemnifiable Losses for which a Purchaser Indemnified Party is seeking recovery may be covered by the R&W Policy, then the Purchaser Indemnified Parties shall use commercially reasonable efforts to recover such Losses from the insurer(s) under the R&W Policy prior to seeking to recover such Losses directly from Sellers pursuant to this Section 8.6(b)(ii), provided that such use of commercially reasonable efforts shall not require any Purchaser Indemnified Party to initiate or pursue any lawsuit, arbitration or similar Action against the applicable insurer; provided, further, that, to the extent any such indemnification obligation is to be satisfied from the Escrow Account, the Sellers and Purchaser shall deliver a joint written instruction, instructing the Escrow Agent to pay an amount equal to such obligation, up to amount of funds then available in the Escrow Account.

(iii) Any claim by a Purchaser Indemnified Party for Fraud shall be satisfied directly by the Sellers (to the extent of the obligation of Sellers resulting from such Fraud).

(c) Special Damages. NO CLAIMS OR CAUSES OF ACTION ARISING UNDER OR RESULTING FROM THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT MAY BE ASSERTED BY ANY PERSON FOR PUNITIVE OR EXEMPLARY DAMAGES; PROVIDED, HOWEVER, THAT CLAIMS MAY BE ASSERTED HEREUNDER FOR DAMAGES OF THE TYPE DESCRIBED ABOVE IF A THIRD PARTY SUCCESSFULLY RECOVERS SUCH DAMAGES FROM AN INDEMNIFIED PARTY IN A THIRD PARTY CLAIM.

(d) Other Limitations.

(i) The amount an Indemnified Party shall be entitled to receive from the Indemnifying Party with respect to an item of Loss shall be reduced by and net of any recovery actually received by such Indemnified Party from any other Person with respect to such Loss (including insurance proceeds, indemnification rights, counterclaims, warranties, subrogation actions and the like, but excluding proceeds received pursuant to the R&W Policy), in each case, net of any actual costs, expenses or premiums incurred in connection with securing or obtaining such recovery. Purchaser and the Acquired Companies shall use commercially reasonable efforts to seek full recovery under all insurance policies covering any

Losses to the same extent as they would if such Losses were not subject to indemnification hereunder, including the R&W Policy, provided that such use of commercially reasonable efforts shall not require Purchaser or the Acquired Companies to initiate or pursue any lawsuit, arbitration or similar Action against the applicable insurer. In the event that an insurance or other third party recovery is made by Purchaser, any Acquired Company, or any of their Affiliates with respect to any Losses for which any Purchaser Indemnified Party has been indemnified hereunder, then a refund equal to the aggregate amount of the recovery (net of all collection expenses) shall be made promptly to the Sellers, but such refund payment shall not be in an amount that exceeds the indemnification payment made to the Purchaser Indemnified Parties with respect to such Losses hereunder.

(ii) No Purchaser Indemnified Party shall be entitled to receive indemnification for any Losses to the extent such Losses are reserved or provided for in the Final Closing Date Schedule or in the determination of the Final Shareholders' Equity Position.

(iii) After becoming aware of any event or occurrence that could reasonably be expected to give rise to an indemnification right hereunder, each Person entitled to indemnification shall take commercially reasonable steps to mitigate all Losses arising therefrom.

(iv) Any indemnification obligation under this Agreement shall be determined without duplication of recovery by reason of the state of facts giving rise to such obligation constituting a breach of more than one representation, warranty, covenant or agreement hereunder.

(e) Exclusion from Limitations. Notwithstanding any of the foregoing, the limitations set forth in this Section 8.6 shall not in any way preclude the Purchaser Indemnified Parties from making any claims (i) against the R&W Policy or (ii) arising from the Fraud of any Seller or the Company. The denial of any claim made by any Purchaser Indemnified Party under the R&W Policy, in and of itself, shall not be construed as, or used as evidence that, such Purchaser Indemnified Party is not entitled to indemnification under this Article VIII.

**Section 8.7 Exclusive Remedies.**

If the Closing occurs, the remedies provided in this Article VIII (and claims for recovery pursuant to the R&W Policy) shall constitute the sole and exclusive remedies available to any party hereto with respect to any claim relating to this Agreement or the Transactions and the facts and circumstances relating and pertaining hereto (whether any such claim shall be made in contract, breach of warranty, tort or otherwise), other than for disputes required to be resolved pursuant to Section 2.4(c) and for Fraud; provided, however, that the foregoing shall not limit the availability to any party hereto of injunctive and other equitable relief, including specific performance pursuant to Section 10.10.

# ARTICLE IX
# TERMINATION

**Section 9.1 Termination.**

This Agreement may be terminated at any time prior to the Closing Date:

(a) By the mutual written consent of Purchaser, the Company and Sellers;

(b) By Purchaser, on the one hand, or Sellers, on the other hand, if the Closing has not occurred on or prior to December 31, 2021; provided, however, that neither party may terminate this Agreement pursuant to this Section 9.1(b) if such party's failure to fulfill any of its obligations hereunder has caused or resulted in the Closing having not occurred on or before such date;

(c) By Sellers, if Purchaser has breached any of its representations, warranties, covenants or other agreements contained in this Agreement that would give rise to the failure of a condition set forth in Section 6.2, which breach has not been waived by Sellers and cannot be or has not been cured within twenty (20) days after the giving of written notice by Sellers to Purchaser specifying such breach; provided, however, that Sellers may not terminate this Agreement pursuant to this Section 9.1(c) at any time when any Seller is in material breach of this Agreement;

(d) By Purchaser if any Seller or the Company shall have breached any of their representations, warranties, covenants or other agreements contained in this Agreement that would give rise to the failure of a condition set forth in Section 6.1, which breach has not been waived by Purchaser and cannot be or has not been cured within twenty (20) days after the giving of written notice by Purchaser to Sellers or the Company, as applicable, specifying such breach; provided, however, that Purchaser may not terminate this Agreement pursuant to this Section 9.1(d) at any time when Purchaser is in material breach of this Agreement; and

(e) By either party if any Governmental Entity that must grant a Requisite Regulatory Approval has denied approval of any of the Transactions or any Governmental Entity of competent jurisdiction shall have issued any Applicable Law, Order or other legal restraint or prohibition permanently enjoining or otherwise prohibiting or making illegal the consummation of any of the Transactions, unless the failure to obtain a Requisite Regulatory Approval shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the obligations, covenants and agreements of such party set forth herein.

**Section 9.2 Effect of Termination.**

In the event of the termination of this Agreement by any party hereto pursuant to this Article IX, the party seeking termination shall deliver written notice to the other parties specifying the provision hereof pursuant to which this Agreement is being terminated, and this Agreement shall become void and shall be deemed to have terminated without liability or obligation thereafter on the part of any party hereto except (a) for breach of this Agreement prior to any termination

pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(d), or Section 9.1(e) and (b) pursuant to the provisions of Section 5.2(b) and (c), Section 5.5, this Section 9.2 and Article X, each of which shall survive the termination of this Agreement. No termination of this Agreement shall affect the obligations of the parties under the Confidentiality Agreement, which shall survive termination of this Agreement in accordance with its terms. Nothing in this Agreement shall relieve any party hereto after a termination of this Agreement from liability for Fraud or willful breach, including incidental or consequential damages.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1 Fees and Expenses.**

All costs and expenses incurred in connection with this Agreement and the consummation of the Transactions shall be paid by the party incurring such expenses whether or not the Transactions are consummated, except as specifically provided to the contrary in this Agreement. Purchaser shall pay the cost of (a) the R&W Policy, including any underwriting fees and other costs and expenses relating thereto (whether incurred before or after the date hereof), (b) all filing fees incurred in connection with filings required of any party or any of its Affiliates under all Requisite Regulatory Approvals (including the HSR Act) with respect to the Transactions (whether incurred before or after the date hereof), and (c) the premium and all related costs and expenses related to obtaining and binding the D&O Tail Policy. Purchaser, on the one hand, and Sellers, on the other hand, shall share equally the costs and expenses of the Escrow Agent (except to the extent the Escrow Agreement otherwise provides).

**Section 10.2 Amendment and Modification.**

This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating such instrument is intended to amend, modify or supplement this Agreement.

**Section 10.3 Notices.**

All notices, requests, instructions, demands, documents and other communications to be given pursuant to this Agreement shall be in writing and shall be delivered personally, sent by nationally-recognized overnight courier or electronic mail to a party at the addresses set forth below for such party or to such other address as the party to whom notice is to be given may have furnished to the other parties hereto in writing in accordance herewith. Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of a nationally-recognized courier service that guarantees overnight delivery, on the Business Day after the date when sent for overnight delivery, and (c) in the case of electronic mail, on the date sent (or on the first Business Day following the date sent if the date sent is not a Business Day):

IF TO PURCHASER, TO:

Ameris Bank
3490 Piedmont Road NE

Suite 1550
Atlanta, GA 30305
Attention: James A. LaHaise
Email: [redacted]

and a copy (which will not constitute notice) to:

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Attention: Frank M. Conner III
Christopher J. DeCresce
Email: [redacted]

IF TO ANY SELLER, TO:

Patrick Byrne
P.O. Box 232
Dana Point, California 92629
Email: [redacted]

and a copy (which will not constitute notice) to:

Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202-4003
Attention: Paul Murphy
Brian Mesibov
Email: [redacted]

**Section 10.4 Counterparts.**

This Agreement may be executed in one or more counterparts (including electronic portable document format (PDF) or similar format), each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

**Section 10.5 Entire Agreement; No Third Party Beneficiaries.**

This Agreement (including the Exhibits and the Schedules), the other Transaction Documents and the Confidentiality Agreement constitute the final, complete and exclusive statement of the agreement between the parties with respect to the subject matter hereof and supersede all prior written agreements and all prior or contemporaneous oral agreements with respect to the subject matter hereof. Except as expressly provided herein (including in Section 5.8

and Article VIII), this Agreement shall not confer any third-party beneficiary rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

**Section 10.6 Severability.**

Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. To the extent permitted by Applicable Law, the parties waive any provision of Applicable Law that renders any provision of this Agreement invalid, illegal or unenforceable in any respect. The parties shall, to the extent lawful and practicable, use their commercially reasonable efforts to enter into arrangements to reinstate the intended benefits, net of the intended burdens, of any such provision held invalid, illegal or unenforceable.

**Section 10.7 Governing Law.**

This Agreement and all matters relating hereto, and all claims or causes of action arising hereunder, shall be construed, interpreted, enforced and governed by and under the internal laws of the State of Delaware (including its statute of limitations) without regard to its choice of law rules that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

**Section 10.8 Consent to Jurisdiction.**

Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and the Court of Chancery of Delaware in the State of Delaware, for the purposes of any Action arising out of this Agreement or the transactions contemplated hereby. Each party hereto agrees to commence any such Action either in the United States District Court for the District of Delaware or the Court of Chancery of Delaware in the State of Delaware. Each party hereto further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any Action in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 10.8. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any Action arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the District of Delaware and the Court of Chancery of Delaware in the State of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

**Section 10.9 Waiver of Jury Trial.**

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS. EACH PARTY

CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF AN ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATION IN THIS SECTION 10.9.

**Section 10.10 Specific Performance.**

Each of the parties hereto acknowledges that the rights of each other party to consummate the Transactions are special, unique and of extraordinary character and that, in the event that a party violates or fails and refuses to perform any covenant or agreement made by it in this Agreement, then each other party may be without an adequate remedy at law. Each party agrees, therefore, that in the event it violates or fails and refuses to perform any covenant or agreement made by it in this Agreement, each other party may, in addition to any remedies hereunder for damages or other relief, institute and prosecute an Action in any Delaware Court to enforce specific performance of such covenant or agreement or seek any other equitable relief.

**Section 10.11 Retention of Counsel; Privileged Communications.**

In any dispute or proceeding arising under or in connection with this Agreement following the Closing, Sellers shall have the right, at their election, to retain Moore & Van Allen PLLC to represent them in such matter, and Purchaser, for itself and the Acquired Companies, and for their respective Affiliates, successors and assigns, hereby irrevocably consents to any such representation in any such matter and the communication by such counsel to Sellers in connection with any such representation of any fact known to such counsel arising by reason of such counsel's prior representation of any of the Acquired Companies. Purchaser, for itself and (after the Closing) the Acquired Companies, and for their respective Affiliates, successors and assigns, irrevocably acknowledges and agrees that all communications between any of the Acquired Companies and counsel made in connection with the negotiation, preparation, execution, delivery and Closing under, or any dispute or proceeding arising under or in connection with, this Agreement, immediately prior to the Closing, would be deemed to be privileged communications of any of the Acquired Companies and its counsel and would not be subject to disclosure to Purchaser in connection with any process relating to a dispute arising under or in connection with, this Agreement, shall continue after the Closing and for all purposes be deemed to be privileged communications between Sellers and such counsel, and neither Purchaser nor any Person purporting to act on behalf of or through Purchaser shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications, belongs to any of the Acquired Companies and not Sellers.

**Section 10.12 Waiver.**

Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver

by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. No failure or delay by any party hereto in exercising any right, power or privilege of this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.13 Assignment.**

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties; provided, however, that Purchaser may assign any of its rights, interests, or obligations hereunder to an Affiliate of Purchaser without the prior written consent of the other parties hereto, but any such assignment to an Affiliate shall not relieve Purchaser of any of its obligations hereunder. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

**Section 10.14 Exhibits and Schedules.**

Each Schedule and Exhibit hereto referred to in this Agreement is hereby incorporated herein by reference and shall be deemed and construed to be a part of this Agreement for all purposes. All references to this Agreement herein or in any of the Schedules, shall be deemed to refer to this entire Agreement, including all Schedules and Exhibits. Any disclosure of a party made in any Schedule that may be applicable to another Schedule shall be deemed to be made with respect to such other Schedule, so long as it is reasonably apparent on its face that such disclosure would also apply to such other Schedule, notwithstanding the presence or absence of any reference in this Agreement to the existence of such other Schedule in the representation or warranty in which such a reference would appear, and notwithstanding the presence or absence of any cross-reference thereto. The inclusion of any information in any Schedule shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever. Furthermore, the inclusion of any information in any Schedule shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by any Seller in this Agreement.

**Section 10.15 Further Assurances.**

From time to time at or after the Closing Date, at the request of the other, Purchaser and Sellers will execute and deliver such other instruments of conveyance, assignment, transfer and delivery and take such actions as the other reasonably may request in order to consummate, complete and carry out the Transactions.

**Section 10.16 Interpretation.**

(a) Headings. Section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(b) Use of Includes or Including. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(c) References to this Agreement, Sections or Exhibits. The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references in this Agreement are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(d) Grammatical Forms. The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning. The conjunction "or" when used herein includes both the conjunctive and the disjunctive (*i.e.*, "or" shall mean "and/or").

(e) References to Parties. A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns. The words "party" or "parties" shall refer to parties to this Agreement unless otherwise specified.

(f) References to Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g) Drafting of this Agreement. The parties to this Agreement and their counsel have mutually contributed to its drafting. Consequently, no provision of this Agreement shall be construed against any party on the ground that such party drafted the provision or caused it to be drafted.

(h) Currency. Any reference to "$" or "dollars" means United States dollars.

(i) Business Day. Where the last day on which any action under this Agreement is required or permitted to be taken is not a Business Day, the time within which such action may be taken shall include the next Business Day.

(j) Provision of Information. The phrases "provided to," "made available," "furnished to," and phrases of similar import when used herein, unless the context otherwise requires, shall mean, with respect to any statement in this Agreement to the effect that any information, document or other material has been "delivered" or "provided" to Purchaser or its Representatives, that such information, document, or material was (a) made available for review (and not subsequently removed) by Sellers or the Company to Purchaser or its Representatives in the virtual data room set up by FIRMEX in connection with this Agreement at least two (2) Business Days prior to the date of this Agreement or

(b) actually delivered (whether by physical or electronic delivery) to Purchaser or its Representatives at least two (2) Business Days prior to the date of this Agreement.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the undersigned parties have executed this Stock Purchase Agreement as of the date first written above.

**COMPANY:**

Balboa Capital Corporation

By:______________________________
Name: Patrick E. Byrne
Title: Chief Executive Officer

**SELLERS:**

______________________________
Name: Patrick E. Byrne

The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001

By:______________________________
Name: Patrick E. Byrne
Title: Trustee

The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021

By:______________________________
Name: Phil Silva
Title: Trustee

**PURCHASER:**

AmerisBank

By:______________________________
Name: James A. LaHaise
Title: Chief Strategy Officer

IN WITNESS WHEREOF, the undersigned parties have executed this Stock Purchase Agreement as of the date first written above.

**COMPANY:**

Balboa Capital Corporation

By:________________
Name: Patrick E. Byrne
Title: Chief Executive Officer

**SELLERS:**

____________________________
Name: Patrick E. Byrne

The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001

By:________________
Name: Patrick E. Byrne
Title: Trustee

The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021

[redacted]

**By:** PhilSilva (Dec9,202117:38PST)
Name: Phil Silva
Title: Trustee

**PURCHASER:**

Ameris Bank

By:________________
Name: James A. LaHaise
Title: Chief Strategy Officer

IN WITNESS WHEREOF, the undersigned parties have executed this Stock Purchase Agreement as of the date first written above.

**COMPANY:**

Balboa Capital Corporation

By:________________________
Name:
Title:

**SELLERS:**

________________________________
Name: Patrick E. Byrne

The Patrick E. Byrne Revocable Trust U/T/A dated February 23, 2001

By:________________________
Name: Patrick E. Byrne
Title: Trustee

The Patrick E. Byrne Irrevocable Trust U/T/A dated July 22, 2021

By:________________________
Name: Phil Silva
Title: Trustee

**PURCHASER:** [redacted]

Ameris Ban[redacted]

By: [redacted]
Name: James A. [redacted]
Title: Chief Strategy Officer